UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DIANNE SOLOMON-SHRAWDER, Individually and on Behalf of All Others Similarly Situated, | ) Civil Action No. ) ) ) |
| Plaintiff, | ) CLASS ACTION ) |
| vs. | ) ) |
| CARDIONET INC., RANDY THURMAN and MARTIN P. GALVAN, | ) COMPLAINT FOR VIOLATIONS OF ) FEDERAL SECURITIES LAWS ) |
| Defendants. | ) ) ) |

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by CardioNet, Inc. ("CardioNet" or the "Company"), as well as securities analysts' reports about the Company, Company's press releases and conference calls with securities analysts and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of purchasers of the common stock of CardioNet between April 30, 2009 and June 30, 2009, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

4. Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b), as and many of the acts and practices complained of herein occurred in substantial part in this District.

5. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6. Plaintiff, Dianne Solomon-Shrawder, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of CardioNet at artificially inflated prices during the Class Period and has been damaged thereby.

7. Defendant CardioNet is the leading provider of ambulatory, continuous, real-time outpatient management solutions for monitoring clinical information on an individual's health. Its efforts are focused on the diagnosis and monitoring of cardiac arrhythmias through its principal product, the Mobile Cardiac Outpatient Telemetry ("MCOT"). The Company maintains its principal executive offices in this District. The Company had its initial public offering of common stock on March 25, 2008.

8. (a) Defendant Randy Thurman ("Thurman") was, at all relevant times, Chairman President and Chief Executive Officer of CardioNet.

(b) Defendant Martin P. Galvan ("Galvan") was, at all relevant times, CardioNet's Chief Financial Officer.

(c) Defendants Thurman and Galvan are collectively referred to herein as the "Individual Defendants."

9. Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

10. It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's

public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above. Each of the above officers of CardioNet, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

11. As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Securities Act, and was traded on the NASDAQ National Market ("NASDAQ"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

12. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and

omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with CardioNet, each of the Individual Defendants had access to the adverse undisclosed information about CardioNet's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about CardioNet and its business issued or adopted by the Company materially false and misleading.

13. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

14. Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of CardioNet common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding CardioNet's business, financial prospects and the intrinsic value of CardioNet common stock; and (ii) caused Plaintiff and other members of the Class to purchase CardioNet common stock at artificially inflated prices.

**CLASS ACTION ALLEGATIONS**

15. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of CardioNet during the Class Period and who were damaged thereby.

Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

16.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, CardioNet common shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by CardioNet or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

17.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

18.   Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

19.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about CardioNet; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

20. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

21. Defendant CardioNet's revenues and profits are driven principally by the level of reimbursement paid by healthcare providers for its systems, including the MCOT system. The reimbursement rates paid by commercial payors and Medicare are set by those providers, in conjunction with presentations and meetings with Defendants. At those meetings and presentations, Defendants present the health benefits of the Company's systems. CardioNet's principal sources of reimbursement revenue come from Highmark Medicare Series ("Highmark"), the Pennsylvania Medicare carrier, and the Center for Medicare and Medicaid Services ("CMS"). During the Class Period, Highmark's reimbursement rate for MCOT services was $1,123.07.

22. The Class Period commences on April 30, 2009. On that date, CardioNet issued a Press Release announcing its financial results for the first quarter of 2009, the period ended March 31, 2009. For the quarter, the Company reported revenues of $35.7 million, an increase of 40.3% compared to the first quarter of 2008, and a 46% increase in its sales force. Defendant Thurman commented on the results in the Press Release, stating as follows:

> We are pleased to announce another quarter of strong results, demonstrating our ability to deliver earnings while also investing in strategic initiatives to increase market share and deliver world class service to our prescribing physicians and patients. During the quarter we made substantial progress in the expansion of our sales force and the development of our corporate infrastructure, including

- 6 -

enhancements to our customer service unit. Overall, our financial and operating performance in the quarter reflects the continued strong adoption of the MCOT™ system in the healthcare community and our commitment to excellence in all areas of our business.

We continue to view 2009 as an inflection point in our business and believe that we can achieve accelerated growth and profitability in 2010 and beyond through strategic investments in our sales organization and corporate infrastructure. Since year end, we have added 41 sales executives, most of whom are currently in the training process and should begin to gain traction in the marketplace beginning in the second half of the year. We are ahead of our sales force expansion plans and expect to substantially complete our expansion by mid-year 2009. As we continue to expand our sales organization, we anticipate being well positioned to gain significant market share in the future as our new account executives become fully established and proficient in marketing our services primarily to cardiologists and electrophysiologists. Our infrastructure enhancements have already translated to improvements in customer service and monitoring operations.

