# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| DIANNE SOLOMON-SHRAWDER, Individually and on Behalf of All Others Similarly Situated, | CIVIL ACTION No. 2:09-cv-3894-SD |
| Plaintiff, | |
| v. | CLASS ACTION |
| CARDIONET INC., RANDY H. THURMAN and MARTIN P. GALVAN, | |
| Defendants. | |

## CONSOLIDATED CLASS ACTION COMPLAINT OF LEAD PLAINTIFF CENTRAL LABORERS' PENSION, WELFARE AND ANNUITY FUNDS

Jeffrey W. Golan
M. Richard Komins
Jeffrey A. Barrack
Beth T. Seltzer
**BARRACK, RODOS & BACINE**
Two Commerce Square, Suite 3300
2001 Market Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838

J. Gerard Stranch, IV
Michael Stewart
Joe P. Leniski
Michael J. Wall
**BRANSTETTER, STRANCH & JENNINGS, PLLC**
227 Second Avenue North, Fourth Floor
Nashville, Tennessee 37201-1631
Telephone: (615) 254-8801
Facsimile: (615) 250-3970

*Co-Lead Counsel for the Lead Plaintiff and Putative Class*

# TABLE OF CONTENTS

**Pages**

OVERVIEW OF THE CASE ..................................................................................... 1

JURISDICTION AND VENUE ................................................................................ 8

THE PARTIES............................................................................................................ 9

CLASS ACTION ALLEGATIONS ........................................................................ 11

BACKGROUND ...................................................................................................... 12

    A.    Company History and History of the MCOT<sup>TM</sup> device ........................................ 12

    B.    Reimbursement for Use of the MCOT<sup>TM</sup> Device .................................. 16

EVENTS LEADING UP TO DEFENDANTS' FALSE AND MISLEADING
STATEMENTS........................................................................................................... 20

DEFENDANTS' FALSE AND MISLEADING STATEMENTS ............................. 27

    A.    The April 28, 2009 Press Release ........................................................ 27

    B.    The April 30, 2009 Press Release and Conference Call ....................... 30

    C.    The May 12, 2009 Bank of America Health Care Conference............................. 38

    D.    The May 18, 2009 Press Release ........................................................ 42

THE Company FINALLY Discloses the truth about THE
REIMBURSEMENT PROCESS AND RATES............................................................ 44

ADDITIONAL FACTS RELEVANT TO SCIENTER............................................... 49

LOSS CAUSATION/ECONOMIC LOSS ................................................................. 53

APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD-ON-THE-MARKET
DOCTRINE ............................................................................................................... 54

NO SAFE HARBOR ................................................................................................. 55

COUNT I ................................................................................................................... 55

COUNT II .................................................................................................................. 57

PRAYER FOR RELIEF ............................................................................................................. 58

JURY DEMAND ..................................................................................................................... 59

Lead Plaintiff Central Laborers' Pension Welfare and Annuity Funds ("Lead Plaintiff" or "Central Laborers"), on behalf of the other named plaintiff on this Complaint and the Class (defined in ¶ 29 below), by its undersigned attorneys, alleges the following upon personal knowledge as to Lead Plaintiff, and upon information and belief as to all other matters, based upon the investigation of counsel. The investigation of counsel is predicated upon, among other things, a review of public filings by CardioNet, Inc. ("CardioNet" or the "Company") with the United States Securities and Exchange Commission ("SEC"), including, among other things, its Forms 10-K and 10-Q, proxy and registration statements, and press releases, as well as a review of media reports about the Company, publicly available data relating to the prices and trading volumes of CardioNet securities, reports issued by securities analysts who followed CardioNet, and interviews with former employees, analysts and others with first-hand information. Lead Plaintiff believes that substantial, additional evidentiary support for the allegations set forth herein will be obtained after a reasonable opportunity for discovery.

## OVERVIEW OF THE CASE

1.      This is a securities class action against CardioNet and two of its senior officers for violations of the Securities Exchange Act of 1934 ("1934 Act"), brought on behalf of all persons, other than defendants and their affiliates, who purchased or otherwise acquired the common stock of CardioNet from April 28, 2009 to and including July 10, 2009 (the "Class Period").

2.      CardioNet, a company that was formed in 1997 and went public in March 2008, provides continuous, real-time ambulatory outpatient management solutions for monitoring relevant and timely clinical information regarding an individual's health. Its initial efforts are focused on the diagnosis and monitoring of cardiac arrhythmias, or heart rhythm disorders, through its core Mobile Cardiac Outpatient Telemetry ("MCOT™") device and Holter services. CardioNet claims that its MCOT™ device enables heartbeat-by-heartbeat, ECG monitoring,

analysis and response, at home or away, twenty-four hours a day, seven days a week, three

hundred and sixty-five days a year.

3.      Much of CardioNet's success as an enterprise revolves around the reimbursement

rates set for its MCOT$^{TM}$ device.  On October 31, 2008, Highmark Medicare Services

("Highmark"), an intermediary designated by the Centers for Medicare and Medicaid Services

("CMS") as the controlling contractor for services pertaining to the MCOT$^{TM}$ device, set a

Category I CPT Code reimbursement rate of $1,123 per service, effective January 1, 2009.

Subsequently, on February 17, 2009, CardioNet announced its fourth quarter and year end 2008

results, and further issued bullish revenue and earnings guidance to the market for the years 2009

through 2011.

4.      However, on April 24, 2009, Brian Kennedy, an analyst at Jefferies & Company,

Inc. ("Jefferies"), issued a report (hereafter, the "April 24 Report" or "Report"), a copy of which

is attached to this Complaint as Exhibit 1, initiating coverage of CardioNet, rating CardioNet as

"underperform," and suggesting that based on an extensive investigation that Mr. Kennedy and

Jefferies had conducted a significant reimbursement rate cut by Highmark was imminent.  The

April 24 Report, which referred to CardioNet by its name and by its stock symbol (BEAT),

stated "[t]he Street has assumed that Highmark will keep the technical fee at $1,123 for 2009,

even though neither BEAT nor LifeWatch has explicitly stated that the fee won't change.  We

think the Street's assumption is wrong.  Our checks indicate that Highmark is currently

reviewing the technical fee."  The Report further indicated that a rate reduction of at least $200

was imminent.

5.      On the day the Report was issued, the price of CardioNet's common stock fell by

$2.97 per share to close at $19.94 on April 24, 2009, a one-day decline of 13%.

6.      Following issuance of the April 24 Report, CardioNet and its senior officers embarked on a concerted campaign to discredit Mr. Kennedy, Jefferies and the information in the Report.  First, within hours of the April 24 Report, Leerink Swann LLC ("Leerink"), one of the underwriters for the Company's March 2008 initial public offering ("IPO") and a co-lead manager for the Company's August 2008 secondary stock offering, reiterated its "Outperform" rating on CardioNet, and stated "[t]his morning, we checked in with BEAT management who emphasized to us that they are confident no decision regarding a potential change to reimbursement is imminent based on their conversations today with Highmark senior medical personnel who are unaware of any final decisions."

7.      Second, on April 26, 2009, an analyst at Citigroup, Inc. ("Citigroup"), the lead underwriter for the Company's IPO in March 2008 and the sole book-running manager for its secondary stock offering in August 2008, issued a report entitled "Not Worthy of the BEAT-down," which maintained Citigroup's "Buy" rating for CardioNet stock and explicitly questioned the legitimacy of Jefferies' April 24 Report.  The Citigroup report stated that CardioNet management had been in contact with Highmark and saw "no signal of pending reimbursement changes."  However, as later reported in *The Wall Street Journal* on November 20, 2009, in an article by David Armstrong, entitled "A Tough 'Sell' for Jefferies Analyst" (hereafter, the "*Wall Street Journal* article"), a copy of which is attached to this Complaint as Exhibit 2, Citigroup's analyst, Amit Bhalla, never even tried to contact Highmark before issuing his April 26 report on CardioNet.

8.      Third, on April 28, 2009 – the first day of the Class Period – CardioNet issued a press release specifically responding to the April 24 Report.  The press release stated that after frequent communications with its two main reimbursement entities, CardioNet had not been

notified of any proposed adjustment downward of its reimbursement rates.  CardioNet further

stated that it believed the Jefferies analyst's reference to such an imminent decrease in the

reimbursement rate was "not based on any indication or suggestions provided by Highmark

Medicare Services or CMS."  The press release went on to say, among other things, that any

changes in reimbursement rates would normally occur only "after a substantial amount of

interaction and dialogue with our organization."

9.      <u>Fourth</u>, after the April 24 Report, CardioNet refused to speak with any analyst

from Jefferies and did not allow any Jefferies analysts to participate in the Company's

conference calls with analysts and investors.  Specifically, according to Confidential Witness

("CW") 1, a person in the Medical Device & Diagnostics Industries Group within Jefferies,

CardioNet refused to return phone calls from Jefferies and blocked Jefferies entirely from the

Company's April 30, 2009 analyst conference call.  Nobody from CardioNet ever asked Jefferies

analysts about the basis for or any information underlying the Report.  Indeed, although Jefferies

was eventually allowed to listen to the most recent CardioNet conference calls, defendants

continued to refuse to take any questions from Jefferies' analysts.

10.     In sharp contrast, defendants clearly communicated with other analysts after

Jefferies' April 24 Report.  Both the Leerink analyst and the Citigroup analyst specifically cited

to communications with CardioNet management in their reports of April 24 an April 26, 2009,

and both of them were among the analysts who were allowed to ask questions of CardioNet

management during a conference call with analysts on April 30, 2009, following the issuance of

the Company's first quarter 2009 results.  CW1 explained that other analysts "definitely all

talked to Randy [referring to defendant Randy Thurman, the Chairman of the Board, President

and Chief Executive Officer of CardioNet] and those guys during the April time frame."

CardioNet's exclusion of Jefferies from conference calls was part of the defendants' scheme to prevent the disclosure of accurate information, prevent pointed questioning about CardioNet's relationship with Highmark, and/or conceal the reality of the status of Highmark's reimbursement process and decision.

11.     <u>Fifth</u>, defendants made direct statements during investor and analyst calls in seeking to discredit Mr. Kennedy, Jefferies and the information contained in the April 24 Report. During the first quarter 2009 earnings call, CardioNet's senior officers expressly and specifically repeated the revenue and earnings guidance provided to the market by CardioNet on February 17, 2009, for the years 2009 through 2011.  In reiterating this guidance, defendant Thurman stated that while the Company had assumed "some reduction in reimbursement that's factored into the earnings projections we put out there," the Company was working "hand in glove with Highmark and with CMS on an ongoing basis **and …, candidly the argument is just as strong that we could justify a higher level of reimbursement as there would be any reduction**."  He went on at great length, during the question and answer period, about the April 24 Report, questioning the bases upon which it was written.  Defendant Thurman made similar and even more egregious comments at a May 12, 2009 Bank of America Healthcare Conference, during which he expressly questioned the "due diligence" of Mr. Kennedy and Jefferies prior to their issuance of the April 24 Report and further questioned Jefferies' motives in issuing the Report – stating that it was likely issued to assist short sellers who would gain from a rapid decline in the Company's stock price.

12.     <u>Sixth</u>, according to CW1, despite the fact that CardioNet refused to communicate with Jefferies, CardioNet was telling others on the Street that Jefferies had never spoken with Highmark.  CW1 explained that "[t]he story kept changing on Jefferies about what we did and

didn't do.  CardioNet initially went out and told people that we made it up, like literally made it

up."  Subsequently, after CardioNet could not longer pretend that Mr. Kennedy had not spoken

with anyone at Highmark in connection with the April 24 Report, according to CW1, defendants

took a new position that Jefferies had misrepresented themselves to Highmark.

13.     In truth, however, the April 24 Report was based on credible information and

reflected a thorough investigation that Mr. Kennedy and Jefferies had undertaken.  During the

course of that investigation, Mr. Kennedy spoke not only with a reliable source at Highmark, but

also with reimbursement experts, insurers and physicians.  As later reported in the *Wall Street

Journal* article, Mr. Kennedy had detailed information stemming from his investigation that was

not even included in the April 24 Report.  The article further reported that Jefferies' head of

research backed and encouraged Mr. Kennedy to issue the Report.  Indeed, according to CW2, a

person with knowledge of the investigation, Mr. Kennedy received information from Highmark's

Vice President for Clinical Affairs, Dr. Andrew Bloschichak ("Bloschichak"), who is directly

responsible for oversight of the reimbursement rate process at Highmark.