The future looks very promising for CardioNet. We have made concrete progress in expanding our leadership position in wireless cardiac monitoring and establishing our first adjacent market business in clinical services through our pending merger with Biotel Inc. Looking forward, we expect to be well positioned to leverage our technical expertise, customer service and monitoring infrastructure to be the clear leader in wireless medicine.

Defendant Galvan also commented on the announcement, stating, in pertinent part as follows:

Gross margins continued to benefit from the positive shift in sales mix towards MCOT™ along with ongoing improvements in our efficiency and productivity. The expected sequential decline in our adjusted operating margins reflects the strategic investments we are making in our sales organization and infrastructure that we believe will provide a solid foundation for market share gains and long term growth. However, adjusted operating margins improved compared to the first quarter of 2008, reflecting our ability to expand profitability in a heavy investment year.

Finally, the Press Release provided a "Financial Outlook," in which Thurman stated as follows:

Based on our first quarter results, along with the continued strong outlook for our core business, we are reaffirming our 2009 financial guidance of revenue of $170.0 to $175.0 million and earnings of $0.69 to $0.73 per diluted share excluding any impact of net operating losses, other tax related items, and any nonrecurring charges. This also excludes the $0.01 per share dilutive impact that we are anticipating as a result of the Biotel Inc. acquisition, which we expect to close mid-year. Beyond 2009, we are comfortable with our previous guidance of revenue

growth of at least 50% combined with earnings growth of 100% in 2010, with earnings per diluted share that could reach $2.00 in 2011.

23.     Defendants made no mention of reimbursement rates in the Press Release and did not disclose that Defendants knew that Highmark was engaged in a review of the reimbursement rate it had set for the MCOT system and that Defendants were engaged in an ongoing dialogue with Highmark concerning the health benefits of the MCOT system and the appropriate reimbursement rate for the MCOT system. Defendants also knew, based on their dialogue with commercial payors and work in the healthcare industry, that the environment was causing commercial payors, such as Highmark, to reduce reimbursement levels in an effort to lower the cost of healthcare and improve Medicare profitability and Defendants were currently experiencing reductions in reimbursement rates. Although the reimbursement rate level set by Highmark for the MCOT system was the factor most critical to CardioNet's achievement of its current and guided revenues, Defendants were silent as to these material facts in the Press Release, including their revenue guidance for 2009, 2010 and 2011 provided in the Press Release.

24.     Also on April 30, 2009, CardioNet held a conference call for analysts and investors to discuss the Company's earnings release and operations. Defendants Thurman and Galvan were the spokespersons on the call. Thurman opened the conference call with a reiteration of the financial guidance provided in the Press Release, stating as follows:

> Looking forward and turning to our guidance, I would like to provide some additional detail around our outlook for 2009. As we indicated in our earnings release, we are reaffirming our 2009 outlook of $0.69 to $0.73 per diluted share, excluding the impact of net operating losses, which does not take into consideration a potential $0.01 per share dilution that may occur due to the pending merger with Biotel.
>
> With respect to the quarters in 2009, we expect sequential quarterly revenue growth to be consistently in the low to mid-teens. As for the pace of earnings across the year, we continue to anticipate that our quarterly EPS flow in the first half of 2009

would be very similar to that which we experienced in 2008 and as growth in EPS in 2009, compared to 2008 encouraged entirely in the second half of 2009.

This earnings phasing is primarily driven by increased expense due to the new account executives coming on board in the first half of this year with limited productivity expected until the latter part of the year.

25.    The security analysts were quick to address Defendants' omissions concerning reimbursement rates and immediately questioned Thurman and Galvan on reimbursement levels, as follows:

**Amit Bhalla**
And then, just kind of talk to us about what your assumptions are for reimbursement going forward and I'll jump back. Thanks.

**Randy Thurman, Chairman, President and Chief Executive Officer**
In our three year -- in our earnings projections that we put out through 2011, we have assumed some reduction in reimbursement that's factored into the earnings projections we put out there. As a matter of process, we really work hand in glove with Highmark and with CMS on an ongoing basis and as Phil went through the detail, candidly the argument is just as strong that we could justify a higher level of reimbursement as there would be any reduction. So that's the way the process works. We know of no reason today to expect any significant change in the reimbursement levels.

**Bob Hopkins**
Okay, thanks. And then I just wanted to ask you couple on reimbursement. First, the back and forth with Highmark over the course of the last week, did you, ask them specifically about your reimbursement rate and whether or not it was under review at the current time?