14.     Seventh, according to the *Wall Street Journal* article,  in order to further discredit

the April 24 Report, in early June 2009, **defendant Thurman sent letters to the SEC, Nasdaq

and the Financial Industry Regulatory Authority ("FINRA") suggesting that the Jefferies

report "may have been part of a plot to enrich CardioNet short sellers betting on a share-

price decline**."  The article further reports that the letters (which Lead Plaintiff's investigator

sought to obtain through an FOIA request addressed to the SEC) stated "this strikes me as blatant

and inappropriate manipulation of our company's stock" and that the Jefferies report was suspect

"given its apparent inaccuracies."  And, without any basis whatsoever, Thurman's letters to the

SEC and other regulatory agencies questioned "whether it was written with the intent of driving down our stock price."

15.     CardioNet's campaign to discredit Mr. Kennedy, Jefferies and the April 24 Report came crashing down around CardioNet first on June 30, 2009 and then on July 12, 2009, when the information contained in the Report – which had been vigorously denied and belittled by CardioNet and its senior officers – was shown to be true.

16.     On June 30, 2009, CardioNet issued a press release announcing that it was **lowering its full year 2009 guidance and withdrawing its 2010 and 2011 guidance based on "lower than anticipated commercial reimbursement rates" for its MCOT$^{TM}$ device**.  On this news, CardioNet's shares plunged $6.75 per share from $16.32 per share on June 30, 2009 to $9.57 per share on July 1, 2009, a one-day decline of 41% per share on volume of 23.4 million shares, over 24 times the preceding three-month's daily average.

17.     Then, on July 12, 2009, CardioNet announced that it had received a letter from Highmark stating that **the reimbursement rate for the MCOT$^{TM}$ device would be lowered by approximately 33%, from $1,123 to $754 per service, and that as a result, the Company was withdrawing its full year 2009 guidance entirely**.  With this announcement, the price of CardioNet's stock once again suffered a significant decline, falling $2.96 per share to close at $5.87 per share on July 13, 2009 – a one-day decline of 34% on volume of 11.8 million shares, over seven times the average three-month daily average.

18.     In all, with the announcements made by CardioNet on June 30 and July 12, 2009, the truth about the Company's reimbursement rates and business prospects was finally disclosed, causing the Company's stock price to fall from $16.32 per share on June 30, 2009 to $5.87 per share on July 13, 2009 – **an overall decline of $10.45 per share, or 64%** – causing persons who

purchased CardioNet during the Class Period to suffer enormous losses on their stock purchases. Indeed, as reported in the *Wall Street Journal* article, defendant Thurman, in a later interview, stated that the rate cut means CardioNet "will not be able to sustain operations as a stand-alone company." Further, in mid-December 2009, defendant Thurman disclosed that (a) the Company planned to cut $15 million in operating costs (in addition to the $8 million in expense cuts that had been made during the period from mid-July to mid-December 2009) to remain afloat, and (b) the Company had retained Lazard Frères & Co. to evaluate its options, including what some analysts believe could be a sale of the Company. Yet, even today, with talk of a possible sale of the Company in the market, CardioNet stock continues to trade in the range of $5.00 to $6.00 per share, after falling as low as $4.36 per share on December 8, 2009.

## JURISDICTION AND VENUE

19.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. 240.10b-5.

20.     This Court has jurisdiction pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1337.

21.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15, U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Many of the false and misleading statements giving rise to the violations of law complained of herein were made in or issued from this District. In addition, defendant CardioNet maintains its principal executive offices in this District, at 227 Washington Street, Conshohocken, PA 19428, where the day-to-day operations of the Company are directed and managed.

22.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications and the facilities of the national

securities markets.

## **THE PARTIES**

23.     Lead Plaintiff, Central Laborers, consists of three funds: Central Laborers'

Pension Fund (the "Pension Fund"); Central Laborers' Annuity Fund; and Central Laborers

Welfare Fund.  The Pension Fund, a Taft-Hartley Trust Fund established in 1965 to help provide

financial security to laborers during retirement currently has more than 6,400 pensioners and

beneficiaries receiving over $73 million each year in pension benefits.  During the Class Period,

the Pension Fund purchased 18,184 shares of CardioNet stock, as more fully set forth in the

attached Schedule A, at artificially inflated prices and has been damaged thereby.

24.     Plaintiff Dianne Solomon-Shrawder is an individual who purchased 1,000 shares

of CardioNet stock during the Class Period, as more fully set forth in the attached Schedule A, at

artificially inflated prices and has been damaged thereby.

25.     Defendant CardioNet, based in Conshohocken, Pennsylvania, is a leading wireless

medical technology company which provides continuous, real-time ambulatory outpatient

management solutions for monitoring relevant and timely clinical information regarding an

individual's health.

26.     Defendant Randy H. Thurman ("Thurman") is the Chairman of the Board,

President and Chief Executive Officer ("CEO") of CardioNet, having served in those positions

since February 2009.  Thurman joined CardioNet in July 2008 and served as the Executive

Chairman of the Board from July 2008 through February 2009.  Prior to his tenure at CardioNet,

Thurman was a consultant to Cardinal Health, Inc. ("Cardinal Health"), from July 2007 through

June 2008; served as CEO of Viasys Healthcare Inc. ("Viasys"), a healthcare technology

company, from April 2001 until its acquisition by Cardinal Health in July 2007; served as

Chairman and Chief Executive Officer of Strategic Reserves LLC, a privately held company

providing funding and strategic direction to healthcare technology companies, from 1996 to

April 2001; served as Chairman and CEO of Corning Life Sciences, Inc., from 1993 to 1996;

served as Chairman of the Board of Directors of Enzon Pharmaceuticals, Inc., from 1994 to

2001; and held various positions at Rhone-Poulenc Rorer Pharmaceuticals, Inc. ("Rhone-Poulenc

Rorer"), a global pharmaceutical company, from 1984 to 1993, ultimately serving as its

President.

      27.      Defendant Martin P. Galvan ("Galvan") was Chief Financial Officer ("CFO") of

CardioNet from September 2007 until January 15, 2010.  From June 2001 to July 2007, Galvan

held several positions with Viasys until it was acquired by Cardinal Health, most recently as

Executive Vice President, Chief Financial Officer and Director of Investor Relations.  Prior to

that, Galvan served as Chief Financial Officer of Rodel, Inc., a precision surface technologies

company, from 1999 to 2001, and held various positions with Rhone-Poulenc Rorer from 1979

to 1998, including as Vice President, Finance Worldwide.  On January 15, 2010, CardioNet

announced that Galvan had left the Company to pursue other career opportunities.

      28.      Thurman and Galvan are hereafter referred to as the "Individual Defendants."

The Individual Defendants, because of their positions with the Company, possessed the power

and authority to control the contents of CardioNet's annual and quarterly reports, SEC filings,

press releases and presentations to securities analysts, money and portfolio managers and

institutional investors, i.e., the market.  Each of the Individual Defendants was provided with

copies of the Company's reports and press releases alleged herein to be false and misleading

prior to or shortly after their issuance and had the ability and opportunity to prevent their

issuance or cause them to be corrected.  Each also directly made public statements that are

alleged herein to be false and misleading.  Because of their positions and access to material non-public information, these Defendants knew or were reckless in failing to know that adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations that were made were materially false and misleading.

## CLASS ACTION ALLEGATIONS

29.     Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons, including the Pension Fund and plaintiff Solomon-Shrawder, who purchased or otherwise acquired CardioNet's publicly traded securities, during the period from April 28, 2009 through and including July 10, 2009 (the "Class Period"), and were damaged thereby (the "Class").  Excluded from the Class are defendants, their officers, directors and partners, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which defendants have a controlling interest.

30.     The members of the Class are so numerous that joinder of all members is impracticable.  The Company's initial public offering of 4,500,000 shares of CardioNet common stock was completed on March 25, 2008.  On August 6, 2008, the Company completed a secondary offering of another 5,000,000 shares.  According to the Company's 2009 Proxy Statement, as of March 16, 2009, there were 23,731,126 shares outstanding.  The disposition of the claims asserted herein in a class action will provide substantial benefits to the parties and the Court.

31.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class predominate over questions that may affect individual Class members, including:

(a)     Whether defendants' conduct violated the federal securities laws;

11

(b)     Whether defendants omitted and/or misrepresented material facts;

(c)     Whether defendants act with scienter;

(d)     Whether defendants engaged in perpetrating a manipulative and deceptive device and/or scheme, and/or otherwise engaged in a fraudulent course of conduct;

(e)     Whether the market prices of CardioNet's common stock were artificially inflated; and

(f)     The extent of damages sustained by Class members and the appropriate measure of damages.

32.     The claims of Lead Plaintiff and plaintiff Solomon-Shrawder are typical of those of the Class.

33.     Lead Plaintiff and plaintiff Solomon-Shrawder will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation. Lead Plaintiff has no interests that conflict with those of the Class.

34.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## **BACKGROUND**

**A.     Company History and History of the MCOT**[TM] **device**

35.     CardioNet is a wireless medical technology company that provides continuous, real-time ambulatory outpatient management solutions for monitoring relevant and timely clinical information regarding an individual's health.

36.     The Company was founded in 1997 by James M. Sweeney, who at the time he founded CardioNet had been involved in buying, selling or taking public about 20 healthcare product and service companies over a 30 year period.  The largest was Caremark, which Sweeney had sold to Baxter in 1987 for approximately $600 million.  According to a fact sheet

about Sweeney during the time he was serving as CEO and Chairman of CardioNet, he had

started eight health care product and service companies, taken two companies public, led an LBO

[leveraged buy-out], raised over $1 billion in financing for his various companies, and sold two

companies for over $1 billion.  CardioNet was described as his "eighth startup."

37.     According to a press release of April 18, 2000 announcing that CardioNet had

closed a $5 million round of venture capital financing, the Company was founded in 1997 "to

develop a wireless, real-time, ambulatory, ECG monitoring service linked to the Internet to allow

physicians to more effectively monitor the status of cardiovascular patients outside the hospital."

The press release further stated that the Company expected to begin field evaluations of the

CardioNet system in the fourth quarter of 2000.

38.     The Company obtained approval from the U.S. Food and Drug Administration

("FDA") for its MCOT$^{TM}$ heart monitor device in 2002.  As noted in an EP Lab Digest story of

June 1, 2002, in February 2002 the Company received FDA approval for its "core monitoring

technology, the CardioNet Ambulatory ECG Monitor with Arrhythmia Detection," and opened

its first CardioNet Service Center in Philadelphia, Pennsylvania.  CEO, Chairman and founder

Sweeney was quoted in the article as stating that initially the Company would be serving patients

in the Philadelphia area, and intended to expand to other parts of Pennsylvania and the

surrounding states.  Eventually, the Company would market the MCOT$^{TM}$ device throughout the

United States.

39.     CardioNet developed an integrated patient monitoring platform that incorporates a

wireless data transmission network, internally developed software, the FDA-cleared algorithms

and medical devices, and an around-the-clock digital monitoring service center.  Its initial efforts

were focused on the diagnosis and monitoring of cardiac arrhythmias, or heart rhythm disorders,

through its core MCOT[TM] System.  Specifically, CardioNet's MCOT[TM] system incorporates a lightweight patient-worn sensor attached to electrodes that capture two-channel EKG data, measuring electrical activity of the heart and communicating wirelessly with a compact, handheld monitor.  The monitor analyzes incoming heartbeat-by-heartbeat information from the sensor on a real-time basis by applying algorithms designed to detect arrhythmias.  When the monitor detects an arrhythmic event, it automatically transmits the ECG to the CardioNet Monitoring Center, even in the absence of symptoms noticed by the patient and without patient involvement.

40.    A cardiac arrhythmia is a disorder of the heart rate or rhythm (*i.e.*, a person's heart beats too quickly, too slowly or with an irregular pattern).  The most common form of arrhythmia is atrial fibrillation, which is categorized by a rapid, irregular heartbeat in the upper chambers of the heart.  An arrhythmia may be diagnosed either in a physician's office or remotely by monitoring a patient's heart rhythm.  If it is done remotely, a physician will prescribe an ambulatory cardiac monitoring device that a patient must wear externally for a period of time.  The monitoring device will record the patient's heart rate either intermittently or continuously.