**Martin P. Galvan, Chief Financial Officer**
No. We really have an outstanding relationship with Highmark and a dialogue with that [sic] is weekly if not more frequently and this always happens. And Phil went through the kind of the detailed explanation of how reimbursement is determined and we have no question that whether if there was any meaningful or anticipated change in the reimbursement rates, that we would be well aware of that. That's the professional relationship that exits with Highmark. And so at this point in time, we see nothing that would significantly change our current way to reimbursement.

**Bob Hopkins**
So you did ask them specifically about whether or not reimbursement was under review at the current time and they said no?

**Martin P. Galvan, Chief Financial Officer**
They just said we know nothing based on our relationship with Highmark that would anticipate any change in reimbursement whatsoever.

**Bob Hopkins**
Okay. And then just one other thing on Highmark, just to clarify, in the past, has there been sort of an annual review process or was there just been semi-annual or has there been any consistency to the process in the past?

**Randy Thurman, Chairman, President and Chief Executive Officer**
Yeah, the consistency to the process has been what I stated before and that there is an ongoing relationship between Highmark and ourselves and frankly with CMS. But there is not a scheduled event, we are – you have to remember that CardioNet is really the pioneer in this whole area of wireless medicine. And I think there has been absolutely professional and collaborative relationship between the payors and us on justifying and understanding the cost benefit of what we do.

**Bob Hopkins**
Okay.

**Randy Thurman, Chairman, President and Chief Executive Officer**
Say it one more time that it's just an ongoing and a very collaborative effort between the parties that are involved.

26.     On May 15, 2009, Defendants caused CardioNet to file with the SEC its Form 10-Q for the first quarter of 2009, signed by Defendant Galvan. In this 10-Q, CardioNet reported:

**Statements of Operations Overview**

*Revenues*

Our principal source of revenues is patient revenue from cardiac monitoring services. The amount of revenue generated is based on the number of patients enrolled through physician prescriptions and the rates reimbursed to us by commercial payors, physicians, patients and Medicare. Reimbursement rates are set by and the CMS on a case rate basis for the Medicare program and through negotiations with commercial payors who typically pay a daily monitoring rate. From 2002 through March 2009, our average case rate for monitoring Medicare patients has remained relatively stable. We expect pricing to decline over time in a manner consistent with the introduction and penetration of a premium priced service due to competition, introduction of new technologies and the potential addition of larger commercial payors. Since our MCOT services are relatively new and the reimbursement status is evolving, our revenues are subject to fluctuations due to increases or decreases in rates and decisions by payors regarding reimbursement.

**Results of Operations**

*Quarters Ended March 31, 2008 and 2009*

*Revenues.* Total revenues for the quarter ended March 31, 2009 increased $35.7 million from $25.5 million for the quarter ended March 31, 2008, an increase of $10.2 million, or 40.3%. MCOT revenue increased $11.3 million, offset by a decrease in PDS revenue of $1.1 million.

*Gross Profit.* Gross profit increased to $23.9 million for the quarter ended March 31, 2009, or 66.9% of revenues, from $15.9 million for the quarter ended March 31, 2008, or 62.6% of revenues. The increase of $8.0 million, or 49.8%, was due to the increased revenue from MCOT as well as operational efficiencies achieved and cost reductions negotiated with vendors during 2009.

27. The statements referenced above in ¶¶22, 24, 25 and 26 were each materially false and misleading when made because they failed to disclose and misrepresented adverse facts alleged in ¶23 and the following adverse facts:

(a) that Highmark was engaged in a review of the reimbursement rate for the MCOT system;

(b) Defendants were currently experiencing reductions in reimbursement rates; and

(c) that Defendants' financial outlook for 2009, 2010 and 2011 had no reasonable basis in fact because it was based on the current $1,123.07 Highmark reimbursement rate for the MCOT system, which rate Defendants knew was under review by Highmark and which was likely to be reduced because of, *inter alia*, the cost-driven reimbursement environment which was driving down virtually all reimbursement levels set by commercial providers.

28. On June 30, 2009, CardioNet issued a Press Release lowering dramatically the financial guidance Defendants had provided to the market on April 30, 2009 and disclosing previously undisclosed material facts concerning reimbursement levels and the healthcare

environment and their adverse impact on CardioNet's financial position. The Press Release stated as follows:

> The Company is revising its revenue guidance for full year 2009 to reflect growth of 30%-33% compared to the full year 2008 and now expects revenue for 2009 to be in the range of $156 million to $160 million. The revenue guidance is based on lower than anticipated commercial reimbursement rates. . . . Other areas of spending will be curtailed and restructured to partially offset the native price and volume dynamics. Accordingly, the Company is now expecting adjusted earnings per diluted share for full year 2009 to be in the range of $0.30 to $0.35 excluding any impact of NOLS, other tax related items and any nonrecurring charges, with the majority of the impact affecting results in the second half of 2009. At this time, the Company is not in a position to provide revenue or earnings guidance for 2010 and 2011. The Company may issue such guidance if greater certainty develops with respect to long-term reimbursement and physician adoption.