41.    Traditional heart rate monitors include Holter and event monitors.  Holter monitors continuously record a patient's heartbeats.  They are generally worn for a one-day or two-day period.  Older Holter monitors require the patient to physically return the device to the physician for review, while newer Holter monitors allow for the results to be uploaded via the Internet.  Event monitors intermittently record a patient's heartbeats during cardiac events.  They are generally worn for a 15-day to a 30-day period.  Some types of event monitors are manually activated by the patient when he or she experiences symptoms associated with a cardiac event,

14

while other types of event monitors have an auto trigger that will automatically record an event. The event monitors have limited storage capacity and the data must be transmitted periodically via telephone in order to avoid the risk of exhausting their storage.

42.     In contrast, the MCOT$^{TM}$ system continuously monitors a patient's heartbeats and the data is transmitted wirelessly to the Company's control center. The device is typically worn by the patient for up to 21 days.

43.     Following approval of the MCOT$^{TM}$ system by the FDA in 2002, CardioNet continued to raise private capital. In January 2003, Guidant Corporation announced that it had increased its equity investment in CardioNet to a total of $13.4 million, bringing Guidant's equity ownership in the Company to nearly 20%. Sweeney, the CEO and Chairman of CardioNet, noted that Guidant's investment would "help us expand CardioNet's services to new markets."

44.     In March 2007, while still a privately-owned company, CardioNet completed two important events in the life of the Company. First, on March 13, 2007, CardioNet announced the completion of its acquisition of a company called PDSHeart, Inc. ("PDS"), a leading cardiac monitoring company that provided three product lines in 48 states: event, Holter and pacemaker monitoring services. The acquisition of PDS added these three additional product lines to complement the Company's MCOT™ device. According to the Company's prospectus for the IPO, dated March 18, 2008, the acquisition also supplied the Company with existing sales channels and relationships in geographic areas that had not been penetrated by the Company. Second, the Company completed $110 million in private financing, bringing the total that CardioNet had raised from 1999 to 2007 to nearly $200 million in private debt and equity.

According to a Company press release of March 26, 2007, Citigroup served as the lead placement agent for this financing.

45.     According to CW3, a former PDS employee who continued to work for CardioNet as an account executive following the PDS acquisition, physicians who use or prescribe the event monitor receive compensation of $75 for an in-house nurse who hooks up the monitor to the patient and three EKG reads.  In addition to the $75, the physician receives $25 in compensation for reading the monitor.  By contrast, with the MCOT^TM system, because there is no device in the physician's office, CW3 explained that there was no need for the nurse to hook up the MCOT^TM and therefore no compensation.  Rather, the patient does this himself after receiving the device, which is shipped directly from CardioNet.

46.     Additionally, the amount of work for a physician prescribing the MCOT^TM is greater than if the physician were using the event monitor.  According to CW3, because the event monitor is limited to three EKG reads and the MCOT^TM has continuous monitoring capabilities, physicians who prescribe the MCOT^TM are also reading vastly greater numbers of EKGs per patient and thus have more work to do.

47.     Notwithstanding these potential concerns, revenues from the MCOT^TM system represented 88% of the Company's revenue in the first quarter 2009, compared to 86% in the fourth quarter 2008 and 79% in the first quarter 2008.  According to the Company, offsetting the growth in the use of the MCOT^TM system were declines in the event and Holter revenue, as the Company converted physicians to the newer technology.  Consistent with the results during 2008, the Company's payor mix in the first quarter 2009 was 34% from Medicare and 66% from commercial payors.

**B.      Reimbursement for Use of the MCOT^TM Device**

48.     MCOT<sup>TM</sup> has two distinct parts: a professional component, collected by the physician for interpreting the reports generated by the MCOT<sup>TM</sup> service; and a technical component, collected by the MCOT<sup>TM</sup> provider for offering the service itself.  Prior to January 1, 2009, both components were billed by the physician under Current Procedural Terminology ("CPT") code CPT 93799, a nonspecific code used for unlisted cardiovascular services. Physicians would add the modifier -26 and specify "mobile cardiac outpatient elementary" (or a close variation) on the Centers for Medicare and Medicaid Services ("CMS") claim form.  While CMS guidelines stated that the service should be paid only one time in any 30-day period regardless of the number of data transmission involved, the use of an unlisted code made payment inconsistencies from carrier to carrier fairly common.

49.     The American Medical Association ("AMA") establishes CPT codes.   On October 31, 2008, CardioNet announced that the AMA had established Category I CPT codes that covered CardioNet's system, which became effective on January 1, 2009.  The AMA established separate CPT codes for the professional and technical component of the MCOT<sup>TM</sup> system.  CMS elected to price the professional component at approximately $25 for 2009 and to "contractor price" the technical component, which meant that Highmark would again set the technical fee.  The new rate of approximately $25 was much lower than the prior professional fee, which ranged anywhere from $30 to $300.  The rate set by Highmark for the technical component remained at $1,123.

50.     After the establishment of CPT codes applicable to the MCOT<sup>TM</sup> system, Highmark issued various Highmark Medical Policy Bulletin revisions for real-time cardiac surveillance monitoring systems, including the MCOT<sup>TM</sup> system.  The Bulletin revision issued on January 5, 2009 for such M-60 systems stated, among other things, that a cardiac surveillance

service "is not indicated in all patients with arrhythmias" and should be used "only in circumstances where traditional Holter monitoring or cardiac event recording is not expected to provide adequate information or has been unrevealing."  A Bulletin revision issued January 26, 2009 similarly listed a series of conditions for which a home-based, real-time cardiac surveillance system is not indicated for use.

51.     On April 13, 2009, Highmark issued a Medical Policy Bulletin, effective that day, that stated that coverage for this service is limited "to a very select patient population who have demonstrated a need for cardiac monitoring and for whom all of the following pertain:

(1)     There is a low likelihood of a malignant cardiac event.

(2)     Other testing and/or monitoring has been unrevealing or is inappropriate for the patient.

(3)     It is anticipated that the results of this service would provide diagnostic and treatment information."

52.     The Bulletin issued April 13, 2009 further made clear (with emphasis in the original) that systems such as the MCOT[TM] system are NOT for patients with mild to moderate symptoms of "palpitations" or "weakness," NOT indicated for use as a screening tool, and expected to not be reported more than once in a 30 day period or more than twice in a twelve month period.  It reiterated that the system is not indicated for all patients with arrhythmias and should be used "only in circumstances where traditional Holder or cardiac event record is not expected to provide adequate information or has been unrevealing."  The April 13, 2009 revision was a strong statement with respect to the limitations of when the MCOT[TM] system should and should not be utilized.

53.     Commercial payors (*i.e.*, private insurers for the most part) also establish reimbursement rates once they accept a device for payment.  This represents a critical market for almost all device manufacturers.  Although each payor has its own process, in most cases a committee is charged with the responsibility for coverage policy, and it is each payor's committee that is typically the first step in the process of obtaining coverage.  Commercial payors require, at a minimum, that devices have FDA approval, and they further look to clinical literature that documents the safety and efficacy of the product.  Many use an external assessment company and may supplement the information with their own literature review and/or use outside clinical consultants to review the data.  According to generally available sources, physician advocacy can also be an important component of the coverage decision-making process.

54.     In the commercial payor market, once coverage issues have been resolved, the payor will set a reimbursement rate or rates for use of devices.  These may be pegged in some fashion to a rate set for Medicare, and may be determined either with manufacturer input or as a result of discussions and negotiations between medical service providers and commercial payors.

55.     CW4, a former CardioNet employee who served as a Regional Sales Manager for CardioNet and reported to Chris Stasinski, a former Vice President of Sales, explained that reimbursement rates were handled through CardioNet's Reimbursement Services division, which dealt with reimbursement rates and interacted with Medicare and Medicaid payors.  The division was headed by Philip G. Leone ("Leone").  According to CW5, a former PDS officer who was employed by CardioNet from the time of the PDS acquisition until early 2008, CardioNet had a rate reimbursement committee which consisted solely of Leone and Anna McNamara,

CardioNet's Senior Vice President, Clinical Operations, who joined CardioNet in September 2002.

## EVENTS LEADING UP TO DEFENDANTS' FALSE AND MISLEADING STATEMENTS

56.     CardioNet went public on March 25, 2008, selling 3 million shares of the Company's stock and 1.5 million shares of CardioNet stock owned by Guidant Investment Corp., one of its early investors.  By the time of the IPO, Sweeney had been succeeded as President and CEO by Arie Cohen, but had remained as the Executive Chairman of the Board of Directors.

57.     On July 9, 2008, the Company announced that its board had appointed defendant Thurman as Executive Chairman, and that Sweeney, who had been the Executive Chairman, had accepted a position at the University of California, San Diego.  In the announcement, then-CEO Cohen stated: "Our CFO Marty Galvan and I have had the privilege of working with Randy [Thurman] at VIASYS, so we have great confidence that this will be a seamless transition.  His deep experience in building strong healthcare enterprises is well documented and his insight to the investment community is unrivaled.  We look forward to Randy's contribution and his active role as a counselor to management on a wide range of topics, including operations and strategic direction, as well as assisting in CardioNet's investor relations."  The announcement further disclosed that Sweeney, who had founded the Company and served as its CEO until November 2007, expected to "transition from the board" by the end of 2008.

58.     Later that same month, on July 22, 2008, the Company announced a secondary offering of approximately 5 million shares of CardioNet stock to be sold by certain of the Company's existing stockholders.  Thereafter, on August 1, 2008, it priced the secondary offering at $26.50 per share – $8.50 more than the price in the IPO – and sold 5 million shares, plus a 750,000 over-allotment.  In the secondary offering, Sweeney sold 516,414 of the

1,279,845 CardioNet shares he held (going from a 5.5% holder to a 3.3% holder).  Other early

investors also sold significant portions of their holdings.  These included: (a) Sanderling Funds

sold 869,565 of their 2,576,195 CardioNet shares (going from an 11.1% holder to a 7.4%

holder); (b) Hambrecht & Quist funds sold 503,240 of their 1,446,814 CardioNet shares (going

from a 6.3% holder to a 4.1% holder); (c) Basso Funds sold 290,800 of their 334,420 shares; (d)

BioFrontier Partners sold 873,892 of its 1,004,975 shares; and (e) Guidant sold 239,956 of its

remaining 689,873 shares (going from a 3.0% holder to a 1.9% holder).

59.     Later in 2008, Sweeney left the Board, Arie Cohen left his management positions,

and Thurman took over as Interim President and CEO, while retaining his position as Executive

Chairman of the Board.

60.     On February 17, 2009, CardioNet issued a press release reporting on its fourth

quarter and full year 2008 financial results.  The Company reported fourth quarter revenue of

$34.4 million, a 43.8% increase over the prior fourth quarter, and full year revenue of $120.5

million, a 65.0% increase over its revenue during the year 2007.  The Company noted that it had

successfully completed an $82.8 million IPO in March 2008 and a $152.4 million secondary

offering in August 2008.  It further reported adjusted fourth quarter 2008 earnings per diluted

share excluding net operating losses (NOLs) of $0.16, a 33.3% increase over its fourth quarter

2007 results, and full year 2008 earnings per diluted share (on the same basis) of $0.39 compared

to a loss of $0.12 per diluted share for the full year 2007.

61.     Defendant Thurman, who was then the Interim President and CEO, was quoted in

the press release as follows:

> In 2008 we achieved a number of significant accomplishments throughout the
> organization that positioned us for accelerated growth in 2009. We secured
> Category I CPT codes and reimbursement rates for the CardioNet System in
> October, a major milestone in facilitating broader adoption. We also secured

contracts with over 30 new payors during the year, including two major national payors, accounting for an additional 32.1 million covered lives. We strengthened the management team with several key hires and successfully completed the integration of the PDSHeart acquisition and the consolidation of our corporate functions to Pennsylvania. We continued growing and developing our sales and marketing organization, expanding our geographic footprint and elevating our profile within the medical community. We also remained committed to our research and development efforts, as demonstrated by the recent launch of our enhanced atrial fibrillation reporting package. Finally, we continued to benefit from the growing body of peer-reviewed research highlighting the benefits of the CardioNet System. We look forward to the future publication of additional studies, supported by our ongoing clinical programs.

Looking forward, CardioNet is uniquely positioned within the healthcare industry and perhaps most industries today. We are leading what we believe is a revolution in healthcare - wireless medicine. The demand for our cardiac outpatient services is growing at greater than 40% per year. Our services provide significant and meaningful benefits to patients and prescribing physicians while delivering improved cost/benefit outcomes to the payors. **Every indication is that CardioNet is positioned for years of exceptional growth**.