29.  In response to the Press Release on June 30, 2009, the price of CardioNet stock dropped from $16.32 per share to $9.57 per share, or 41%, on extremely heavy trading volume of more than 23 million shares.

30.  The market for CardioNet common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, CardioNet common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired CardioNet common stock relying upon the integrity of the market price of CardioNet common stock and market information relating to CardioNet, and have been damaged thereby.

31.  During the Class Period, Defendants materially misled the investing public, thereby inflating the price of CardioNet common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

32. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about CardioNet's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of CardioNet and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein. When the true facts about the Company were revealed to the market the inflation in the price of CardioNet stock was removed and the price of CardioNet stock declined dramatically causing loss to Plaintiff and the other members of the Class.

## Additional Scienter Allegations

33. As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, based on their constant dialogue with Highmark, knew that Highmark was reviewing the reimbursement rates for the MCOT system and, based on industry factors, was likely to reduce the rate significantly below the current rate of $1,123.07. Defendants, by virtue of their receipt of information reflecting the true facts regarding CardioNet, their control over, and/or receipt and/or modification of CardioNet's allegedly materially misleading misstatements and/or

their associations with the Company which made them privy to confidential proprietary information concerning CardioNet, participated in the fraudulent scheme alleged herein.

### Applicability of Presumption of Reliance:
### Fraud On the Market Doctrine

34. At all relevant times, the market for CardioNet common stock was an efficient market for the following reasons, among others:

(d) CardioNet's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(e) As a regulated issuer, CardioNet filed periodic public reports with the SEC and the NASDAQ;

(f) CardioNet regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(g) CardioNet was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

35. As a result of the foregoing, the market for CardioNet's common stock promptly digested current information regarding CardioNet from all publicly-available sources and reflected such information in the price of CardioNet stock. Under these circumstances, all purchasers of CardioNet common stock during the Class Period suffered similar injury through their purchase of CardioNet common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

36. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of CardioNet who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

37. Plaintiff incorporates ¶¶1-36 by reference.

38. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

39. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Applica publicly traded securities during the Class Period.

40.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for CardioNet stock. Plaintiff and the Class would not have purchased CardioNet stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

41.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of CardioNet common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

42.     Plaintiff incorporates ¶¶1-41 by reference.

43.     The Individual Defendants acted as controlling persons of CardioNet within the meaning of Section 20(a) of the Exchange Act. By reason of their positions as officers and/or directors of CardioNet, the Individual Defendants had the power and authority to cause CardioNet to engage in the wrongful conduct complained of herein. CardioNet controlled each of the Individual Defendants and all of its employees. By reason of such conduct, the Individual Defendants and CardioNet are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: 8-26, 2009

LAW OFFICES
BERNARD M. GROSS, P.C.

_____
BERNARD M. GROSS
DEBORAH R. GROSS
SUSAN R. GROSS
The Wanamaker Building, Suite 450
100 Penn Square East
Philadelphia, PA 19107
Telephone: 215-561-3600
Fax: 215-561-3000

*Attorneys for Plaintiff*

LAW OFFICES BERNARD M. GROSS, P.C.

## CERTIFICATION OF DIANNE SOLOMON-SHRAWDER

1. I, Dianne Solomon-Shrawder, have reviewed the Complaint and have authorized the filing of same;

2. I did not purchase the common stock of CARDIONET INC. at the direction of plaintiff's counsel or in order to participate in any private action arising under this title of the federal securities laws;

3. I am willing to serve as class representative and provide testimony at deposition and trial if necessary;

4. During the period April 30, 2009 through June 30, 2009 my transactions in the common stock of CardioNet Inc. consisted of the following:

| Date | Purchase(s) or Sales(s) | Amount | Price |
|---|---|---|---|
| MAY 1, 2009 | PURCHASE | 1000 | $18.75 |

5. During the previous three years, I have not been a lead plaintiff in the any securities fraud class action.

6. I will not accept any payment for serving as a class representative beyond my pro rata share of any recovery, except as ordered or approved by the Court with respect to an award for reasonable costs and expenses (including lost wages).

I declare under penalty of perjury that the foregoing is true and correct. Executed this 14th day of AUGUST, 2009, at New Wilmington, Pennsylvania.

*Dianne Solomon-Shrawder*
DIANNE SOLOMON-SHRAWDER