62.     In addition to reporting its fourth quarter and full year 2008 results, CardioNet also provided detailed revenue and earnings guidance to the market.  Defendant Thurman was quoted in the press release in this regard as follows:

…, **we are establishing revenue guidance for 2009 of $170.0 to $175.0 million, somewhat higher than expectations, and over 40% growth compared to 2008**. Based on the incremental investments I have just outlined, which represent approximately $0.08 to $0.10 per diluted share, **we are providing earnings guidance for 2009 of $0.69 to $0.73 per diluted share, excluding any impact of NOLs, other tax related items and any nonrecurring charges**. **This represents over 75% earnings growth year over year**. In addition, we currently anticipate a one-time benefit in 2009 related to NOLs and other tax related items which could favorably impact earnings by approximately $1.00 to $1.30 per diluted share. We do not anticipate any earnings per diluted share benefit from NOLs and other tax related items in 2010 or 2011. We believe the investment in 2009 is the foundation that will drive higher revenues and earnings in 2010 and beyond. **Our outlook for 2010 is for revenue to increase at least 50% and earnings to increase 100%, compared to the Company's 2009 guidance excluding NOLs and other tax related items. In 2011, we believe that earnings per diluted share could reach $2.00**. We expect that the increased investment in 2009 and the rapid revenue growth that we are targeting will result in increased shareholder value over the long term.

63.     The February 17, 2009 press release thus provided the market not only with the Company's results for the prior year, but also guidance for 2009 and the following two years. The Company explicitly established the following guidance for 2009 through 2011:

- Revenue of $170 to $175 million for 2009, representing 40% growth over 2008;

- Earnings of $0.69 to $0.73 per diluted share for 2009, representing 76% to 87% growth over 2008;

- Revenue growth of at least 50% for 2010 (at least $255 to $262.5 million);

- Earnings growth of 100% for 2010 ($1.38 to $1.46 per diluted share); and

- Earnings that could reach $2.00 per diluted share by 2011.

64.     In a conference call with analysts that started at 5:00 p.m. the same day, defendants Thurman and Galvan presented the Company's 2008 results and reiterated its guidance for 2009 through 2011.  Defendant Thurman began the conference call by stating: "In addition to providing detail on '08 and '09, our objective today is to outline for you the opportunity that we believe CardioNet has to gain significant share in the $2 billion cardiac monitoring market, and how we plan to leverage that opportunity for the benefit of all of our stakeholders."  Defendant Thurman stated, with respect to reimbursement, that the reimbursement codes and reimbursement rates for the professional and technical components of the CardioNet System "provide strong validation of our technology, remove major obstacles for commercial payors, and establish a simplified and stable reimbursement environment."  He stated the Company had secured payor contracts with two major commercial payors, Aetna and Humana, and more than 30 smaller providers, and was focused on securing contracts with the remaining major payors to further improve the Company's coverage.  He also announced that the Company had learned that day of a new payor joining CardioNet, which would add coverage for over 3 million new lives.

65.     During the question and answer period, defendant Thurman stated that the Company's guidance did not assume any new acquisitions to help achieve the figures provided for 2009 through 2011.  Defendant Galvan stated the Company ended 2008 with a sales force of 88 individuals, and would grow that number to 148 by the end of 2009.  And, when a question was asked concerning physician reaction to the new reimbursement code, defendant Thurman introduced Philip Leone, CardioNet's Vice President of Managed Care, who stated the new code was helping physicians "tremendously" when seeking payments for the Medicare population, and that on the commercial side, while movement was expected towards the latter part of the first quarter and into the second quarter, "early indications are it's gone well, the code's gone well."

66.     In reaction to CardioNet's statements on February 17, 2009, CardioNet's stock price rose from a $22.22 per share close on February 17, 2009, to a closing price of $25.00 on February 18, 2009.  As indicated on the call and thereafter, CardioNet's immediate and long-term guidance surprised but impressed analysts.  As later reported in an article entitled "Portable Heart Monitor Lets Patients Go About Their Daily Lives," in the *Investor's Business Daily* on April 20, 2009:

> CardioNet has given guidance for the next three years. That's rare.
>
> "While most companies are pulling their guidance," [Matt] Dolan [an analyst at Roth Capital Partners] said, "CardioNet is looking over the horizon."
>
> That long-range forecast is one reason for the recent run-up in share price, says CEO Thurman.  "Our strategy is to provide better earnings than when the company went public," he said.

67.     Following the reports of its 2008 results and guidance for the years 2009 through 2011, CardioNet continued to issue a series of very positive reports.  The Company announced defendant Thurman's appointment as Chairman, President and CEO on February 25, 2009, reported on its restructured and expanded medical advisory board on March 30, 2009, and

announced expanded product offerings and new clinical research services on April 2, 2009.

Defendants Thurman and Galvan further made a presentation on March 17, 2009, at the Cowen

and Company 29th Annual Health Care Conference, where, among other things, they reiterated

the guidance provided to the market on February 17, 2009, and defendant Thurman noted the

guidance had assumed "about a 5% decline in reimbursement every year."

68.     However, on April 24, 2009, an analyst at Jefferies & Co. issued a research report

that raised significant questions about the health of CardioNet and its business model going

forward.  Analyst Brian Kennedy of Jefferies issued a detailed 16-page report initiating coverage

of CardioNet, rating CardioNet as "Underperform," and suggesting that a significant

reimbursement rate cut by Highmark was imminent.  The Investment Summary in the Report

stated:

> Although BEAT is the hands-down leader in mobile cardiac outpatient telemetry
> (MCOT), we think soon-to-be-implemented reimbursement reductions for the
> service will prevent the company from achieving the aggressive growth targets set
> by management and the Street.

69.     The Report, which was a culmination of extensive research about CardioNet and

then-current reimbursement rates for the MCOT$^{TM}$ device, indicated that Highmark was

currently reviewing the reimbursement rate for the MCOT$^{TM}$ device and, as a result of the

review, Kennedy expected the technical reimbursement fee by Highmark to be cut in 2009 by at

least $200 per service.  The Report noted that CardioNet had guided the market to believe that its

earnings would improve to $0.69 to $0.73 per share in 2009 and to as much as $2.00 per share in

2011, based on the assumption that the Medicare technical fee for the MCOT$^{TM}$ system would

essentially remain on par with the current $1,123 rate paid by Pennsylvania Medicare carrier

Highmark.  Stating Jefferies' disagreement, the Report continued:

**But we expect Highmark to cut the technical fee in 2009.**  Our checks indicate that the technical fee is now under review at Highmark, which is contrary to the Street assumption.  We believe that Highmark plans to lower the fee by at least $200, a decision that should be announced shortly and implemented around midyear.  Though several things likely swayed Highmark to revisit the technical fee, we highlight CMS's recent decision to price the MCOT professional fee (which doctors collect) at roughly $25 versus Highmark's prior rate of $128.  We think this sent a clear signal to Highmark that it's been overvaluing the service.

**We believe CMS will establish a lower technical fee regardless of Highmark's actions.**  Though the prospect of a 2009 cut by Highmark concerns us most, there's evidence CMS won't maintain the $1,123 technical rate regardless. … [Emphasis in original.]

The Report also stated that "[m]ost physicians and industry experts we speak with suggest the national technical fee will initially fall **in the $700 to $1,000 range**."

70.     The April 24 Report set forth numerous reasons why Jefferies believed Highmark would be lowering the reimbursement rate.  In discussing the decision by CMS to price the MCOT™ professional fee at $25 compared to Highmark's previous fee of $128, which Jefferies saw as an indicator that Highmark was likely to reduce its rate, the Report stated "[w]e think the new lower professional fee clearly establishes where the technical fee is heading.  The decline seen in the professional fee with the transition to an MCOT-specific code bodes poorly for the technical fee under the new CPT code."  According to the Report, other factors, including that MCOT™ costs are considered indirect costs (which increased the likelihood of a lower national technical fee), and the 2009 Outpatient Prospective Payment System ("OPPS") payment rate assigned to the technical component was $369 lower than the then-current Highmark rate, also supported that a rate cut was imminent.

71.     The Report further noted that while five of the six analysts who covered CardioNet rated its stock as Outperform or Buy, with an average 12-month price target of $33 per share, Jefferies' "bearish stance on BEAT stems from our concerns about reimbursement for

MCOT, specifically Medicare reimbursement, **which we believe is at risk of being cut in a matter of weeks**."  As the Report further stated:

> The Street has assumed that Highmark will keep the technical fee at $1,123 for 2009, even though neither BEAT nor LifeWatch has explicitly stated that the fee won't change.  We think the Street's assumption is wrong.  **Our checks indicate that Highmark is currently reviewing the technical fee.  We believe the carrier plans to lower the fee by at least $200, a decision that should be announced shortly and implemented around midyear**.  This decline – likely made in response to CMS's move to reduce the 2009 professional fee – should mark the end of the favorable Medicare reimbursement terms MCOT has enjoyed for years thanks to Highmark's support of the technology.

72.     Based on its analysis, Jefferies established a price target for CardioNet's stock of $17.00 per share, compared to its then-current price of $22.91 per share.  After issuance of the Report, the price of CardioNet's common stock fell by $2.97 per share to close at $19.94 on April 24, 2009, a one-day decline of 13%.

73.     Thereafter, as noted in ¶¶ 6-7, above, on April 24 and April 26, 2009, analysts from Leerink and Citigroup, both of which had served as underwriters and managers for CardioNet's IPO and secondary stock offering in March 2008 and August 2008, issued reports that reiterated their Outperform and Buy recommendations.  Both reports stated that the analysts had spoken with the Company's management, and that based on those discussions, there was no basis to believe that Highmark was contemplating a reduction in the MCOT[TM] technical fee reimbursement rate.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

A.     **The April 28, 2009 Press Release**

74.     On April 28, 2009, the first day of the Class Period, CardioNet issued a press release that specifically addressed Jefferies' April 24 Report.  The press release, entitled "CardioNet Addresses Analyst Report on Reimbursement Speculation," stated:

The analyst [Brian Kennedy] purported to have information indicating that
Highmark Medicare Services plans to reduce reimbursement for CardioNet
technology and that an announcement to such effect could be made shortly.
Following the issuance of this report, CardioNet has been in frequent
communication, both written and verbal, with officials of Highmark Medicare
Services and the Centers for Medicare and Medicaid Services (CMS) regarding the
content of the analyst report.  CardioNet has not been notified of any proposed
adjustment and believes that the reference in the analyst's report to a pending
reimbursement reduction is not based on any indication or suggestion provided by
Highmark Medicare Services or CMS.

CardioNet's CEO, Randy Thurman, issued the following statement: "While it is not
our practice to respond publicly to analyst reports, we felt that it was important to
address some of the assertions contained in the April 24 report.  Since the release of
this analyst report, CardioNet has received information from senior officials at both
CMS and Highmark Medicare Services.  These officials have stated to us that the
analyst's suggestion of an imminent adjustment was not based on guidance from
Highmark Medicare Services or CMS and that 'neither organization provided the
analyst with any confidential information or any information specifically about
CardioNet.'"

Mr. Thurman went on to say: "CardioNet and Highmark Medicare Services have
regularly discussed reimbursement for mobile cardiac telemetry since we began
providing that service in 2002.  It has been our experience that any significant
adjustment by a Medicare contractor of this nature would ordinarily occur after a
substantial amount of interaction and dialogue with our organization. To date,
Highmark Medicare Services has neither proposed or discussed any payment
reductions with us.  Furthermore, we have a longstanding and professional
relationship with both CMS and Highmark Medicare Services and have no reason to
believe either organization would ever disclose confidential information that could
have a material effect on CardioNet or any other company."

75.     The statements made in the April 28, 2009 press release were materially false and

misleading in at least the following respects:

(a)     Defendants' statement that "we have a longstanding and professional

relationship with both CMS and Highmark Medicare Services and have no reason to believe

either organization would ever disclose confidential information that could have a material effect

on CardioNet or any other company," was materially false and misleading because, among other

reasons, CardioNet purposefully failed to contact anyone from Jefferies concerning the sources

of the information contained in the Report, and even went so far as to ban Jefferies from

attending subsequent conference calls with investors.  Thus, the statement that we "have no

reason to believe" that anyone from Highmark provided any information to Jefferies, and similar

statements in the press release, were made without a reasonable basis, and evidenced defendants'

willful and/or reckless misconduct in making the statements.

(b)      Defendants' statements concerning the professional relationships between

CardioNet and Highmark and CardioNet and CMS were materially false and misleading.  Had

the Company had the type of positive relationship with Highmark that defendant Thurman

represented it had, defendants would have learned that (a) Mr. Kennedy had received

information from Dr. Andrew Bloschichak ("Dr. Bloschichak"), Vice President for Clinical

Affairs at Highmark Medicare Services, who has oversight of the reimbursement rate process at

Highmark, and (b) Highmark had indicated to Jefferies that a reimbursement rate cut for the CPT

code under which the MCOT$^{TM}$ device is billed was imminent.  As CW1 confirmed, CardioNet

management "overstated their relationship with Highmark" and defendants' representation to the

public that CardioNet was in constant communication with Highmark "was clearly an inaccurate

statement."

(c)      Defendants' April 28, 2009 statement that Highmark and CMS "officials

have stated to us that the analyst's suggestion of an imminent adjustment was not based on

guidance from Highmark Medicare Services or CMS and that 'neither organization provided the

analyst with any confidential information or any information specifically about CardioNet'" was

also materially false and misleading because it gave the investing public the impression that

Jefferies did not receive any information from Highmark regarding an impending rate cut and

that the Report was false.  While Highmark may or may not have provided information to the

Jefferies analysts specifically about CardioNet, it did provide information regarding an impending rate cut for the CPT code under which the MCOT™ device is billed, which was in essence information specific to CardioNet. On this point, CW1 explained that this statement made by CardioNet in its April 28 press release was nothing more than a "word game." CW1 and CW2 explained that information was provided to Jefferies by Dr. Bloschichak of Highmark, and CW1 further explained that Highmark did, in fact, give Jefferies information concerning the impending rate cut for the CPT code under which the MCOT™ device is billed, which is tantamount to providing information specific to CardioNet and, perhaps, one or two of its closest competitors.

(d)     Defendants had no basis to and were reckless in disparaging the Jefferies April 24 Report when, in fact, the information contained in the Report was provided by Highmark and other industry insiders. Rather than investigate the facts set forth in the April 24 Report, as set forth above, defendants thwarted communication with Jefferies, made a conscious decision not to call any of Jefferies analysts, and instead attacked the Report in an effort to discredit Mr. Kennedy, Jefferies and the information contained in the Report.

**B.      The April 30, 2009 Press Release and Conference Call**

76.     On April 30, 2009, CardioNet issued a press release with its first quarter 2009 financial results. The Company announced that revenues for the first quarter of 2009 increased to $35.7 million compared to $25.5 million in the first quarter of 2008, a 40.3% increase, and that gross profit increased to $23.9 million in the first quarter of 2009, or 66.9% of revenues, compared to $15.9 million in the first quarter of 2008, or 62.6% of revenues. Commenting on the Company's financial results, defendant Galvan stated that "[g]ross margins continued to benefit

from the positive shift in sales mix towards MCOT™ along with ongoing improvements in our efficiency and productivity."

77.     In the same press release, defendant Thurman is quoted as stating:

We are pleased to announce another quarter of strong results, demonstrating our ability to deliver earnings while also investing in strategic initiatives to increase market share and deliver world class service to our prescribing physicians and patients. During the quarter we made substantial progress in the expansion of our sales force and the development of our corporate infrastructure, including enhancements to our customer service unit. Overall, our financial and operating performance in the quarter reflects the continued strong adoption of the MCOT™ system in the healthcare community and our commitment to excellence in all areas of our business.

We continue to view 2009 as an inflection point in our business and believe that we can achieve accelerated growth and profitability in 2010 and beyond through strategic investments in our sales organization and corporate infrastructure.

*       *       *

The future looks very promising for CardioNet. We have made concrete progress in expanding our leadership position in wireless cardiac monitoring and establishing our first adjacent market business in clinical services through our pending merger with Biotel Inc. Looking forward, we expect to be well positioned to leverage our technical expertise, customer service and monitoring infrastructure to be the clear leader in wireless medicine.

78.     With regard to the Company's financial outlook, defendant Thurman stated:

Based on our first quarter results, along with the continued strong outlook for our core business, **we are reaffirming our 2009 financial guidance of revenue of $170.0 to $175.0 million and earnings of $0.69 to $0.73 per diluted share excluding any impact of net operating losses, other tax related items, and any nonrecurring charges**. This also excludes the $0.01 per share dilutive impact that we are anticipating as a result of the Biotel Inc. acquisition, which we expect to close mid-year. **Beyond 2009, we are comfortable with our previous guidance of revenue growth of at least 50% combined with earnings growth of 100% in 2010, with earnings per diluted share that could reach $2.00 in 2011.**

79.     After the release of its first quarter 2009 financial results, CardioNet hosted a conference call for analysts, media representatives and investors. According to CW1, CardioNet

blocked Jefferies analysts from this call following the issuance of the April 24 Report, and the

conference call transcript confirms that no analyst from Jefferies participated in the call, even

though it had initiated coverage of CardioNet on April 24, 2009.

80.     During the call, defendant Thurman stated:

During the first quarter, we made excellent progress in the execution of our 2009
plan. We continue to leverage the clinically proven superiority of the MCOT™
system and our world-class customer service and monitoring organizations to
effectively expand on the $2 billion cardiac monitoring market.

81.     Defendant Galvan discussed the revenues derived from the MCOT™ system:

Revenue from the MCOT system continues to grow as a percent of revenue,
representing 88% of revenue in the first quarter, compared to 86% in the fourth
quarter of 2008 and 79% of revenue in the first quarter of last year.  Offsetting
this growth are declines in event in [sic] Holter revenue as we continue to convert
physicians to the new technology.

82.     With respect to the guidance provided to the market, defendant Galvan stated:

Looking forward and turning to our guidance, I would like to provide some
additional detail around our outlook for 2009.  As we indicated in our earnings
release, **we are reaffirming our 2009 outlook of $0.69 to $0.73 per diluted
share**, excluding the impact of net operating losses, which does not take into
consideration a potential, $0.01 per share dilution that may occur due to the
pending merger with Biotel.

With respect to the quarters in 2009, we expect sequential quarterly revenue
growth to be consistently in the low to mid teens.  As for the pace of earnings
across the year, we continue to anticipate that our quarterly EPS flow in the first
half of 2009 will be very similar to that which we experienced in 2008 and that
the growth in EPS in 2009 compared to 2008 incurs entirely in the second half of
2009.

This earnings phasing is primarily driven by increased expense due to the new
account executives coming onboard in the first half of this year, with limited
productivity expected until the latter part of the year.

83.     During the conference call defendants Thurman and Galvan further addressed the

issue raised in Jefferies' April 24 Report of an imminent reimbursement rate cut by Highmark.

Defendant Thurman stated:

Now, let me comment on the reimbursement front, another area where CardioNet has taken on the leadership role in the industry.  QI 2009 was the first quarter that included Category 1 CPT codes and reimbursement rates for the professional and technical components of our MCOT™ system, setting the stage for a more simplified and stable reimbursement environment going forward.

In addition, the validation provided by having dedicated CPT codes has been positive reinforcement in our efforts to establish coverage with the remaining commercial payors.  Year-to-date, we have added 11 new payors, representing over 4 million new covered lives.  As such, CardioNet now has contracts covering nearly 200 million lives. Coupled with the fact that CardioNet will soon have been used on a 0.25 million patients, nearly seven times that of any MCOT competitor, it is clear that we've moved well beyond the experimental or investigational stage.

We have established the MCOT™ as the most cost beneficial means of providing wireless cardiac monitoring.  Everyone benefits greatly, the payors, the physicians and, most importantly, the patients.

84.     Defendants continued to deny that a rate cut was imminent when specifically

asked by analysts:

Amit Bhalla [of Citigroup]: … And maybe, just kind of talk to us about what your assumptions for reimbursement going forward and I'll jump back. Thanks.

Defendant Thurman: **In our three-year -- in our earnings projections that we put out through 2011, we have assumed some reduction in reimbursement that's factored into the earnings projections we put out there**.  As a matter of process, **we really work hand in glove with Highmark and with CMS on an ongoing basis**.  **And as Phil** [referring to Philip G. Leone, Senior Vice President, Reimbursement Services, Regulatory and Compliance] **went through the detail, candidly the argument is just as strong that we could justify a higher level of reimbursement as there would be any reduction**.  So that's the way the process works.  **We know of no reason today to expect any significant change in the reimbursement levels**.

*        *        *

Bob Hopkins [of Bank of America-Merrill Lynch]: … Okay, Thanks.  And then just wanted to ask you couple on reimbursement.  First, the back and forth with Highmark over the course of the last week, did you, ask them specifically about your reimbursement rate and whether or not it was under review at the current time?

Defendant Galvan: No.  **We really have an outstanding relationship with Highmark and a dialogue with that is weekly if not more frequently and this always happens**.  And Phil went through the kind of the detailed explanation of how

reimbursement is determined and **we have no question that whether if there was any meaningful or anticipated change in the reimbursement rates, that we would be well aware of that. That's the professional relationship that exists with Highmark.  And so at this point in time, we see nothing that would significantly change our current way to reimbursement**.

Bob Hopkins: So you did ask them specifically about whether or not reimbursement rate was under review at the current time and they said no?

Galvan: They just said, we know nothing based on our relationship with Highmark that would anticipate any change in reimbursement whatsoever.

*        *        *

Bob Hopkins: Okay. And then just one other thing on Highmark, just to clarify, in the past, has there been sort of an annual review process or was there just been semi-annual or has there have been any consistency to the process in the past?

Defendant Thurman: Yeah, the consistency to the process has been what I stated before and that there is an ongoing relationship between Highmark and ourselves and frankly with CMS.  **But there is not a scheduled event**, we are – you have to remember that CardioNet is really the pioneer in this whole area of wireless medicine.  And I think **there has been this absolutely professional and collaborative relationship between the payors and us on justifying and understanding the cost benefit of what we do**. So, it's really – just I can't –

Bob Hopkins: Okay.

Defendant Thurman: **Say it one more time, that it's just an ongoing and a very collaborative effort between the parties that are involved**.

85.    Defendants April 30, 2009 statements contained in ¶¶ 76-84 were materially false and misleading in at least the following respects:

(a)    Defendants' statements denying that a rate reimbursement review was underway (*e.g.*, "there is not a scheduled event"), promoting the notion that CardioNet had a positive, professional relationship with Highmark and other payors (*e.g.*, "there has been this absolutely professional and collaborative relationship between the payors and us on justifying and understanding the cost benefit of what we do," "[w]e really have an outstanding relationship with Highmark," we work "hand in glove" with Highmark and CMS, and "we have no question

34

that whether if there was any meaningful or anticipated change in the reimbursement rates, that we would be well aware of that. That's the professional relationship that exists with Highmark."), and denying an imminent reimbursement rate cut (*e.g.*, "at this point in time, we see nothing that would significantly change our current way to reimbursement" and "[w]e know of no reason today to expect any significant change in the reimbursement levels") were materially false and misleading, and made recklessly because, among other reasons, CardioNet purposefully failed to contact anyone from Jefferies concerning the sources of the information contained in the Report, and even went so far as to ban Jefferies from attending subsequent conference calls with investors. Thus, the statements were made without a reasonable basis, and evidenced defendants' willful and/or reckless misconduct in making the statements.

(b)     Defendants' statements concerning the professional relationships between CardioNet and Highmark and CardioNet and other payors were further materially false and misleading because had the Company had the type of positive relationship with Highmark that defendants represented it had, defendants would have learned that (a) Mr. Kennedy had received information from Dr. Bloschichak, and (b) Highmark had indicated to Jefferies that a reimbursement rate cut for the CPT Code under which the MCOT$^{TM}$ device was billed was imminent. As CW1 confirmed, CardioNet management "overstated their relationship with Highmark."

(c)     Defendants' statements reiterating the guidance they had provided to the market on February 17, 2009 were also materially false and misleading, and made without a reasonable basis, because, among other reasons, the guidance factored in only a relatively small long-term reimbursement rate decline but, had defendants spoken with Mr. Kennedy or others at Jefferies concerning the April 24 Report, they would have learned that a significant

reimbursement rate cut was imminent, and that this key assumption underlying their market guidance was materially in error.  Defendants' statements in this regard were further materially false and misleading because, through the reiteration of the Company's guidance, defendants gave the investing public the impression that Jefferies did not receive <u>any</u> information from Highmark regarding an impending rate cut and that the Report was false.  While Highmark may or may not have provided information to the Jefferies analysts specifically about CardioNet, it did provide information regarding an impending rate cut for the CPT code under which the MCOT™ device is billed, which was in essence information specific to CardioNet.  CW1 and CW2 explained that information was provided to Jefferies by Dr. Bloschichak of Highmark, and CW1 further explained that Highmark did, in fact, give Jefferies information concerning the impending rate cut for the CPT code under which the MCOT™ device is billed, which is tantamount to providing information specific to CardioNet and, perhaps, one or two of its closest competitors.

        (d)      Defendants' statements that "we really work hand in glove with Highmark and with CMS on an ongoing basis" and that "candidly the argument is just as strong that we could justify a higher level of reimbursement as there would be any reduction" were also materially false and misleading because, in addition to the reasons stated above, defendants had no basis to lead the market to believe that a reimbursement rate increase was just as likely as a reimbursement rate decrease.  Indeed, the large sales of stock by Sweeney, Guidant and other early investors in the IPO and secondary offering, which occurred just a few months after the IPO, suggest that the Company's founder and its early investors anticipated that the reimbursement rates set by commercial payors, Highmark and eventually the CMS would

decline significantly as the MCOT™ device gained further acceptance and penetration in the market.

(e)   Defendants' statements that the Company had assumed only "some reduction in reimbursement" in setting its revenue and earnings projections through 2011, "the argument is just as strong that we could justify a higher level of reimbursement as there would be any reduction," "at this point in time, we see nothing that would significantly change our current way to reimbursement," and "[w]e know of no reason today to expect any significant change in the reimbursement levels," were further materially false and misleading because CardioNet had failed to adequately apprise itself of likely reimbursement rate cuts by its commercial payors, who collectively paid approximately 66% of the Company's revenues on a quarter-to-quarter basis by April 2009.  Thus, while much of the question and answer portion of the April 30, 2009 conference call was devoted to questions concerning Highmark and the reimbursement rate for the MCOT™ system under Medicare, defendants' statements were also materially false and misleading with respect to reimbursement rates being set or re-set by commercial payors.

(f)   Defendants' statements concerning the increasing level and percentage of the Company's revenues that were derived from its MCOT™ system, and offsetting declines from its Holter and event devices, were materially misleading because, as more Medicare claims were made based on usage of the MCOT™ system – including claims that may have been outside the strict limitations of coverage under the Highmark Medical Policy Bulletin revisions issued in January and April 2009, referred to in ¶¶ 50-52 above – such increasing and potentially abusive claims would increasingly push Highmark to review and cut the reimbursement rate applicable to the MCOT™ system, hurting the Company's future revenues and earnings.  The statements were further materially misleading because to the extent CardioNet pushed the usage

37

of the MCOT™ system, with its higher reimbursement rate, as opposed to usage of Holter and event devices, which had lower reimbursement rates, in contradiction of Highmark's limitations on usage of the MCOT™ system, that would only temporarily make the Company's reported revenues and earnings appear better, and it would factor into Highmark's and/or CMS's decision to significantly reduce the reimbursement rates applicable to the MCOT™ system.

**C.     The May 12, 2009 Bank of America Health Care Conference**

86.     On May 12, 2009, CardioNet participated in the Bank of America Health Care Conference.  Among other statements made during the conference, during the question and answer portion of the presentation, defendant Thurman again denied that a rate cut from Highmark was imminent, and he point-blank accused Jefferies of failing to do proper "due diligence."  In response to a questions about how the Company would provide comfort to people about the current reimbursement situation, defendant Thurman stated:

> **Well obviously we've been inundated in the last two weeks with this question since an analyst came out with a report claiming that he had spoken with the people of Highmark and that there was a pending $200 decrease in reimbursement**.  For starters that analyst has never spoken with Cardionet before that report came out or afterwards.  We have about seven other analysts who cover the company, all of whom Marty [referring to Defendant Galvan] and I are in constant dialogue with.  Most, if not all of them, have actually visited the company and sat down with Marty and me, so, **we certainly wish that that analyst had taken the extra effort and done the proper due diligence, which he did not**.  Now obviously we've been in constant dialogue with Highmark, but that's not unusual.  We're in regular dialogue with Highmark all the time.  Highmark established the current reimbursement rate several years ago, and then the code on the reimbursement rate was published, you know, at the beginning of this year so, you know, four months ago.  **In speaking with the Highmark people, they have been unequivocal in their comments.  That they provided this analyst with no information whatsoever on CardioNet and never spoke to them about price.   So that's the Highmark position**.  With regard to what the current situation is, it was always expected that we would migrate from carrier pricing to national pricing and we thought that that time frame would be by 2010.  We still think that's the case.  Highmark has never suggested to us that they're going to decrease the price, but never suggested to us that they're going to raise the price, but you would expect them to do that.  In the past they have always

38

communicated with us anywhere from 45 days to three months in advance of any pricing consideration.

\*       \*       \*

So I'm telling everybody here, you know everything that I know.  **We've never gotten any signal from Highmark that they're considering a price reduction. Our interface with them has been nothing less than extraordinary since the company was created.  We're in absolute constant dialogue with the individual at Highmark who would be the decision maker, who absolutely denies that they provided any information to this analyst whatsoever.**

\*       \*       \*

Unidentified Questioner: So, I just want to follow up because I think its an interest point and that was the point of your press release.  You said that they didn't provide any information to that analyst, but probably the more interesting question is: did you ask them point blank, "Is your reimbursement rate under review currently?"

Defendant Thurman: Oh we know it is.  I just explained the whole process. You know, they are, you know, you know, we're in this process of hand off from Highmark to the CMS, so, that's procedure.  Whether you consider that "under review" or not I guess is subject to interpretation. But they have told us that there is nothing eminent [sic.] in the way of change.

\*       \*       \*

Unidentified Questioner: Ok. So if hypothetically there, so I guess just to be clear:  We don't know what CMS is going to do this July.  Highmark is, as they do from time to time, they do review the status of reimbursement and right now the status of reimbursement is officially under review.  We're in one of those 40 to 45 day periods…"

Defendant Thurman: No, I think that's, **no I didn't say that**."

Unidentified Questioner: Ok.

Defendant Thurman:  You also started your statement by saying "hypothetical." It's a little difficult to deal with hypothetical.  **There is no formal review of our pricing underway at Highmark that we are aware of, nor any, as they've said, nor any pending change**.

Unidentified Questioner: Ok, yeah, because in the past you said you usually get 40 to 45 day sort of discussion period or…

Defendant Thurman: No they always have notified us at least 5 days in advance of any change.  There's been no notification of that whatsoever.

Unidentified Questioner: Ok … Anything more specific you'd like to talk about in terms of [Highmark]?  Exactly what we're going to see there?

Defendant Thurman: …I don't think I need to apologize, back on this reimbursement thing.  I mean, no one's more frustrated that this thing has put a question over our company than we are.  We are, no matter what happened here, **Cardionet, you know, it is kind of the victim of a train wreck that, you know, we didn't participate in**. The company is performing extraordinarily well.  You can see the growth.  We are well ahead of our plan for hiring and integrating new sales reps, the number of new physician practices that are adopting the ((M-Cot)) technology is increasing dramatically.  We would love nothing more than for Highmark to come out with a definitive statement.  I also will suggest.  **I also will tell you that FNRA and we believe the SEC is going to investigate the circumstances behind this.  You know, we lost 20% of our market cap almost overnight, you know.  If the analyst was right, I guess he'll be vindicated. If it was wrong for any reason, we all ought to know what happened**.

87.     Defendant Thurman's statements made at the May 12, 2009 Bank of America Conference were materially false and misleading in at least the following respects:

(a)     Defendants' statement that Jefferies and its analyst, Mr. Kennedy, had not conducted "proper due diligence" was materially false and misleading, and made recklessly because, among other reasons, CardioNet purposefully failed to contact anyone from Jefferies concerning the sources of the information contained in the Report, and even went so far as to ban Jefferies from attending subsequent conference calls with investors.  Thus, the statement impugning Jefferies' "due diligence" was made without a reasonable basis, and evidenced defendants' willful and/or reckless misconduct in making the statement.

(b)     Defendants' statements concerning the professional relationships between CardioNet and Highmark were further materially false and misleading because had the Company had the type of positive relationship with Highmark that defendants represented it had, defendants would have learned that (a) Mr. Kennedy had received information from Dr. Bloschichak, and (b) that Highmark had indicated to Jefferies that a reimbursement rate cut for

40

the CPT code under which the MCOT$^{TM}$ device is billed was imminent.  As CW1 confirmed, CardioNet executives "overstat[ed] their relationship with Highmark."

(c)      Defendants' statements that "[w]e've never gotten any signal from Highmark that they're considering a price reduction" and that [w]e're in absolute constant dialogue with the individual at Highmark who would be the decision maker, who absolutely denies that they provided any information to this analyst whatsoever" were materially false and misleading because, among other reasons, as explained by CW1 and CW2, the person who was responsible for setting Highmark's reimbursement rate, Dr. Bloschichak, had provided Jefferies with information relative to a rate reduction in the CPT code applicable to CardioNet's product. The statements were further materially false and misleading because they gave the investing public the impression that Jefferies did not receive <u>any</u> information from Highmark regarding an impending rate cut and that the Report was, therefore, false.  Finally, defendant Thurman's statements denying that Highmark was conducting a reimbursement rate review were false, as evidenced by the fact that a reimbursement rate change was announced just two months later, on July 12, 2009, when the Company itself admitted that it <u>had been aware</u> Highmark was conducting a review of the reimbursement rate for the MCOT$^{TM}$ device.

(d)      Defendant Thurman's statement that "I also will tell you that FNRA and we believe the SEC is going to investigate the circumstances behind this" was further materially false and misleading because, among other reasons, defendant Thurman failed to disclose that <u>he was the person who was asking the SEC and FINRA to investigate Jefferies</u>.  Indeed, according to the *Wall Street Journal* article*,* in early June, defendant Thurman sent formal letters to the SEC, Nasdaq and FINRA suggesting that the Jefferies report may have been part of a plot to

enrich CardioNet short sellers betting on a share-price decline and characterizing the April 24

Report as a "blatant and inappropriate manipulation of our company's stock."

        (e)    Defendant Thurman's statement that "For starters that analyst has never

spoken with Cardionet before that report came out or afterwards" was materially false and

misleading because (i) other personnel from Jefferies had spoken with CardioNet employees

several times in advance of the April 24 Report, albeit not on the subject of the imminent

reimbursement rate cut by Highmark, (ii) personnel from Jefferies called defendant Galvan, but

he did not return their calls, and (iii) any communications after issuance of the Report were

thwarted by CardioNet, whose executives refused to speak with anyone from Jefferies and

banned Jefferies analysts from participating in CardioNet conference calls with analysts.  In this

regard, CardioNet's exclusion of Jefferies from conference calls was part of the defendants'

scheme to prevent the disclosure of accurate information, prevent pointed questioning about

CardioNet's relationship with Highmark, and/or conceal the reality of the status of Highmark's

reimbursement process and decision.

**D.**    **The May 18, 2009 Press Release**

        88.    On May 18, 2009, CardioNet issued a press release announcing a reimbursement

rate from Highmark for its MCOT$^{TM}$ services.  The press release stated in relevant part:

> CardioNet, Inc. today announced that last week Highmark Medicare Services
> posted a reimbursement rate for CPT code 93229, Mobile Cardiovascular
> Telemetry Services, of $1,123.07 at:
> www.highmarkmedicareservices.com/partb/reimbursement/talc-2009.html.
>
> Highmark Medicare Services had not posted a reimbursement rate for CPT code
> 93229 since the CPT code was published by the AMA in October of 2008.  The
> reimbursement of $1,123.07 reflects the same rate that the Company announced
> in November 2008 on attaining the CPT code.

89. On this news, the price of CardioNet's stock increased by $2.50 per share, to close at $19.60 per share on May 19, 2009 – a one-day increase of 15%.

90. While technically accurate, the May 18, 2009 press release was materially misleading because it falsely implied that (a) there had been no basis for the statements made in Jefferies' April 24 Report, (b) the posting of the reimbursement rate indicated that the $1,123.07 rate would remain in place at least through the end of 2009, and (c) Highmark was not undertaking and would not undertake any further review of the reimbursement rate for 2009. However, defendants issued the press release without ever once attempting to speak with Mr. Kennedy or Jefferies to ascertain the basis for the statements made in the April 24 Report. Instead, defendants purposefully and willfully excluded Jefferies' analysts from their analyst conference calls, and sought to discredit them in the market – even going so far as contacting and writing letters to the SEC, Nasdaq and FINRA to initiate an investigation of Jefferies.

91. In this connection, according to the *Wall Street Journal* article, defendant Thurman wrote letters in early June 2009 to the SEC, Nasdaq and FINRA suggesting that Jefferies' April 24 Report may have been part of a scheme to enrich short sellers of CardioNet stock. Notably, this followed defendant Thurman's presentation at the May 12, 2009 Bank of America conference, during which he stated: "I also will tell you that FNRA and we believe the SEC is going to investigate the circumstances behind this." Thus, even into June 2009, CardioNet was continuing its smear campaign against Mr. Kennedy and Jefferies. Ironically, while the smear campaign was successful in one sense – as it was instrumental in getting Mr. Kennedy to resign his analyst position at Jefferies – it was unsuccessful in a far different sense, since the Company's later announcements of June 30 and July 12, 2009, would eventually show that CardioNet had <u>no basis whatsoever</u> to question either the "due diligence" that Mr. Kennedy

43

had conducted or the information contained in the April 24 Report about Highmark planning to

reduce drastically its reimbursement rate for the Company's MCOT™ services.

92.     The May 18, 2009 statement was further materially misleading materially

because, as more Medicare claims were made based on usage of the MCOT™ system –

including claims that may have been outside the strict limitations of coverage under the

Highmark Medical Policy Bulletin revisions issued in January and April 2009, referred to in ¶¶

50-52 above – such increasing and potentially abusive claims would increasingly push Highmark

to review and cut the reimbursement rate applicable to the MCOT™ system, hurting the

Company's future revenues and earnings.  The statement was further materially misleading

because to the extent CardioNet pushed the usage of the MCOT™ system, with its higher

reimbursement rate, as opposed to usage of Holter and event devices, which had lower

reimbursement rates, in contradiction of Highmark's limitations on usage of the MCOT™

system, that would only temporarily make the Company's reported revenues and earnings appear

better, and it would factor into Highmark's and/or CMS's decision to significantly reduce the

reimbursement rates applicable to the MCOT™ system.

### THE COMPANY FINALLY DISCLOSES THE TRUTH
### ABOUT THE REIMBURSEMENT PROCESS AND RATES

93.     On June 30, 2009, after the close of the market, the Company issued a press

release lowering the financial guidance defendants had previously provided, stating that the

revenue guidance "is based on lower than anticipated commercial reimbursement rates."  The

press release,  entitled "CardioNet, Inc. Updates Full Year 2009 Guidance, Industry Dynamics

and Future Strategies," stated in pertinent part:

> The Company is revising its revenue guidance for full year 2009 to reflect growth of
> 30%-33% compared to the full year 2008 and now expects revenue for 2009 to be in
> the range of $156 million to $160 million.  **The revenue guidance is based on**

**lower than anticipated commercial reimbursement rates**.  Volume growth continues to be significant, but is expected to be somewhat lower than the Company had anticipated.  The Company believes that the long-term outlook for its business and the wireless healthcare industry remains highly attractive, and CardioNet intends to continue its previously announced investments in its sales and marketing organization, product development and clinical research programs.  Other areas of spending will be curtailed and restructured to partially offset the negative price and volume dynamics.  **Accordingly, the Company is now expecting adjusted earnings per diluted share for full year 2009 to be in the range of $0.30 to $0.35 excluding any impact of NOLs, other tax related items and any nonrecurring charges, with the majority of the impact affecting results in the second half of 2009**.  At this time, the Company is not in a position to provide revenue or earnings guidance for 2010 and 2011.  The Company may issue such guidance if greater certainty develops with respect to long-term reimbursement and physician adoption. CardioNet's balance sheet remains strong with no debt and substantial cash.

94.     With this news, the prior guidance of 40% growth in revenues in 2009 compared to 2008, and 75% growth in earnings in 2009 compared to 2008, was lowered to 30%-33% revenue growth in 2009 over 2008 (to $156 to $160 million in revenues for the year) and to 52%-56% growth in earnings in 2009 over 2008 (to $0.30 to $0.35 per share).  But even with this reduced revenue and earnings growth disclosures, defendant Thurman still reassured the investing public that the Company was "structured to produce long-term shareholder value [in a highly cost conscious healthcare reform market] environment."

95.     On July 1, 2009, the Company held an investor call where defendants reiterated that the update to the 2009 full year guidance was a result of "the Company being negatively impacted by downward pressure on commercial reimbursement rates greater than previously planned."  Participating on this call were defendants Thurman and Galvan, on behalf of the Company, and analysts from Citigroup, Leerink, Bank of America (where defendant Thurman had presented on May 12, 2009), Cowen & Co. (where defendants Thurman and Galvan had presented on March 17, 2009) and Thomas Weisel Partners.  Still, Jefferies was not invited or allowed to attend CardioNet's conference calls.

96.     Defendant Thurman stated that 98% of the reduction in the Company's projected revenue for 2009 was a result of the Company being "negatively impacted by downward pressure on commercial reimbursement rates greater than previously planned."  He stated, however, that the current pricing dynamics in the commercial area "should be, while unfortunate, **a mere bump in the road** for those committed to the potential of wireless medicine," and that even with the commercial payor reductions, "**[w]e remain very enthusiastic about the long-term success of CardioNet**."  When asked specifically about the basis for the guidance the Company was providing as of that time, defendant Thurman refused to answer, stating that "because of the changing environment and other reasons, we don't want to be more specific." However, he did acknowledge that the new guidance was based on the assumptions that (a) "what we are seeing currently as continuing for the remainder of the year" and (b) "**Medicare reimbursement rates will remain stable**."

97.     Defendant Thurman further stated, in response to a question from Leerink's analyst, "[a]s we have stated consistently in the past, we have an outstanding dialogue undergoing with both our regional carrier [meaning Highmark] as well as with CMS."  Thus, even as late as July 1, 2009, defendants continued to make broad, positive statements about their relationship with Highmark, and specifically assured investors that Medicare reimbursement rates would "remain stable," which statements were materially false and misleading when made. Indeed, during the July 1st conference call, defendant Thurman further sought to reassure the market by citing to a study that had allegedly concluded that CardioNet should have a $1,300 reimbursement rate from Medicare (compared to the then-existing $1,123 rate).

98.     The disclosures made in the press release issued after the close of the market on June 30 and during the conference call on July 1 led to a drastic decline in the price of CardioNet

stock on July 1, 2009.  The price of CardioNet stock fell $6.75 per share, from $16.32 per share on June 30, 2009 to $9.57 per share on July 1, 2009, a one-day decline of 41% on volume of 23.4 million shares, over 24 times the average three-month daily average.  However, the full truth about CardioNet, and specifically the critical Medicare reimbursement rate for MCOT™ services, still remained concealed and misrepresented by defendants.

99.     It was not until July 12, 2009 that the full truth was revealed.  On July 12, 2009, defendants disclosed that Highmark was adjusting its reimbursement rate for MCOT™ services. In a press releases entitled "CardioNet, Inc. Announces Highmark Medicare Services Reimbursement Reduction Regarding CPT Code 93229," defendants revealed:

> CardioNet announced today that on Friday, July 10, 2009, it received a letter from Highmark Medicare Services stating effective September 1, 2009 Highmark was adjusting its reimbursement rate for MCOT™ services **to $754 per service**. This reimbursement change affects all providers covered under CPT Code 93229.

> Randy Thurman, Chairman, President and CEO of CardioNet, Inc., said, "CardioNet strongly believes that this reduction is unjustified and will immediately pursue with Highmark and CMS a methodology that appropriately values MCOT™ technology and related services. This review with Highmark and CMS will reinforce for Medicare the demonstrated benefit of Mobile Cardiac Outpatient Telemetry™ in detecting cardiac arrhythmias and improving the health of Medicare beneficiaries.

> We are strong proponents and supporters of the very real need to manage the cost of healthcare.  We believe that early diagnosis through innovation in technology is fundamental to the provision of high quality health care and a cost efficient US healthcare system.  Nearly 250,000 patients have been enrolled in MCOT™ to date with physicians and patients greatly benefiting from the CardioNet MCOT™ technology and service.  We have made it our mission at CardioNet to educate the medical community about the value of wireless medicine in the diagnosis and detection of disease and we will further increase our efforts to demonstrate its potential to substantially lower costs to both patients and payors."

> CardioNet has previously indicated that **while it had been aware Highmark Medicare Services was conducting a normal review of the reimbursement rate for MCOT™**, it had received no indication of any rate adjustment or the specific timing of a Highmark decision prior to being notified on July 9, 2009.  During a July 9 communication, Highmark reported that CardioNet would receive a letter notifying

it of a change in reimbursement including the exact amount of the change.  That letter arrived July 10, 2009.

Based on the Company's ongoing discussions with Highmark and CMS and the Company's desire for a re-evaluation of reimbursement that it is pursuing, but cannot assure will be realized, **the Company believes it is prudent to withdraw previously stated 2009 guidance at this time**.

100.    Notably, the $754 reimbursement rate finally disclosed in CardioNet's July 12, 2009 press release fell precisely within the $700 to $1,000 range provided in Jefferies' April 24 Report.

101.    With this disclosure, CardioNet's stock fell another $2.96 per share, falling from its close on July 10, 2009 of $8.83 per share to $5.87 per share on July 13, 2009 – a one-day decline of 34% on volume of 11.8 million shares, over seven times the average three-month daily average.

102.    As shown above, throughout the Class Period, defendants made false and misleading statements about the potential for Highmark to reduce its reimbursement rates for the Company's MCOT$^{TM}$ device and made baseless and aggressive projections for 2009 through 2011.  Indeed, while the Company admitted in the July 12, 2009 press release that it had been aware Highmark was conducting "a normal review of the reimbursement rate for MCOT$^{TM}$," during the May 12, 2009 health care conference, defendant Thurman **denied** that Highmark was conducting any such review.  Further, from the outset of the Class Period through the time of the June 30 and July 1, 2009 disclosures, the Company had failed to adequately disclose to the market the likely reimbursement rate cuts by its commercial payors, who collectively paid approximately 66% of the Company's revenues on a quarter-to-quarter basis by April 2009.

103.    Moreover, as further set forth in detail above, defendants recklessly downplayed the potential for a reimbursement rate cut and conducted a systematic, intentional smear

campaign against Mr. Kennedy and Jefferies stemming from Jefferies' April 24 Report by, *inter alia*: (a) materially overstating CardioNet's relationship with Highmark, CMS and other payors; (b) questioning publicly Jefferies' purported motive in issuing the Report; (c) falsely denying that Highmark was conducting a reimbursement rate review; (d) falsely denying that Jefferies analysts had received any information from Highmark about a rate cut that would impact CardioNet; (e) prodding "friendly" analysts – which had "outperform" and "buy" recommendations out for CardioNet and who worked for investment banks that had underwritten and managed the Company's IPO and secondary stock offering (and, in the case of Citigroup, had also served as lead placement agent for its $110 million private financing in March 2007) – to write reports attacking Jefferies' April 24 Report; and (f) seeking to have the SEC, Nasdaq and FINRA initiate investigations into possible market manipulation by Jefferies.  Defendants' statements falsely assured the investing public that a significant reimbursement rate cut was neither imminent nor in the works, causing CardioNet's stock to trade at artificially inflated prices during the Class Period.  However, eventually, CardioNet was forced to withdraw its market guidance and announce the same type of drastic reimbursement rate cut that Jefferies had said was coming in its April 24 Report, leading to a market decline of 64% from June 30, 2009 to July 13, 2009.

## ADDITIONAL FACTS RELEVANT TO SCIENTER

104.   Each of the Individual Defendants (and, by imputation, CardioNet) acted with scienter in that, as set forth herein, each knew or recklessly disregarded that CardioNet's public statements issued during the Class Period were materially false and misleading.  The Individual Defendants were the senior management of the Company, and thus at all times were the ones with principal responsibility for ensuring that the Company's statements were accurate and

truthful. Yet, as the Company admitted on July 12, 2009, the Company was facing a rate reimbursement review by Highmark and a significant rate reimbursement cut, facts that defendants recklessly denied throughout the Class Period.

105.    As further demonstrated above, after the issuance of the April 24 Report, defendants embarked on a concerted campaign to discredit the information in the Report, as well as Mr. Kennedy's and Jefferies' "due diligence" and motives.  At the same time, defendants sought to falsely reassure the investing public that the statements in the April 24 Report were not true, and affirmatively stated that the Company (and Jefferies) had no information of a rate reimbursement cut by Highmark.

106.    Defendants' actions were even more egregious in light of the fact that the April 24 Report evidenced significant due diligence, and presented many indications that Highmark was going to lower the reimbursement rate.  First, CMS's recent decision to price the MCOT™ professional fee at $25 was indicative of an impending technical fee reduction.  This $25 professional fee compared to the $128 rate that Highmark previously paid for MCOT™'s professional component.

107.    Aside from the professional fee reduction, there were other factors, including the fact that MCOT™ costs were considered indirect costs, which increased the likelihood of a lower national technical fee, and the 2009 OPPS payment rate assigned to the technical component was $369 lower than current Highmark rate, which indicated that a rate cut by Highmark was looming.

108.    Defendants intentionally also set out to discredit Mr. Kennedy, Jefferies and the April 24 Report in ways other than through their own false and misleading statements.  Just after the April 24 Report was issued, Leerink, an underwriter for the Company's IPO and a manager

of its secondary stock offering, reiterated its "Buy" rating on CardioNet, and stated that "[t]his morning, we checked in with BEAT management who emphasized to us that they are confident no decision regarding a potential change to reimbursement is imminent based on their conversations today with Highmark senior medical personnel who are unaware of any final decisions."  Two days later, on April 26, 2009, Citigroup, the lead underwriter for the Company's IPO and sole book-manager for its secondary stock offering (and lead placement agent for the March 2007 private financing), issued a report maintaining its "Buy" rating and questioning the legitimacy of Jefferies' April 24 Report and stating that CardioNet management had been in contact with Highmark and "saw no signal of pending reimbursement changes." Notably, however, according to the *Wall Street Journal* article, the Citigroup analyst author Amit Bhalla relied entirely upon representations from CardioNet's management in writing his analysis on this point, and never even tried to contact Highmark before issuing Citigroup's report on CardioNet.

109.    Defendants further halted all communications with Jefferies analysts after the April 24 Report.  Jefferies analysts were blocked from the Company's April 30, 2009 analyst conference call and, although Jefferies analysts were allowed to listen in on the most recent CardioNet conference calls, defendants continued to refuse to take any questions from Jefferies. CardioNet's exclusion of Jefferies from conference calls was part of the defendants' scheme to prevent the disclosure of accurate information, prevent pointed questioning about CardioNet's relationship with Highmark, and/or conceal the reality of the status of Highmark's reimbursement process and decision.  Such conduct, at a minimum, constituted willful blindness on the part of defendants CardioNet, Thurman and Galvan.

110.     By contrast, as alleged above, defendants communicated with analysts from many other firms – including the investment banks that served as underwriters of the Company's IPO. Moreover, according to CW1, defendant Thurman and others from CardioNet were "on the road a lot" and at the May 12, 2009 Bank of America Health Care Conference spoke to many different analysts and constituencies about Jefferies and the information contained in the April 24 Report.

111.     In order to further discredit the April 24 Report and Jefferies, in early June, defendant Thurman sent letters to the SEC, Nasdaq and FINRA suggesting that the Jefferies report "may have been part of a plot to enrich CardioNet short sellers bettering on a share-price decline." According to the *Wall Street Journal* article, the letters stated "this strikes me as blatant and inappropriate manipulation of our company's stock," stated that the Report was suspect "given its apparent inaccuracies," and questioned "whether it was written with the intent of driving down our stock price."

112.     Defendants' scienter is further evidenced by the fact that they consistently misrepresented the nature of the information that Jefferies received from Highmark. According to CW1, despite the fact that CardioNet refused to communicate with Jefferies, CardioNet was telling others on the Street that Jefferies had never spoken with Highmark. CW1 stated that "[t]he story kept changing on Jefferies about what we did and didn't do. CardioNet initially went out and told people that we made it up, like literally made it up." CardioNet's story, however, began to change once it could no longer credibly claim that Jefferies had not spoken to Highmark in connection with the Report. CardioNet, which had first claimed that Highmark never provided Jefferies with any information, thereafter took the position that Jefferies had misrepresented themselves to the Highmark.

## LOSS CAUSATION/ECONOMIC LOSS

113.    Defendants' fraudulent scheme and misrepresentations and omissions concerning

an impending reimbursement rate cut and CardioNet's ability to meet earnings estimates caused

the price of the Company's stock to be artificially inflated during the Class Period.  When

defendants' prior misrepresentations and fraudulent conduct were disclosed and became

apparent to the market, the price of CardioNet's common stock fell precipitously as the prior

artificial inflation came out.  As a result of their purchases of CardioNet's common stock during

the Class Period, the Pension Fund, plaintiff Solomon-Shrawder and other Class members

suffered economic loss, *i.e.*, damages, under the federal securities laws.

114.    Defendants' false and misleading statements had the intended effect and caused

CardioNet's common stock to trade at artificially inflated levels throughout the Class Period. As

a direct result of defendants' corrective statements on June 30 and July 12, 2009, CardioNet's

common stock price plummeted, falling from $16.32 per share on June 30, 2009 to $5.87 per

share on July 13, 2009 – **an overall decline of $10.45 per share, or 64%** – causing persons

who purchased CardioNet during the Class Period to suffer enormous losses on their stock

purchases.  This 64% decline in CardioNet's common stock price was a direct result of the

nature and extent of defendants' fraud finally being revealed to investors and the market.

115.    The timing and magnitude of CardioNet's common stock price declines negate

any inference that the loss suffered by plaintiffs and other Class members was caused by

changed market conditions, macroeconomic or industry factors or Company-specific facts

unrelated to the defendants' fraudulent conduct.  To the contrary, the economic loss, *i.e.*,

damages, suffered by plaintiffs and other Class members was a direct result of defendants'

fraudulent scheme to artificially inflate CardioNet's common stock price and the subsequent

significant declines in the value of CardioNet's common stock when defendants' prior

misrepresentations and other fraudulent conduct was revealed.

116.    These drops removed the inflation from CardioNet's stock price, causing real

economic loss to investors who had purchased the stock during the Class Period.

### APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD-ON-THE-MARKET DOCTRINE

117.    At all relevant times, the market for CardioNet's common stock was an efficient

market for the following reasons, among others:

(a)    CardioNet's stock met the requirements for listing, and was listed and

actively traded on the Nasdaq, a highly efficient and automated market;

(b)    as a regulated issuer, CardioNet filed periodic public reports with the

SEC;

(c)    CardioNet regularly communicated with public investors via established

market communication mechanisms, including through regular disseminations of press releases

on the national circuits of major newswire services and through other wide-ranging public

disclosures, such as communications with the financial press and other similar reporting

services; and

(d)    CardioNet was followed by several securities analysts employed by major

brokerage firms who wrote reports which were distributed to the sales force and certain

customers of their respective brokerage firms.  Each of these reports became publicly available

and entered the public marketplace.

118.    As a result of the foregoing, the market for CardioNet's common stock promptly

digested current information regarding CardioNet from all publicly available sources and

reflected such information in CardioNet's stock price.  Under these circumstances, all purchasers

of CardioNet's common stock during the Class Period suffered similar injury through their purchase of CardioNet's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

119.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements, and the forward-looking statements were joined with false and misleading statements of existing facts.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of CardioNet who knew that those statements were false when made.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

120.    Lead Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.

121.     Throughout the Class Period, defendants, individually and in concert, directly and indirectly, by use of the means or instrumentalities of interstate commerce, the mails and/pr the facilities of a national securities exchange:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material fact and/or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or;

(c)     Engaged in acts, practices, and a course of conduct that operated as a fraud or deceit upon Lead Plaintiff and other members of the Class in connection with their purchases of CardioNet stock.

122.     Defendants made material misrepresentations or omissions knowingly and/or in reckless disregard for the truth, with the purpose and effect of misleading the investing public with respect to CardioNet's true condition and prospects, and supporting the artificially inflated prices of CardioNet common stock.

123.     Defendants knowingly or in reckless disregard for the truth employed devices, schemes, artifices to defraud, and/or engaged in acts, practices and/or courses of business, with the purpose and effect of misleading the investing public with respect to the true condition and prospects of CardioNet, and supporting the artificially inflated prices of CardioNet common stock.

124.     Defendants carried out a plan, scheme and course of business that was intended to and did deceive the investing public, including Lead Plaintiff, plaintiff Solomon-Shrawder and other members of the Class, as alleged herein, to artificially inflate and maintain the market price

of CardioNet common stock and induce plaintiffs and other members of the Class to purchase or otherwise acquire CardioNet common stock.

125.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5.

126.    As detailed herein, in ignorance of the materially false and misleading nature of the reports and statements described above, Lead Plaintiff, plaintiff Solomon-Shrawder and the Class relied to their detriment on the statements described above and/or on the integrity of the market prices as reflecting the completeness and accuracy of the information disseminated in connection with their purchases of the securities.  Lead Plaintiff, plaintiff Solomon-Shrawder and other members of the Class would not have purchased CardioNet common stock at the prices they paid, if at all, had they known that the market prices of those securities were artificially inflated by the fraudulent conduct alleged herein.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against the Individual Defendants

127.    Lead Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.

128.    As set forth in Count I above, defendant CardioNet committed a primary violation of Section 10(b) of the Exchange Act and Rule 10b-5 through its knowing and/or reckless dissemination of materially false and misleading statements, and/or through its use of devices, schemes, artifices, practices and/or courses of conduct that operated as a fraud on the investing public.

129.    Each of the Individual Defendants possessed, directly or indirectly, the power to direct and/or control CardioNet's management and policies, including CardioNet's management

of and policies surrounding its public statements, and was therefore a controlling person of CardioNet within the meaning of Section 20(a) of the Exchange Act.

130.    Each of the Individual Defendants is liable, jointly and severally with and to the same extent as the Company under Section 10(b) of the Exchange Act and Rule10b-5 promulgated thereunder, to plaintiffs and the other members of the Class who purchased CardioNet securities.

131.    By virtue of the Individual Defendants' operational and management control of CardioNet's businesses and systematic involvement in the fraudulent scheme alleged herein, each of the Individual Defendants had the ability to prevent the issuance of the statements alleged to be false and misleading or cause such statements to be corrected.  Each of the Individual Defendants also had direct and supervisory involvement in the operations of CardioNet and, therefore, is presumed to have had the power to control or influence the particular statements giving rise to the securities violations alleged herein, many of which were made directly by the Individual Defendants, and exercised the same.

132.    As a direct and proximate result of the Individual Defendants' conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchase of CardioNet common stock.

133.    By virtue of the foregoing, the Individual Defendants are liable under Section 20(a) of the Exchange Act to plaintiffs and the other members of the Class, each of whom has been damaged as a result of the fraud alleged herein.

### PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of plaintiffs and other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including litigation costs, counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: February 19, 2010                    Respectfully submitted,

   /s/Jeffrey W. Golan
Jeffrey W. Golan
M. Richard Komins
Jeffrey A. Barrack
Beth T. Seltzer
**BARRACK, RODOS & BACINE**
3300 Two Commerce Square, Suite 3300
2001 Market Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838

                    and

J. Gerard Stranch, IV
Michael Stewart
Joe P. Leniski
Michael J. Wall
**BRANSTETTER, STRANCH & JENNINGS, PLLC**
227 Second Avenue North, Fourth Floor
Nashville, Tennessee 37201-1631
Telephone: (615) 254-8801
Facsimile: (615) 250-3970

*Attorneys for Lead Plaintiff and Co-Lead Counsel for the Class*

John T. Long
**CAVANAGH & O'HARA LLP**
407 East Adams
P.O. Box 5043
Springfield, Illinois 62705
Telephone: (217) 544-1771
Facsimile: (217)544-9894

*Other Attorneys for Lead Plaintiff*

Deborah R. Gross
**LAW OFFICES OF BERNARD M.
    GROSS, P.C.**
The Wanamaker Building, Suite 450
100 Penn Square East
Philadelphia, PA 19107
Telephone: (215) 561-3600
Facsimile: (215) 561-3000

*Attorneys for Plaintiff Dianne Solomon-Shrawder*