# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| DIANNE SOLOMON-SHRAWDER, Individually and on Behalf of All Others Similarly Situated, | : : : : : | CIVIL ACTION No. 2:09-cv-3894-SD |
| Plaintiff, v. | : : : : : | CLASS ACTION |
| CARDIONET INC., RANDY H. THURMAN and MARTIN P. GALVAN, | : : : : | ORAL ARGUMENT REQUESTED |
| Defendants. | : : : | |

## LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT

Jeffrey W. Golan
M. Richard Komins
Jeffrey A. Barrack
Beth T. Seltzer
**BARRACK, RODOS & BACINE**
Two Commerce Square, Suite 3300
2001 Market Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838

J. Gerard Stranch, IV
Michael Stewart
Joe P. Leniski
Michael J. Wall
**BRANSTETTER, STRANCH & JENNINGS, PLLC**
227 Second Avenue North, Fourth Floor
Nashville, Tennessee 37201-1631
Telephone: (615) 254-8801
Facsimile: (615) 250-3970

*Co-Lead Counsel for the Lead Plaintiff and Putative Class*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ..................................................................................... 1

    I.      The Company and Its Business.............................................................. 1

    II.    CardioNet's Source of Revenues – Third Party Payors.......................... 2

    III.   Prelude to the Fraud: CardioNet Provides Positive Guidance to the Market and Its Stock Price Increases.................................................... 3

    IV.   Jefferies & Co. Questions CardioNet's Guidance Assumptions ............ 4

    V.    Defendants' Fraudulent Statements ....................................................... 7

ARGUMENT ....................................................................................................... 16

    I.      Standards Governing a Motion to Dismiss ........................................ 17

    II.    The Complaint Adequately Alleges that Defendants Made Materially False and Misleading Statements throughout the Class Period.................................... 18

          A.    Defendants' Statements Concerning the Jefferies Report Were Materially False and Misleading............................................ 18

          B.    Defendants' Statements Concerning CardioNet's Relationship with Highmark and CMS Were Materially False and Misleading.................. 25

          C.    Defendants' Statements Reiterating the Company's Revenue and Earnings Guidance Were Materially False and Misleading ..................... 29

    III.   The Allegations of the Complaint Give Rise to a Strong Inference of Scienter... 32

          A.    Defendants' Actions and Statements Seeking to Discredit the Jefferies Report, Overstating Their Relationship with Highmark and CMS, and Reiterating Their Revenue and Earnings Guidance Demonstrate Their Scienter ..................................................................... 35

          B.    The Most Plausible Inference Is that Defendants Knew or Were Reckless In Ignoring the Falsity of Their Statements ............................... 42

C.      Stock Purchases by the Individual Defendants Do Not Weaken the
                Strong Inference of Scienter ................................................................... 45

IV.     The Statutory Safe Harbor Does Not Immunize Any of Defendants' April 30,
        2009 Statements from Liability .......................................................................... 46

CONCLUSION ..................................................................................................................... 53

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*Adams v. Amplidyne, Inc.*,
   No. 99-4468, 2000 WL 34603180 (D.N.J. 2000) ............................................................ 21

*Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.*,
   315 F. Supp. 2d 666 (E.D. Pa. 2004) .............................................................................. 33

*California Public Employees' Retirement System v. Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2004).................................................................................... 28, 29

*Eisenberg v. Gagnon*,
   766 F.2d 770 (3d Cir. 1985)........................................................................................ 30

*Frank v. Dana Corp.*,
   547 F.3d 564 (6th Cir. 2008) ...................................................................................... 23

*Grossman v. Novell, Inc.*,
   120 F.3d 1112 (10th Cir. 1997) .................................................................................. 51

*GSC Partners CDO Fund v. Washington*,
   368 F.3d 228 (3d Cir. 2004)........................................................................................ 50

*Helwig v. Vencor, Inc.*,
   251 F.3d 540 (6th Cir. 2001) ........................................................................... 23, 31, 32

*In re Aetna Inc. Sec. Litig.*,
   34 F. Supp. 2d 935 (E.D. Pa. 1999) ............................................................................ 40

*In re ATI Technologies, Inc. Sec. Litig.*,
   216 F. Supp. 2d 418 (E.D. Pa. 2003) ........................................................... 28, 47, 49, 52

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997)............................................................................ 19, 20, 30

*In re Campbell Soup Co. Sec. Litig.*,
   145 F. Supp. 2d 574 (D.N.J. 2001) ............................................................................. 40

*In re Cell Pathways, Inc.*,
   No. 99-725, 2000 WL 805221 (E.D. Pa. 2000) ............................................................ 32

*In re Discovery Laboratories Sec. Litig.*,
   No. 06-1820, 2007 WL 789432 (E.D. Pa. Mar. 15, 2007) .............................................. 20

*In re Discovery Laboratories  Sec. Litig.*,
　　No. 06-1820, 2006 WL 3227767 (E.D. Pa. Nov. 1, 2006) .......................................... 47, 50

*In re Kidder Peabody Sec. Litig.*,
　　10 F. Supp. 2d 398 (S.D.N.Y. 1998).......................................................................... 35, 36

*In re Lucent Technologies, Inc. Sec. Litig.*,
　　217 F. Supp. 2d 529 (D.N.J. 2002) .................................................................................. 18

*In re Nash Finch Co. Sec. Litig.*,
　　502 F. Supp. 2d 861 (D. Minn. 2007) .............................................................................. 52

*In re Next Level Systems, Inc. Sec. Litig.*,
　　No. 97 C 7362, 1999 WL 387446 (N.D. Ill. March 31, 1999) .......................................... 30

*In re NutriSystem Sec. Litig.*,
　　653 F. Supp. 2d 563 (E.D. Pa. 2009) .............................................................................. 47

*In re Par Pharmaceutical, Inc. Sec. Litig.*,
　　733 F. Supp. 668 (S.D.N.Y. 1990).............................................................. 23, 27, 28, 41

*In re Qwest Communications Int'l., Inc. Sec. Litig.*,
　　387 F. Supp.2d 1130 (D. Colo. 2005) .............................................................................. 43

*In re RAIT Financial Trust Sec. Litig.*,
　　No. 2:07-cv-03148-LDD, 2008 WL 5378164 (E.D. Pa. Dec. 22, 2008)......................... 40

*In re Scholastic Corp. Sec. Litig.*,
　　252 F.3d 63 (2d Cir. 2001)............................................................................................... 31

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
　　266 F. Supp. 2d 1150 (C.D. Cal. 2003) .......................................................................... 52

*In re Sprint Corp. Sec. Litig.*,
　　232 F. Supp. 2d 1193 (D. Kan. 2002) .............................................................................. 51

*In re Suprema Specialties, Inc. Sec. Litig.*,
　　438 F.3d 256 (3d Cir. 2006).............................................................................. 17, 33, 36

*In re System Software Associates, Inc.*,
　　No. 87 C 177, 2000 WL 283099 (N.D. Ill. Mar. 8, 2000) ............................................... 36

*In re Tel-Save Sec. Litig.*,
　　No. 98 CV 3145, 1999 WL 999427 (E.D. Pa. Oct. 19, 1999) .......................................... 40

*In re U.S. Bioscience Sec. Litig.*,
    806 F. Supp. 1197 (E.D. Pa. 1992) ............................................................. 32

*In re Viropharma, Inc. Sec. Litig.*,
    No. 02-1627, 2003 WL 1824914 (E.D. Pa. Apr. 7, 2003) ............................... 47

*Institutional Investors Group v. Avaya, Inc.*,
    564 F.3d 242  (3d Cir. 2009) ................................................................ passim

*Johnston v. HBO Film Management, Inc.*,
    265 F.3d 178 (3d Cir. 2001) ...................................................................... 32

*Kline v. First W. Gov't Sec., Inc.*,
    24 F.3d 480 (3d Cir. 1994) ........................................................................ 51

*Lautenberg Found. v. Madoff*,
    No. 09-816 (SRC), 2009 WL 2928913 (D.N.J. Sept. 9, 2009) ........................ 36

*Marsden v. Select Medical Corp.*,
    No. 04-4020, 2006 WL 891445 (E.D. Pa. Apr. 6, 2006),
    *vacated in part on other grounds*, 2007 WL 518556 (E.D. Pa. Feb. 14, 2007) ......... passim

*McMahan & Co. v. Wherehouse Entertainment, Inc.*,
    900 F.2d 576 (2d Cir. 1990) ...................................................................... 21

*Mississippi Public Employees' Retirement System v. Boston Scientific Corp.*,
    523 F.3d 75 (1st Cir. 2008) ....................................................................... 27

*Nolan v. Duffy Connors LLP*,
    542 F. Supp. 2d 429 (E.D. Pa. 2008) .......................................................... 17

*Phillips v. County of Allegheny*,
    515 F.3d 224 (3d Cir. 2008) ...................................................................... 17

*Reid v. Hemispherx Biopharma, Inc.*,
    No. 09-5262 (and consolidated cases) (E.D. Pa. April 20, 2010) ..................... 40

*Roffman v. Trump*,
    754 F. Supp. 411 (E.D. Pa. 1990) .............................................................. 43

*Rosenbaum Capital, LLC v. McNulty*,
    549 F. Supp. 2d 1185 (N.D. Cal. 2008) ....................................................... 52

*Sassaman v. Gamache*,
    566 F.3d 307 (2d Cir. 2009) ...................................................................... 23

*SEC v. Presto Telecommunications, Inc.,*
    237 Fed. Appx. 198, 2007 WL1695875 (9th Cir. 2009)................................................... 27

*Slemrod v. Yardley Savings and Loan Ass'n,*
    No. 88-9078, 1990 WL 158620 (E.D. Pa. Oct. 15, 1990) ............................................... 19

*South Ferry, L.P., No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ........................................................................................... 33

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308, 127 S.Ct. 2499 (2007)........................................................... 17, 23, 33, 45

*Urbach v. Sayles,*
    779 F. Supp. 351 (D.N.J. 1991) ...................................................................................... 39

*Virginia Bankshares v. Sandberg*,
    501 U.S. 1083 (1991)....................................................................................................... 19

*Warshaw v. Xoma Corp.,*
    74 F.3d 955 (9th Cir. 1996) ................................................................................. 20, 21, 28

*WorldCom, Inc. v. Graphnet, Inc.,*
    343 F.3d 651 (3d Cir.2003)............................................................................................. 17

*Zuckerman v. Smart Choice,*
    No. 6:99-cv-237, 2000 WL 33996254 (M.D. Fla. Aug. 29, 2000)................................... 36


<u>Other Authorities</u>

15 U.S.C. § 78u-4(b)(1) ............................................................................................................ 17

15 U.S.C. § 78u-4(b)(2) ...................................................................................................... 17, 33

15 U.S.C. § 78u-5(c)(1) ....................................................................................................... 46, 52

15 U.S.C. § 78u-5(c)(1)(A)(i) ........................................................................................ 49, 50, 52

de la Merced, Michael and Andrew Ross Sorkin, "Report Details How Lehman Hid Its
    Woes," The New York Times, March 11, 2010 ............................................................... 44

Dealbook, edited by Andrew Ross Sorkin, "In Lehman Report, a Vindication of
    Short-Sellers?," The New York Times, March 15, 2010................................................... 44

Einhorn, David, "Fooling Some of the People All of the Time"
    (John Wiley & Sons, Inc. 2008)...................................................................................... 44

Fisch, Jill E. and Hillary A. Sale, "The Securities Analyst as Agent: Rethinking the
    Regulation of Analysts," 88 Iowa L. Rev. 1035 (May, 2003) .......................................... 43

Lohse, Deborah, "Heard on the Street: Analyst Feels Vindicated on Conseco,"
    The Wall Street Journal (April 14, 2000) ......................................................................... 43

MacDonald, Elizabeth, "Heard on the Street: Libel Suits Pose a Risk For Analysts,"
    The Wall Street Journal (December 29, 1999) .................................................................. 43

Pulliam, Susan, "Deals & Deal Makers: Analysts to Tell Congress that Skepticism Gets
    The Abuse," The Wall Street Journal (March 19, 2002) ................................................... 43

Rynecki, David, "The Price of Being Right,"
    Fortune (Feb. 5, 2001) ..................................................................................................... 43

Lead Plaintiff Central Laborers' Pension Welfare and Annuity Funds ("Lead Plaintiff" or "Central Laborers"), on behalf of itself, plaintiff Dianne Solomon-Shrawder and the putative Class, respectfully submits this memorandum of law in opposition to the motion of defendants CardioNet, Inc. ("CardioNet" or the "Company"), its Chief Executive Officer Randy H. Thurman and its Chief Financial Officer Martin P. Galvan to dismiss the Consolidated Class Action Complaint ("Complaint").

## PRELIMINARY STATEMENT

This case involves a concerted smear campaign orchestrated and carried out by CardioNet and its two senior-most executives to discredit an analyst, Brian Kennedy, who wrote a detailed research report issued by Jefferies & Co. on April 24, 2009 (the "Report" or "Jefferies Report"), which contained information that undermined a key component of CardioNet's business plan. In addition to guiding two friendly analysts to write reports critical of the Jefferies Report, defendants made highly charged statements of their own, during the period from April 28, 2009 through July 10, 2009 (the "class period"), to convince the market that there was no basis for the statements made in the Jefferies Report and to undermine its author's credibility. In the process, however, the statements made by defendants about the Jefferies Report, the Company and its prospects were materially false and misleading.

## STATEMENT OF FACTS

### I.     The Company and Its Business

CardioNet, headquartered in Conshohocken, Pennsylvania, was formed in 1997 and had its initial public offering in March 2008. The Company develops and produces wireless cardiac monitoring devices. Its principal product is a device called the MCOT™ ("MCOT") heart monitor, which is used to detect heart beat arrhythmias. The monitor analyzes incoming

heartbeat-by-heartbeat information, and when it detects an arrhythmic event, it automatically transmits the ECG to the CardioNet Monitoring Center, where the data can be read by a physician or trained technician.  Complaint ¶ 2 (hereafter "¶ __").  Revenues from the MCOT system represented 88% of the Company's revenue in the first quarter 2009, compared to 86% in the fourth quarter 2008 and 79% in the first quarter 2008.  ¶ 47.

## II.    CardioNet's Source of Revenues – Third Party Payors

CardioNet's revenues are paid almost entirely by third party payors, including commercial insurers and Medicare and Medicaid.  Medicare and Medicaid, which accounted for about 34% of CardioNet's revenue payments in 2008, pay uniform rates for medical devices such as the MCOT heart monitor.  ¶ 47.  These rates are established by the Centers for Medicare and Medicaid Services ("CMS"), which uses outside contractors to make rate recommendations.  For the MCOT heart monitor, CMS used Highmark Medicare Services ("Highmark") as the rate-setting intermediary.  ¶ 3.

Health care providers bill third-party payors, including commercial insurers and governmental payors such as Medicare and Medicaid, for medical procedures and devices by codes established by the American Medical Association ("AMA"), which are known as CPT codes (CPT stands for "current procedural terminology").  Commercial insurers are not bound by the reimbursement rates applicable to Medicare and Medicaid.  However, their rates may be influenced (a) by determinations made by the Medicare and Medicaid rate-setting processes or (b) by the same types of factors that may cause CMS to maintain or reduce the reimbursement rate for a newly introduced medical device. ¶¶ 48-49, 53-54.

On October 31, 2008, CardioNet announced that the AMA had established Category I CPT codes that covered the MCOT system.  ¶ 49.  These codes, which became effective on

January 1, 2009, included separate CPT codes for the professional component – the services

provided by the physician or technician – and the technical component – the cost of the

equipment use.  CMS set the price of the professional component at approximately $25 for 2009,

which was substantially lower than the previous professional fee.  At the time, however, it

continued to delegate the pricing of the technical component to Highmark, which maintained the

previously established rate of $1,123.  *Id.*

　　　The increased attention that CMS and Highmark paid to the MCOT system also resulted

in increased scrutiny and control over the system's usage, which showed that CMS and

Highmark were concerned about over-use and possible abuses.  On January 5, 2009, Highmark

issued a Medical Policy Bulletin revision applicable to the MCOT system that stated, among

other things, that a cardiac surveillance service "is not indicated in all patients with arrhythmias"

and should be used "only in circumstances where traditional … monitoring or cardiac event

recording is not expected to provide adequate information or has been unrevealing."  ¶ 50.  A

Bulletin revision issued January 26, 2009 similarly listed a series of conditions for which a

home-based, real-time cardiac surveillance system is not indicated for use.  *Id.*

## III.　　Prelude to the Fraud: CardioNet Provides Positive Guidance to the Market and Its Stock Price Increases

　　　On February 17, 2009, CardioNet issued a press release that described the Company as

"uniquely positioned within the healthcare industry and perhaps most industries today" and

stated that "*[e]very indication is that CardioNet is positioned for years of exceptional growth*."

¶ 61.[1]  The press release announced the Company's fourth quarter and full year 2008 results, and

also quoted Thurman as providing "revenue guidance for 2009 of $170.0 to $175.0 million,

somewhat higher than expectations, and over 40% growth compared to 2008" and "earnings

---

[1]　　　Unless otherwise noted, emphasis in quoted text has been added either in the Complaint or herein.

guidance for 2009 of $0.69 to $0.73 per diluted share, … represent[ing] over 75% earnings growth year over year." ¶ 62. Thurman stated the outlook for 2010 was for "revenue to increase at least 50% and earnings to increase 100%, compared to the Company's 2009 guidance" and that in 2011 "we believe that earnings per diluted share could reach $2.00." *Id*. Thurman subsequently told analysts at a health care conference that this guidance had assumed "about a 5% decline in reimbursement [rate] every year." *Id*.[2]

   In reaction to CardioNet's statements on February 17, 2009, the Company's stock price rose from a $22.22 per share close on February 17, 2009, to a closing price of $25.00 per share on February 18, 2009. ¶ 66.

## IV.   Jefferies & Co. Questions CardioNet's Guidance Assumptions

   On April 24, 2009, Brian Kennedy, an analyst at Jefferies & Co. ("Jefferies"), initiated coverage of CardioNet with a research report that took issue with the fundamental assumption underlying CardioNet's guidance. *See* ¶¶ 4, 68 and the Jefferies Report (Exhibit 1 to Complaint). Assigning an "Underperform" rating to CardioNet, the Report concluded that a significant reimbursement rate cut by Highmark was imminent. The Investment Summary in the Report stated, referring to CardioNet as "BEAT," its ticker symbol (¶ 68):

> Although BEAT is the hands-down leader in mobile cardiac outpatient telemetry (MCOT), we think ***soon-to-be-implemented reimbursement reductions for the service will prevent the company from achieving the aggressive growth targets set by management and the Street***.

   Lead Plaintiff's investigators discovered from confidential witnesses that Kennedy had learned from Dr. Andrew Bloschichak ("Dr. Bloschichak"), Vice President for Clinical Affairs at Highmark Medicare Services, who has oversight of the reimbursement rate process at Highmark,

---

[2]   In the February 17, 2009 press release, Thurman called the AMA's establishment of CPT codes "a major milestone in facilitating broader adoption" of the MCOT system. ¶ 61. During the conference call of the same day, he added that the AMA's actions had "establish[ed] a simplified and stable reimbursement environment." ¶ 64.

that a reimbursement rate cut for the CPT code under which the MCOT device is billed was imminent. *See, e.g.,* ¶ 75(c). While the Jefferies Report did not attribute publicly that information to Dr. Bloschichak, it accurately reported that Highmark was currently reviewing the reimbursement rate for the MCOT device and, as a result of the review the technical reimbursement fee by Highmark would be cut in 2009 by at least $200 per service. The Jefferies Report noted that CardioNet had guided the market to believe that its earnings would improve to $0.69 to $0.73 per share in 2009 and to as much as $2.00 per share in 2011, based on the assumption that the Medicare technical fee for the MCOT system would essentially remain on par with the current $1,123 rate set by Highmark. ¶ 69. Stating Jefferies' disagreement, the Report continued:

> **But we expect Highmark to cut the technical fee in 2009.** Our checks indicate that the technical fee is now under review at Highmark, which is contrary to the Street assumption. We believe that Highmark plans to lower the fee by at least $200, a decision that should be announced shortly and implemented around midyear. …

*Id.* (emphasis in original); *see also* ¶ 71 (citing Report as stating that Highmark's plan to lower the fee would "mark the end of the favorable Medicare reimbursement terms MCOT has enjoyed for years thanks to Highmark's support of the technology"). The Jefferies Report stated that "[m]ost physicians and industry experts we speak with suggest the national technical fee will initially fall *in the $700 to $1,000 range*." *Id.* It further referenced that even CardioNet had acknowledged its dependence on Highmark "bluntly, even limiting its influence to a single person, Highmark medical director Dr. Andrew Bloschichak," and that given CMS's priorities, "an upcoming reimbursement reduction by Highmark will mark the end of MCOT's most favorable Medicare reimbursement terms." Exhibit 1 to Complaint at 13.

The Jefferies Report set forth numerous reasons why Highmark would be lowering the reimbursement rate.  In discussing the decision by CMS to lower the MCOT professional fee from $128 to $25, the Report stated "[w]e think the new lower professional fee clearly establishes where the technical fee is heading."  ¶ 70.  The Report also observed that the decline in the professional fee was likely to be mirrored by commercial insurers: "[W]e believe many private insurers will gravitate toward the new CMS professional fee over time, …."  The Jefferies Report further noted that while five of the six analysts who covered CardioNet rated its stock as Outperform or Buy, Jefferies' "bearish stance on BEAT stems from our concerns about reimbursement for MCOT, specifically Medicare reimbursement, which we believe is at risk of being cut *in a matter of weeks*."  ¶ 71.

Based on its analysis, Jefferies established a price target for CardioNet's stock of $17.00 per share, compared to its then-current price of $22.91 per share and other analysts' average 12-month target of $33 per share.  The price of CardioNet's common stock fell the day the Report was issued by $2.97 per share to close at $19.94 per share, a 13% decline.  ¶¶ 71, 72.

Immediately following the publication of the Jefferies Report, defendants launched a campaign to discredit it and its author.  On April 24 and April 26, 2009, analysts from Leerink Swann LLC ("Leerink") and Citigroup, two investment banks that had served as underwriters and managers for CardioNet's initial and secondary public stock offerings in March 2008 and August 2008, issued reports that reiterated their Outperform and Buy recommendations.  ¶¶ 6-7.  Both reports stated that the analysts *had spoken with the Company's management* and that based on those discussions, there was no basis to believe that Highmark was contemplating a reduction in the MCOT technical fee reimbursement rate.  *Id*.  Notably, as reported in a subsequent article in the *Wall Street Journal* about CardioNet's campaign to discredit Kennedy

and Jefferies, the Citigroup analyst did not even attempt to contact Highmark or CMS, ¶ 7 &

Exhibit 2 to Complaint, but was merely reciting the party line of the Company.

## V.   Defendants' Fraudulent Statements

Defendants' ramped up their campaign to discredit the Jefferies Report and its author on

April 28, 2009, by issuing a press release that included the following statements (¶ 74):

> The analyst [Brian Kennedy] purported to have information indicating that
> Highmark Medicare Services plans to reduce reimbursement for CardioNet
> technology and that an announcement to such effect could be made shortly.
> Following the issuance of this report, CardioNet has been in frequent
> communication, both written and verbal, with officials of Highmark Medicare
> Services and the Centers for Medicare and Medicaid Services (CMS) regarding the
> content of the analyst report.  CardioNet has not been notified of any proposed
> adjustment and believes that the reference in the analyst's report to a pending
> reimbursement reduction is not based on any indication or suggestion provided by
> Highmark Medicare Services or CMS.

> CardioNet's CEO, Randy Thurman, issued the following statement: "While it is not
> our practice to respond publicly to analyst reports, we felt that it was important to
> address some of the assertions contained in the April 24 report.  Since the release of
> this analyst report, CardioNet has received information from senior officials at both
> CMS and Highmark Medicare Services.  These officials have stated to us that the
> analyst's suggestion of an imminent adjustment was not based on guidance from
> Highmark Medicare Services or CMS and that 'neither organization provided the
> analyst with any confidential information or any information specifically about
> CardioNet.'"

> Mr. Thurman went on to say: "CardioNet and Highmark Medicare Services have
> regularly discussed reimbursement for mobile cardiac telemetry since we began
> providing that service in 2002.  It has been our experience that any significant
> adjustment by a Medicare contractor of this nature would ordinarily occur after a
> substantial amount of interaction and dialogue with our organization. To date,
> Highmark Medicare Services has neither proposed or discussed any payment
> reductions with us.  Furthermore, we have a longstanding and professional
> relationship with both CMS and Highmark Medicare Services and have no reason to
> believe either organization would ever disclose confidential information that could
> have a material effect on CardioNet or any other company."

The April 28 press release intended to, and did, convey the clear implication that

Kennedy had not received information regarding an imminent reimbursement rate change from

anyone in a position to know the truth. But the press release was false. The fact is that Kennedy had received credible information about a rate decrease from Dr. Bloschichak, which information, as the Jefferies Report makes clear, was consistent with Kennedy's detailed and thoughtful analysis of all of the factors that militated in favor of a significant rate decrease.

The Company's press release was comprised largely of unjustified inferences and speculation. By carefully choosing their words and the innuendoes they created, defendants deliberately or recklessly created the false impressions that: (a) they had such a close relationship with both Highmark and CMS that they would have been advised in advance if either of them were contemplating lowering the reimbursement rate for the MCOT system; and (b) they were advised directly by Highmark and CMS that no senior person at either of those entities spoke to Kennedy about a rate change that would affect CardioNet's business. But, in reality, as described by one of Lead Plaintiff's confidential witnesses, the statements made by CardioNet in its April 28 press release were nothing more than "word games." ¶ 75.

One example of this careful word play is the statement in the press release that "neither [Highmark nor CMS] provided the analyst with any confidential information or any information *specifically about CardioNet.*" ¶ 74. Notably, this statement does not address the fact that Kennedy was told by a senior official of Highmark that it was planning to revise the reimbursement rate for *the particular CPT code* under which the technical component of the MCOT system was billed. ¶ 75. Since CardioNet's MCOT system is the principal device to which this code applies, a revision of the code's reimbursement rate – even at the minimum amount of $200 as stated in the Report – would affect significantly revenues from the product that generated 83% of CardioNet's revenue in 2008 and 88% in the first quarter 2009.

Similarly misleading are the statements implying that defendants had been in close contact with the decision makers at both Highmark and CMS and that the content of the press release came directly from those contacts.  As Thurman later admitted to the *Wall Street Journal*,[3] the statements in the press release were *not* a result of direct contacts with "senior officials at both CMS and Highmark Medicare Services," as the press release implies, but rather were based upon an email from Highmark's legal counsel.  According to one of Lead Plaintiff's confidential witnesses, the press release overstates the nature of the Company's relationship with Highmark.  ¶¶ 74-75.  Moreover, judging from the way defendants' statements are worded, the "frequent" contacts with Highmark and CMS referred to may have been nothing more than repeated inquiries from the Company's side about the status of rate reimbursement revisions.  But even if one or more unnamed "senior officials" with whom defendants claimed to have spoken did not reveal Highmark's then-current consideration of a rate cut, defendants distorted this by stating expressly that no person from Highmark had provided Kennedy with any information about a rate reduction, and that Kennedy had no basis to state that a rate reduction would be implemented shortly.

Defendants never attempted to speak to Kennedy or anyone else at Jefferies to reconcile the apparent discrepancies between what Kennedy claimed in the Report and what the defendants took away from any discussions they may have had Highmark and CMS.  Evidently, having gotten a response from Highmark and CMS that they could interpret in a way that suited them, defendants deliberately did not look any further for fear of finding out that Kennedy had a legitimate source of contrary information.  Indeed, not only did defendants not seek out Kennedy but they also deliberately walled themselves off from further communication with Jefferies by

---

[3]     *See* November 20, 2009, *Wall Street Journal* article entitled "A Tough 'Sell' for Jefferies Analyst," attached to the Complaint as Exhibit 2.

not taking telephone calls from Jefferies personnel and excluding Jefferies analysts from

CardioNet's conference calls.  ¶¶ 8-9.

On April 30, 2009, CardioNet announced its results for the first quarter of 2009.  The

Company reported that revenues for the first quarter of 2009 increased by 40.3% over the first

quarter of 2008 and that gross profit increased to 66.9% of revenues, compared to 62.6% of

revenues in the first quarter of 2008.  Defendants attributed these results to "the positive shift in

sales mix towards MCOT along with ongoing improvements in our efficiency and productivity."

¶ 76.  The press release further quoted Thurman as stating (¶ 78):

> [W]e are reaffirming our 2009 financial guidance of revenue of $170.0 to $175.0
> million and earnings of $0.69 to $0.73 per diluted share excluding any impact of
> net operating losses, other tax related items, and any nonrecurring charges….
> Beyond 2009, we are comfortable with our previous guidance of revenue growth
> of at least 50% combined with earnings growth of 100% in 2010, with earnings
> per diluted share that could reach $2.00 in 2011.

CardioNet blocked Jefferies analysts from participating in the analyst conference call on

the same date, and the conference call transcript confirms that no analyst from Jefferies

participated in the call.  ¶ 79.  While this may seem on its face to have been done simply out of

spite, when viewed in the context of other actions by defendants, such as lobbying the SEC and

FINRA to investigate Jefferies and falsely accusing Jefferies of being in league with short

sellers, which are discussed below, it is clear that there was a conscious decision by defendants

to try to neutralize Jefferies' influence on the market for CardioNet's stock.  In Jefferies' absence

from the conference call, defendants were able to provide their own spin on the likelihood of a

reimbursement rate decrease.  In his prepared remarks, Thurman "comment[ed] on the

reimbursement front," stating that the establishment of the CPT codes and reimbursement rates

applicable to the MCOT system had "set[] the stage for a more simplified and stable

reimbursement environment going forward."  ¶  83.  In response to analysts' questions, Thurman

continued to make it seem as though defendants had inside information concerning Highmark's

and CMS's thinking on reimbursement rates when, in fact, they did not.  ¶ 84.  For instance,

Thurman stated that while CardioNet had "assumed some reduction in reimbursement" that was

factored into the earnings guidance, "candidly the argument is just as strong that we could justify

a higher level of reimbursement as there would be any reduction."  *Id*.  Thurman emphasized

"we really work hand in glove with Highmark and with CMS on an ongoing basis," and based on

that type of interaction, "[w]e know of no reason today to expect any significant change in the

reimbursement levels."  *Id*.  Thurman further stated categorically that there was no review

underway at either Highmark or CMS, stating: "there is not a scheduled event."  *Id*.  And,

shutting the door on any possibility of an imminent rate decrease, Galvan stated (*id*.):

> we have no question that … ***if there was any meaningful or anticipated change in
> the reimbursement rates, that we would be well aware of that***.  That's the
> professional relationship that exists with Highmark.  And so at this point in time, ***we
> see nothing that would significantly change our current way to reimbursement***.

Defendants' repeated boasts about their close relationship with Highmark and CMS were

absolutely false, as was the assurance that there was no current reimbursement rate review

process underway.  In fact, within a few months of this conference call, Highmark reduced the

reimbursement rate in exactly the way that Jefferies said it would.  Similarly, Thurman's

statement that "[w]e know of no reason today to expect any significant change in the

reimbursement levels" was highly misleading in light of the fact that defendants' lack of

information resulted from their own deliberate failure and refusal to speak to Kennedy or any

other Jefferies' analyst who had first-hand knowledge about their sources of information.  ¶ 85.

Defendants' reaffirmation of their previous earnings forecasts, the representation that

those forecasts "assumed some reduction in reimbursement," and their assurance that "candidly

the argument is just as strong that we could justify a higher level of reimbursement as there

would be any reduction," were similarly false or materially misleading.  *See, generally,* ¶¶ 84-85.

First, by failing, indeed refusing, to speak with Kennedy or anyone else from Jefferies,

defendants deliberately ignored a legitimate source of contrary information that was clearly

known to them.  Second, in their zeal to discredit Kennedy, defendants attempted to convince

investors and others in the analyst community that a rate increase was just as likely as a rate

decrease, notwithstanding all of the information and analysis contained in the Jefferies Report to

the contrary.  Thus, defendants had no legitimate, reasonable basis to reaffirm their prior

forecasts because if they had taken into account a reduction of reimbursement rates for Medicare

and Medicaid alone, as defendants subsequently admitted the Company would never achieve the

expected revenue or earnings levels.

Furthermore, the assumption implicit in defendants' projections that current

reimbursement levels would continue, with only potential minor reductions over time regardless

of the growth in acceptance of the MCOT system by physicians and the public, was baseless.  As

noted in the Jefferies Report, as usage of the MCOT system increased, becoming a greater and

greater expense to Medicare and Medicaid, so did the probability that Highmark and CMS would

look more carefully at and lower reimbursement levels.  *Id.*[4]

Over the next few weeks, defendants continued to attack Jefferies and Kennedy.

Speaking at a May 12, 2009 Bank of America Health Care Conference, Thurman again denied

that a rate cut from Highmark was imminent, and he flat out accused Jefferies of failing to have a

legitimate basis for its conclusions.  Noting that other analysts had spoken with CardioNet while

---

[4]      The Report stated on this point: "Several people we've spoken with suggest that MCOT has managed to maintain its substantial reimbursement premium because only BEAT had been actively pursuing the opportunity before 2007, *and the company's scale was much smaller than it is today.*  These observers believe that *BEAT's aggressive growth strategy, paired with LifeWatch's emergence as an MCOT competitor, will attract reimbursement scrutiny **and make cuts inevitable**.*"  Exhibit 1 to Complaint at 13.  "We believe CMS will take pains to prevent MCOT euphoria from building on the national level.  We view CMS's decision to remove the financial incentive favoring MCOT by lowering the professional fee to $25 *as an early tell that the agency plans to rein in MCOT costs and limit the technology's use to only those patients who truly need it.*"  *Id.* at 7.

Kennedy had not, Thurman stated: "we certainly wish that [Kennedy] had taken the extra effort *and done the proper due diligence, which he did not*." ¶ 86.  Thurman reiterated that people at Highmark had provided Kennedy "with *no information whatsoever* on CardioNet and never spoke to them about price." *Id*.  Rather, describing CardioNet's relationship with Highmark as "nothing less than extraordinary," Thurman reassured investors and analysts that CardioNet had "never gotten any signal from Highmark that they're considering a price reduction." *Id*.  And, after acknowledging that the reimbursement rate would at some point be "in [the] process of a hand off from Highmark to the CMS," Thurman stated categorically that (a) no substantive reimbursement rate review process was underway and (b) there was nothing imminent in the way of a reimbursement rate change.  *Id.*

These and other statements made by Thurman on May 12, 2009 demonstrate more of the same deceptive tactics that defendants had displayed in their earlier attempts to discredit Kennedy and the statements made in the Jefferies Report.  Virtually everything he said was, as characterized by CW1, a "word game."  Thurman said, for example, that Kennedy "has never spoken with Cardionet before that report came out or afterwards."  While that be literally true, it was highly misleading because it omitted that (a) in researching the Report, other persons from Jefferies working with Kennedy did speak with CardioNet personnel; and (b) after the Report was issued, defendants refused to take phone calls from Jefferies personnel and excluded them from participating in analyst conference calls.  ¶ 87(e).  Thurman's accusation that Kennedy failed to conduct adequate "due diligence" was completely baseless.  Not only did no one from CardioNet call Kennedy to ask him where he got his information, the Company affirmatively walled itself off from Jefferies so that it could maintain the façade that it had no reason to think that the Jefferies Report was accurate.  ¶ 87(a).  If defendants had contacted Jefferies, they

13

would likely have learned that, contrary to their repeated insistence that no rate revision was under consideration, Jefferies had learned from Dr. Bloschichak that a rate revision was not only under review, it was imminent.  Indeed, the *Wall Street Journal* article reported that Kennedy had additional information that had not even been included in the Report, but that also supported the statements made in the Report.  ¶ 13; *see also* Exhibit 2 to Complaint (confirming that Kennedy spoke with Highmark and that "help[ed] him make his call").  Thus, defendants clearly overstated the quality of their relationships with Highmark and CMS, which could not have been as defendants claimed or they would have been aware of the rate revision about to be announced.

In a further apparent effort to add credibility to CardioNet's contentions, Thurman stated at the May 12 conference that "I also will tell you that FNRA and we believe the SEC is going to investigate the circumstances behind this [allegedly false Report]."  ¶ 86.  Thurman conveniently failed to disclose, however, that ***he was the person who was asking the SEC and FINRA to investigate Jefferies***.  As later reported in the *Wall Street Journal* article, in early June, Thurman sent formal letters to the SEC, Nasdaq and FINRA suggesting that the Jefferies Report may have been part of a plot to enrich CardioNet short sellers betting on a share-price decline and characterizing the Report as a "blatant and inappropriate manipulation of our company's stock."  Again, there was absolutely no basis for this scurrilous accusation.  ¶ 87(d).

Defendants' attack on the Jefferies Report came to abrupt end on June 30, 2009, when the Company was forced to announce that it was lowering its revenue and earnings guidance for the current year due to lower than expected commercial reimbursement rates.  Instead of revenue growth of 40%, as previously stated, defendants said they now expected revenue growth of only 30% to 33%.  And instead of earnings growth of 75%, they now stated they were expecting earnings growth of between 52% and 56%.  ¶¶ 93-94.  The fact that reimbursement rates for the

14

MCOT system had been cut by commercial insurers was contrary to defendants' continued assurances about the stability of its reimbursement rates, and the price of CardioNet stock reacted sharply to this surprising information by falling $6.75 per share, from $16.32 per share on June 30, 2009 to $9.57 per share on July 1, 2009.  This was a one-day decline of 41% on volume of 23.4 million shares, over 24 times the average three-month daily average.  ¶ 98.

Notwithstanding the news about commercial payor rate declines, in a conference call on July 1, 2009, which Jefferies was still not allowed to attend, Thurman attempted to calm restive investors by assuring them that this was a "mere bump in the road" and that "Medicare reimbursement rates will remain stable."  ¶¶ 95-96.  Given that Medicare and Medicaid payments comprised approximately one-third of the Company's revenues, this further misrepresentation had the effect of continuing to keep the price of CardioNet stock at an inflated level.  Medicare reimbursement rates did not, however, remain stable.  On July 12, 2009, the other shoe dropped when the Company announced that it had been notified that, effective September 1, 2009, Highmark was adjusting the technical fee for the MCOT device to $754 per service (which was at the low end of the range stated in the Jefferies Report).  The Company further said that, in light of this development, it was withdrawing its guidance for 2009.  ¶ 99.

The Company's press release attempted to finesse the obvious discrepancy between the alleged suddenness of this rate change and defendants' prior assertions that such a change would have to be preceded by at least 45 days' prior notice by stating:

> CardioNet has previously indicated that while ***it had been aware Highmark Medicare Services was conducting a normal review of the reimbursement rate for MCOT^TM***, it had received no indication of any rate adjustment or the specific timing of a Highmark decision prior to being notified on July 9, 2009

*Id.* Notwithstanding defendants' assertion that they "previously indicated" that the reimbursement rate was under review, defendants never previously disclosed that fact and, to the

contrary, as recently as May 12, 2009 ***Thurman had adamantly denied that the rate was under***

***review***.  In fact, the central theme of defendants' attacks on Kennedy and the Jefferies Report

was that if the reimbursement rate were under review, CardioNet's senior executives would have

known about it.  Defendants' admission that they received no previous indication of a rate

adjustment prior to the date Highmark notified them that it was immediately forthcoming

confirms that defendants' previous assertions about the closeness of their relationship with

Highmark and CMS were greatly exaggerated and that their attack on the Jefferies Report lacked

any legitimate basis.

The July 12, 2009 announcement caused the price of CardioNet's stock to decline by

$2.96 per share, from $8.83 per share to $5.87 per share – a one-day decline of 34% on volume

of 11.8 million shares, over seven times the average three-month daily average.  ¶ 101.  Thus,

defendants' corrective disclosures on June 30 and July 12, 2009 directly caused CardioNet's

common stock price to fall from $16.32 per share on June 30, 2009 to $5.87 per share on July 13,

2009 – an overall decline of $10.45 per share, or 64%.  ¶ 18.  As reported in the November 20,

2009 *Wall Street Journal* article, Thurman admitted that as a result of the cut in MCOT

reimbursement rates, CardioNet "will not be able to sustain operations as a stand-alone

company," *id.*, thus shedding important light on defendants' motivation for their campaign to

discredit the Jefferies Report.

## **ARGUMENT**

The Complaint specifically identifies each of the false and misleading statements made

by defendants during the class period by including when, where, and by whom each statement

was made, and why it was materially false and/or misleading.  As such, the Complaint clearly

satisfies the "who, what, where, when and how" that is required to sustain a Section 10(b) case.

I.      **Standards Governing a Motion to Dismiss**

On a 12(b)(6) motion to dismiss, a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove the facts alleged or ultimately prevail on the merits. *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).  Rather, courts must accept all well pleaded factual allegations in a complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* 551 U.S. 308, 127 S.Ct. 2499, 2509 (2007); *accord Nolan v. Duffy Connors LLP,* 542 F. Supp. 2d 429, 431 n.1 (E.D. Pa. 2008) (*quoting WorldCom, Inc. v. Graphnet, Inc.,* 343 F.3d 651, 653 (3d Cir.2003)).  "The inquiry is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded an opportunity to offer evidence in support of their claims."  *Marsden v. Select Medical Corp.,* No. 04-4020, 2006 WL 891445, at * 4 (E.D. Pa. Apr. 6, 2006), *vacated in part on other grounds,* 2007 WL 518556 (E.D. Pa. Feb. 14, 2007).

Plaintiffs alleging fraud under § 10(b) of the Exchange Act must meet the pleading requirements of Fed.R.Civ.P. 9(b) by pleading the "who, what, when, and where" of the conduct alleged.  *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006).  Moreover, the PSLRA requires that a § 10(b) plaintiff "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading," and plead the required state of mind with particularity.  15 U.S.C. § 78u-4(b)(1) and (2); *Suprema*, 438 F.3d at 276.

Here, plaintiffs' allegations comply with both Rule 9(b) and the PSLRA standards because they specify the allegedly false and misleading statements and proffer facts to support their allegations that these statements were materially false or misleading at the times they were made, and were made with the requisite scienter.  *See, e.g., In re Lucent Technologies, Inc. Sec.*

17

*Litig.,* 217 F. Supp. 2d 529 (D.N.J. 2002).  Accordingly, the Complaint is sufficiently pled to survive defendants' motion to dismiss.

## II.     The Complaint Adequately Alleges that Defendants Made Materially False and Misleading Statements throughout the Class Period

### A.     Defendants' Statements Concerning the Jefferies Report Were Materially False and Misleading

Defendants made numerous statements aimed at giving the investing public the impression that the Jefferies Report was false and that its primary author, Brian Kennedy, lacked a reasonable basis to conclude that a reimbursement rate cut by Highmark was imminent.

- On April 28, 2009, defendants stated that Highmark and CMS "officials have stated to us that the analyst's suggestion of an imminent adjustment was not based on guidance from Highmark Medicare Services or CMS and that 'neither organization provided the analyst with any confidential information or any information specifically about CardioNet.'" ¶ 74.

- On May 12, 2009, defendant Thurman denied that a rate cut was imminent, accused Jefferies of failing to do proper due diligence, and stated that the SEC and FINRA were investigating Jefferies.  Defendant Thurman further stated at the May 12 conference that "[i]n speaking with the Highmark people, they have been unequivocal in their comments. That they provided this analyst with no information whatsoever on CardioNet and never spoke to them about price." ¶ 86.

In fact, it was defendants' insistence that a rate adjustment was not imminent that was false and lacked a reasonable basis.  As CW1 explained, Highmark did, in fact, give Jefferies information concerning the impending rate cut for the CPT code under which the MCOT device is billed, which is tantamount to providing information specific to CardioNet and, perhaps, one or two of its closest competitors.  ¶ 75(c).  And CW1 and CW2 explained that information was provided to Jefferies by Dr. Bloschichak, who has oversight of the reimbursement rate process at Highmark.  *Id.*

The simple fact was that defendants had no idea what information Jefferies had received from Highmark.  As Thurman subsequently admitted to the *Wall Street Journal*, the assurances

he claimed to have relied upon did not come from a senior executive of Highmark or a person responsible for setting rates (*i.e.*, Dr. Bloschichak), but were allegedly conveyed in an email from Highmark's counsel.  Moreover, having never contacted anyone at Jefferies regarding the sources of the information contained in the Report and refusing to return telephone calls from Jefferies, defendants had no basis to know what information Kennedy had received from Highmark.[5]  Thus, defendants' statements, although carefully crafted, were, in the words of CW1 nothing more than a "word game."  These statements were materially misleading[6] because they gave the investing public the impression that Jefferies did not receive <u>any</u> information from Highmark regarding an impending rate cut when, in fact, such information had been provided by

---

[5]     Defendants contend that the Complaint does not "contain reliable particularized allegations" that the Company failed to return phone calls to Jefferies or banned Jefferies' analysts from earnings calls after issuance of the Report. *See* Def. Mem. at 21.  To the contrary, the Complaint alleges that CW1, a member of the Jefferies Medical Device and Diagnostics Industry Group, and therefore, a person who was certainly in a position to know how CardioNet and its executives acted with respect to Jefferies, stated that Jefferies analysts were not allowed on CardioNet's conference calls and that their phone calls to defendant Galvan – CardioNet's CFO with responsibility for investor and analyst relations – were not returned.  As noted above, the transcript of the April 30, 2009 conference call, which defendants submitted as Exhibit 4 to their motion, confirms that no Jefferies analyst participated.

[6]     These statements were clearly "materially significant to investors" and were based on the public's reasonable assumption that senior corporate officials such as defendants Thurman (the CEO) and Galvan (the CFO) "have knowledge and expertise far exceeding that of the ordinary investor."  *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1428 (3d Cir. 1997) (*citing Virginia Bankshares v. Sandberg*, 501 U.S. 1083, 1090-91 (1991)).  In fact, on April 28, 2009, when defendants issued their first statement in response to the Jefferies Report, defendants were successful in convincing investors that a reimbursement rate decrease was <u>not</u> on the horizon, as after the April 28 press release was issued, the price of CardioNet's common stock rose to close at $21.22 per share on April 28, 2009, a $1.29 per share increase from the previous day's closing price.  Defendants argue that their statements "cannot be materially false because, aside from the purported communications with Highmark, the Jefferies Report consists almost exclusively of the collection, analysis, and reporting of publicly available information.  There is no obligation to inform the market of information that is otherwise publicly available."  Def. Mem. at 16.  This argument, however, misses the point because here defendants made the choice to comment publicly on the Jefferies Report, and once they did, they had a duty to speak truthfully and in a non-misleading fashion.  *Virginia Bankshares,* 501 U.S. at 1098 n.7 (1991); *accord Slemrod v. Yardley Savings and Loan Ass'n,* No. 88-9078, 1990 WL 158620, at *4 (E.D. Pa. Oct. 15, 1990) (once a statement concerning the company stock was made defendant "was under a duty to make a full disclosure of all material facts").

Highmark to Jefferies, and it was corroborated by all of the other indicators stated in the highly detailed Jefferies Report.  ¶¶ 75(c), 85(c), 87(c).[7]

The fact pattern of this case is strikingly similar to the facts set forth in *Warshaw v. Xoma Corp.,* 74 F.3d 955 (9th Cir. 1996), where the Ninth Circuit reversed the district court's dismissal of a complaint alleging that defendants made false optimistic statements about early FDA approval of a drug.  In *Warshaw,* the class period began the day Xoma issued a press release in response to an analyst report that had stated, based on data from two "Phase III" clinical trials presented to the FDA advisory committee, "there was no hope" for the approval of Xoma's drug. The press release attacked the report as "scientifically wrong" and "irresponsible." *Id.* at 958. Less than two months later, however, defendants were forced to announce that the FDA denied approval of the drug because it found the Phase III clinical studies to be inconclusive.  The court determined that defendants made misleading, optimistic statements about the FDA-approval process and that these statements were false and misleading because the statements "contravened the unflattering facts [about the drug] in Xoma's possession." *Id.* at 960.  The court stated that "[t]he Complaint alleges that Xoma's optimistic statements about [the drug], when taken in

_____

[7]    Defendants rely on this Court's decision in *In re Discovery Laboratories Sec. Litig.,* No. 06-1820, 2007 WL 789432 (E.D. Pa. Mar. 15, 2007), to argue that their attempt to put "a positive spin" on public information is not enough to form the basis of liability.  Def. Mem. at 17.  In *Discovery Labs*, this Court determined that the defendant's press release describing the Form 483 that Discovery Labs had received downplayed the seriousness of the FDA's observations. *Id.* at *3.  The Court observed, however, that even if defendants had tried to downplay the significance of the Form 483, the stock price declined by 22% after the company issued its press release.  Thus, as the Court found, "even if it was defendants' intention to downplay the significance of the Form 483, they were dramatically unsuccessful in doing so." *Id.* at *3.  By contrast, after the issuance of the April 28, 2009 press release, CardioNet's common stock closed at $21.22 on April 28, 2009, a $1.29 per share increase from the previous day's closing.  Further, in tandem with defendants' statements about their a close, positive, "hand in glove" relationship with Highmark, discussed below, the statements were intended to make investors believe that no rate decrease would ever come without CardioNet being aware of it well in advance.  Thus, in their statements, defendants were also invoking their "special ability" to know what Highmark and CMS would do, emphasizing that they had, in the words of then-Circuit Judge Alito, "knowledge and expertise far exceeding that of the ordinary investor." *In re Burlington Coat,* 114 F.3d at 1428.

context, were designed to prevent shareholder flight in the aftermath of a damaging report regarding the possible hazards of [the drug] and the unlikelihood of FDA approval." *Id.* at 959.

The *Xoma* case is directly on point. Here, defendants CardioNet, Thurman and Galvan made numerous statements aimed at convincing the market that the Jefferies Report was written without a reasonable basis, all of which were aimed at combating the negative effects of the Report. For example, defendants' statements that Highmark never provided Jefferies with information specific to CardioNet were materially false and misleading because, while Highmark may or may not have provided information to the Jefferies analysts specifically about CardioNet, it did provide information regarding an impending rate cut for the CPT code under which the MCOT device is billed. ¶ 75(c). Defendants can properly be held liable for such false and materially misleading statements. *See McMahan & Co. v. Wherehouse Entertainment, Inc.,* 900 F.2d 576, 579 (2d Cir. 1990) (reversing granting of summary judgment for defendants and stating that the central issue is whether "defendants' representations, taken together and in context, would have misl[ed] a reasonable investor"); *see also Adams v. Amplidyne, Inc.*, No. 99-4468, 2000 WL 34603180 at *6 (D.N.J. 2000) ("while it is possible to construe individual sentences in each of defendants' statements so they are literally true, the statements may still be misleading when taken as a whole").

Thurman's May 12, 2009 statement impugning Kennedy's "due diligence" is also actionable. First, the "due diligence" accusation was wrong as a matter of fact because Kennedy's report was the culmination of extensive research and analyses.[8] Second, while

---

[8] As reported in the *Wall Street Journal* article, the sell rating in the Report "came after weeks of research into CardioNet. … After talking with reimbursement experts, insurers and physicians, Mr. Kennedy became convinced that CardioNet was in for a drastic price cut from Medicare, the government health insurer. … Mr. Kennedy says he talked to Highmark and that it supplied important information in helping him make his call." Indeed, as further reported by the *Wall Street Journal,* Mr. Kennedy had detailed information stemming from his investigation that was not even included in the Jefferies Report. ¶ 13.

Thurman criticized Kennedy's "due diligence," it is telling that defendants never spoke to Kennedy or anyone at Jefferies to determine what basis Jefferies had for the statements made in the Report.  ¶ 87(a).  If it was wrong, as Thurman contended, for Kennedy to issue his report without talking with Thurman about it beforehand, then it was even more egregious for Thurman – who had a clear obligation to speak the truth once defendants had decided to comment on the Jefferies Report – to criticize Kennedy's "due diligence" without talking with Kennedy.  It would have been the simplest thing in the world for Thurman or Galvan to call Kennedy, or at least return a phone call from Jefferies, to see what information Kennedy had obtained that led him to issue a report stating that a soon-to-be-reimbursement rate cut was imminent.  Yet, defendants consciously chose not to do that.[9]

Defendants now contend that Thurman's attack on Kennedy's "due diligence," *see* ¶ 86, was meant only to refer to Kennedy's failure to call CardioNet before issuing his Report, and because plaintiffs do not contend that Kennedy spoke with anyone at CardioNet before issuing the Report, it was not a false statement.  Def. Mem. at 20-21.  Defendants' revisionist interpretation of Thurman's comment, however, is not plausible, for if it was meant only to refer to Kennedy's failure to call someone at CardioNet prior to the issuance of the Report, there would have been no need for Thurman to say anything about "proper due diligence."  Thurman had just stated that Kennedy did not call to talk to anyone before issuing the Report.  Thus, his "proper due diligence" comment was clearly meant to convey significantly more than that.  Regardless, it is not for Thurman to decide how the investing public should have interpreted his comment about Kennedy's failure to undertake "proper due diligence."  The question is whether

---

[9]        As reported in the *Wall Street Journal,* Joshua Jennings, a Jefferies analyst who worked with Mr. Kennedy on a team covering health-care companies, stated in reference to the CardioNet rating that "[i]t was very stressful for him [Kennedy] ***because he knew he had done the work that typically hadn't been done on this name, yet he was persecuted for it unjustly***."

a jury could decide that his statement was materially false or misleading – not what Thurman now says he meant.  *See Sassaman v. Gamache,* 566 F.3d 307, 313 (2d Cir. 2009) ("The choice between plausible interpretations of [defendant's] remarks is a question of fact to be resolved by a jury."); *see also Helwig v. Vencor, Inc.,* 251 F.3d 540, 557-58 (6th Cir. 2001) (the court determined that what defendant meant by his "warning" to employees about the potential impact of the Balanced Budget Act was not an issue that the court was "prepared to resolve at this stage");[10] *In re Par Pharmaceutical, Inc. Sec. Litig.,* 733 F. Supp. 668, 677 (S.D.N.Y. 1990) (determining that a reasonable jury could find defendants' statements to have "been misleading to a reasonable investor, in light of the circumstances under which they were made").

Thurman's further statement seeking to discredit Kennedy and the Jefferies Report, "I also will tell you that FINRA and we believe the SEC is going to investigate the circumstances behind this," was similarly materially false and misleading because Thurman failed to disclose that ***he was the person who was threatening Kennedy's livelihood by asking the SEC and FINRA to investigate Jefferies***.  ¶ 87.  Indeed, in early June, Thurman sent formal letters to the SEC, Nasdaq and FINRA suggesting that the Jefferies Report may have been part of a plot to enrich CardioNet short sellers betting on a share-price decline and characterizing the Report as a "blatant and inappropriate manipulation of our company's stock."  *Id.*  Thurman's statement about the various governmental entities' investigations was materially misleading because it

---

[10]     *Helwig* was a Sixth Circuit Court of Appeals decision that reversed in part a district court's conversion of a motion to dismiss into a motion for summary judgment, and the granting of that motion as converted.  In ruling on the appeal, the *Helwig* court utilized a scienter standard under which the Court held that the "strong inference" requirement of the PSLRA meant that plaintiffs are entitled "only to the most plausible of competing inferences." 251 F.3d at 553.  However, this standard was rejected in *Tellabs*, 127 S. Ct. at 2510, in which the Supreme Court held that the inference of scienter must be only "at least as compelling" as competing nonculpable inferences.  *See* Section III, *infra*, at 32; *see also Frank v. Dana Corp.*, 547 F.3d 564, 571 (6th Cir. 2008).

gave the investing public the impression that these entities independently determined that the issuance of the Report warranted an outside investigation.[11]

Finally, defendants argue in this regard that because other analysts "who were aware of public information" reached the opposite conclusion as Jefferies, this somehow confirms the reasonableness of the Company's own analysis.  Def. Mem. at 17.  What defendants fail to mention, however, is that the analysts whose opinions supported the Company's conclusions were employed by investment firms that had been lead underwriters for the Company's IPO and secondary offering in March 2008 and August 2008, *see* ¶¶ 6-7, and these analysts did not conduct independent research or speak with Highmark, but rather relied on the Company's guidance.[12]

---

[11]     Defendants argue that because there are "no averments … that any other analysts were prevented from asking the 'pointed question[s] about CardioNet's relationship with Highmark ... [and] the reality of the status of Highmark's reimbursement process and decision,'" defendants' exclusion of Jefferies from conference calls could not constitute securities fraud.  Def. Mem. at 21.  This argument misses the point.  The securities fraud claims are based upon defendants' materially false and misleading statements.  The fact that CardioNet excluded Jefferies from analyst calls and refused to return phone calls – to say nothing about their attempts to ruin Kennedy's ability to make a living as an analyst by seeking to initiate SEC and FINRA investigations – shows that defendants would stop at nothing to convince investors that Jefferies had no valuable information.  These actions further showed defendants' bad faith in publicly questioning Jefferies' due diligence, among other things, when defendants **would not even return a phone call** in order to find out the source of Kennedy's information.

[12]     Lead Plaintiff attached the Jefferies Report as Exhibit 1 to the Complaint.  Defendants submitted the Citigroup and Leerink reports as Exhibits 1 and 9, respectively, to their motion.  A comparison of the Jefferies Report with the Citigroup and Leerink reports shows that whereas the Jefferies Report was based on independent, extensive research and analysis, and numerous sources of information, the Citigroup and Leerink reports appear to have been based primarily on guidance from CardioNet.  According to the *Wall Street Journal* article, Jefferies' sell rating "came after weeks of research into CardioNet. … After talking with reimbursement experts, insurers and physicians, Mr. Kennedy became convinced that CardioNet was in for a drastic price cut from Medicare, the government health insurer. … Mr. Kennedy says he talked to Highmark and that it supplied important information in helping him make his call."  By contrast, the Citigroup and Leerink reports were put together quickly, and both were based primarily on guidance from the Company.  *See* ¶¶ 6-7.  Indeed, Mr. Bhalla, the Citigroup analyst, admitted to the *Wall Street Journal* that he never even tried to contact Highmark before issuing his report.  ¶ 7.

**B.      Defendants' Statements Concerning CardioNet's Relationship with Highmark and CMS Were Materially False and Misleading**

Throughout the class period, defendants made a series of statements about their supposedly close relationship with Highmark.  The following statements made by defendants on April 28, April 30 and May 12, 2009, were materially false and misleading because they asserted, in words or substance, that defendants' relationship with Highmark was such that, if Highmark had been reviewing the reimbursement rate applicable to the MCOT device or planning any reimbursement rate cut, defendants would certainly have been aware of those facts:

- In the Company's April 28, 2009 press release, defendants stated they had a "longstanding" relationship with Highmark, that "CardioNet has been in frequent communication, both written and verbal" with Highmark officials, and that "[i]t has been our experience that any significant adjustment by a Medicare contractor of this nature would ordinarily occur after a substantial amount of interaction and dialogue with our organization.  To date, Highmark Medicare Services has neither proposed or discussed any payment reduction with us."  ¶ 74.

- In the April 30, 2009 press release and during a conference call that day, defendants made statements (a) denying that a rate reimbursement review was underway (*e.g.*, "there is not a scheduled event"), (b) extolling the Company's supposedly close and positive professional relationship with Highmark (*e.g.*, "there has been this absolutely professional and collaborative relationship between the payors and us on justifying and understanding the cost benefit of what we do," "[w]e really have an outstanding relationship with Highmark," we work "hand in glove" with Highmark and CMS, and "we have no question that … if there was any meaningful or anticipated change in the reimbursement rates, that we would be well aware of that. That's the professional relationship that exists with Highmark.") and (c) denying an imminent reimbursement rate cut (*e.g.*, "at this point in time, we see nothing that would significantly change our current way to reimbursement" and "[w]e know of no reason today to expect any significant change in the reimbursement levels").  ¶¶ 76-84.

- At the May 12, 2009 Bank of America Health Care Conference, Thurman denied that a rate cut from Highmark was imminent while stating that the Company's relationship with Highmark was "nothing less than extraordinary" and "[w]e've never gotten any signal from Highmark that they're considering a price reduction."  ¶ 86.

Defendants' statements clearly overstated their relationship with Highmark and caused the market to incorrectly believe that defendants received and were reporting credible

information that no reimbursement rate review was taking place and that no rate cut would be made without CardioNet knowing about it. By making such statements about the closeness of the Company's relationship with Highmark, without having conducted any investigation into the facts known *to Jefferies analysts* at the time they issued the Report, defendants led the investing public to believe incorrectly that if any rate cut was being contemplated, or any such decision had been made, defendants would know about it. If, however, the defendants had the type of positive relationship with Highmark that they said they had, they would have known that a rate cut was, in fact, imminent. Instead, when Highmark announced a 33% reduction less than three months later, CardioNet claimed in its July 12, 2009 press release that "it had received *no indication* of any rate adjustment." ¶ 99. And although the July 12 press release admitted the Company *had been aware that Highmark was conducting a review of the reimbursement rate for the MCOT device*, *id.*, it had previously stated no such review was taking place. ¶¶ 84, 86.[13]

Indeed, if defendants really had the type of relationship they claimed they had with Highmark, they would have learned that Mr. Kennedy had received reliable information from Dr. Bloschichak, and that Highmark had indicated to Jefferies that a reimbursement rate cut for the CPT code under which the MCOT device is billed was imminent. *See, e.g.*, ¶¶ 75(b), 85(b).[14]

---

[13]     This, of course, indicates that defendants' denials that a rate review was pending were *knowingly false statements*. Defendants argue in this regard that Thurman's May 12, 2009 statement denying that Highmark was conducting a reimbursement rate review was not false because Thurman stated "we know it is" when asked whether CardioNet's "reimbursement rate [is] under review currently." Def. Mem. at 22. Defendants' argument is disingenuous because a reading of the full transcript from the conference reveals that the review to which Thurman was referring when he stated "we know it is" was the "hand off from Highmark to the CMS" – not a review of the reimbursement rate and its imminent decrease that was described in the Jefferies Report. In fact, Thurman stated later during the May 12 conference that there was "no formal review of our pricing underway at Highmark." ¶ 86. Given that later statement and others like it that Thurman made at the same conference, *see id.*, it is impossible for defendants to assert credibly that Thurman admitted that Highmark was conducting a review of the reimbursement rate for the MCOT device. And, in any event, as shown above, it is for the jury to interpret Thurman's statements and decide whether they were materially false and/or misleading when made. *See* cases cited at 23, *supra*.

[14]     Contrary to defendants' assertion at Def. Mem. at 18, plaintiffs set forth in sufficient detail the nature of the information provided to Kennedy and Jefferies from Highmark. Among other things, plaintiffs allege that prior to

Courts readily find violations of the securities laws when a company misrepresents the nature of its relationships with an outside entity important to the company's business.  In *SEC v. Presto Telecommunications, Inc.*, 237 Fed. Appx. 198, 199-200, 2007 WL1695875, at *1 (9th Cir. 2009), for example, the Court concluded there was sufficient evidence to support the district court's finding that the defendant company had violated Rule 10b-5, in light of evidence that the defendant made numerous material misrepresentations to investors concerning, *inter alia*, the company's relationships with major telecommunications companies and the involvement of the U.S. Department of Commerce in procuring certain concessions for the company.

*In re Par Pharmaceutical,* 733 F. Supp. 668, is similarly instructive.  In that case, investors in Par, a corporation engaged in the manufacture and sale of generic drugs, alleged that Par's financial success and well being depended upon its ability to obtain continually first or early FDA approval for its new products.  *Id.* at 672.  Plaintiffs alleged that defendants, through their public statements, created the illusion with the investment community that "Par had a special expertise in obtaining expeditious FDA approvals of its products and that this expertise would result in continued growth and income." *Id* at 673.

---

the issuance of the Jefferies Report, Dr. Bloschichak and others from Highmark provided information to Kennedy and Jefferies (*see, e.g.,* ¶ 75(c)) that formed, in part, the basis of the Report.

Defendants' further argue that to the extent plaintiffs' assertions of falsity are based on the subsequent decision by Highmark to reduce the reimbursement rate that consists of impermissible "fraud by hindsight."  Def. Mem. at 27.  This argument conveniently disregards that the Jefferies Report stated **in April 2009** that a rate decrease was "imminent" and would be announced shortly.  *See* ¶¶ 68 (Report stated there was a "soon-to-be-implemented" rate reduction) and 71 ("the carrier plans to lower the fee by at least $200, a decision that should be announced shortly and implemented around midyear").  "Fraud by hindsight refers to allegations that assert no more than that because something eventually went wrong, defendants must have known about the problem earlier." *Mississippi Public Employees' Retirement System v. Boston Scientific Corp.*, 523 F.3d 75, 91 (1st Cir. 2008) (plaintiffs adequately alleged that defendants were aware of adverse information about the launch of its new product when it made false and misleading statements regarding the product).  Here, however, that such facts existed at the times of defendants' statements negates any application of "fraud by hindsight."  As in *Boston Scientific Corp.,* "[t]his is not the classic fraud by hindsight case where a plaintiff alleges that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly. Nor is this a case where there is no contemporaneous evidence at all that defendants knew earlier what they chose not to disclose until later."  *Id.* at 91 (internal citations omitted).

In denying in part defendants' motion to dismiss the complaint in *Par Pharmaceutical*, the court found that a jury could find Par's statements regarding its relationship with the FDA to have been misleading to a reasonable investor. *Id.* at 677-78. Specifically, the court stated:

> A reasonable jury could find that, by extolling Par's ability to obtain FDA approvals, by comparing Par's success in this regard to other companies in the industry and to its own previous performance, and by projecting continued success in obtaining rapid approvals, the statements conveyed to a reasonable investor the false impression that Par had a particular expertise in obtaining FDA approvals constituting a legitimate competitive advantage over other companies and that this advantageous expertise was responsible for its success in obtaining FDA approvals.

*Id.*; *see also Warshaw v. Xoma,* 74 F.3d 955 (discussed *supra* at 20-21).

Here, CardioNet's class period statements regarding the nature of the Company's relationship with Highmark were similarly materially false and misleading. As summarized by CW1, defendants' representations about their dealings with Highmark were inaccurate statements and CardioNet executives clearly "overstated their relationship with Highmark." *See, e.g.,* ¶¶ 75(b), 85(b), 87.[15] As a result, these statements are actionable.

---

[15]      Relying on *California Public Employees' Retirement System v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004), defendants argue that Lead Plaintiff does not adequately describe its confidential sources. Defendants disregard that the Court in *Chubb* stated "so long as plaintiffs supply sufficient facts to support their allegations, there is no reason to inflict the obligation of naming confidential sources." *Id.* at 146-47. Moreover, the *Chubb* court was evaluating the sufficiency of a complaint that relied upon a single internal memorandum and a number of confidential witnesses, and that found the documentary source to be "inadequate." It was in that context that the Court stated that plaintiffs' reliance on confidential sources to supply the requisite particularity for their fraud claims assumed "a heightened importance." *Id.* at 148. In any event, many decisions in this Circuit have found that reliance on confidential sources, so long as they are sufficiently identified, is a proper method for supporting a 10(b) claim. *See, e.g., In re ATI Technologies, Inc. Sec. Litig.,* 216 F. Supp. 2d 418, 432-33 (E.D. Pa. 2003) ("[A]verments [of facts based on anonymous sources] are particularized if they provide circumstantial assurance that a person in the position occupied by the anonymous source would possess the information alleged and we will consider them as part of the constellation of facts alleged for why the defendants' statement is false or misleading.") (internal citations and quotations omitted). Contrary to defendants' assertion, Lead Plaintiff has sufficiently described the confidential sources in order to show they have first-hand knowledge about the information they provided for the Complaint.

In the Complaint, Lead Plaintiff relies upon five confidential sources, each of whom is described with particularity. CW1 is an analyst in the Medical Device & Diagnostics Industries Group of Jefferies (¶ 9) – which is the Group that covers CardioNet and other medical device makers – and in that role CW1 certainly has first-hand knowledge of the facts s/he provided for the Complaint, including that CardioNet refused to communicate with Jefferies and banned Jefferies from conference calls, and concerning Kennedy's communications with Highmark prior to issuing the Jefferies Report. CW3 is a former PDS employee who continued to work for CardioNet as an

C.      Defendants' Statements Reiterating the Company's Revenue and Earnings
        Guidance Were Materially False and Misleading

Defendants' April 30, 2009 statements reiterating the guidance that they provided to the

market on February 17, 2009 were also materially false and misleading, and made without a

reasonable basis.  In the April 30 press release, after the Company announced its first quarter

2009 financial results, which Galvan noted had "continued to benefit from the positive shift in

sales mix" toward the MCOT device (¶ 76), Thurman reaffirmed the Company's 2009 financial

guidance of $170.0 to $175.0 million in revenues and $0.69 to $0.73 in earnings, and said that

beyond that the Company was "comfortable" with its previous guidance of revenue growth of at

least 50% combined with earnings growth of 100% in 2010, and earnings per diluted share that

could reach $2.00 in 2011.  ¶ 78.  Galvan reiterated the guidance for 2009 during the follow-up

conference call with analysts the same day, and Thurman represented that it had assumed some

reduction in reimbursement levels.  ¶¶ 82, 84.

Defendants' guidance was false because it factored in only a relatively small long-term

reimbursement rate decline, and ignored the information in the Jefferies Report that "soon-to-be-

implemented reimbursement reductions" for the MCOT device was imminent.  Had defendants

spoken to Kennedy or given *any* credence to the Report, they would have learned that a

---

account executive following the PDS acquisition, which was completed on March 13, 2007 (¶¶ 43, 45-46).  In this
position, CW3 had first-hand knowledge of physician compensation associated with the prescription of the MCOT
device.  Similarly sufficient details are provided about CW4, a former CardioNet employee who served as a
Regional Sales Manager for CardioNet (¶ 55), and CW5, a former PDS officer who was employed by CardioNet
from the time of the PDS acquisition until early 2008 (*id.*).  In their positions, CW4 and CW5 had first-hand
knowledge about the division that handled reimbursement rates within the Company.

      CW2 is described as a person with knowledge about the investigation conducted by Jefferies.  While Lead
Plaintiff has been somewhat more vague about this witness's identity because providing more detail would,
effectively, identify the person, the information provided by CW2 is consistent not only with statements included in
the Jefferies Report but are also corroborated by the *Wall Street Journal* article.  Thus, as with the other confidential
sources, there are sufficient facts to support the reliability of the information provided by this source.  *See Chubb,*
394 F.3d at 147 (assessing the reliability of confidential witness by evaluating, among other things, the
"corroborative nature of other facts alleged, including from other sources").

reimbursement rate cut was, in fact, imminent and that the key assumption underlying their market guidance was materially in error.

While the federal securities laws do not obligate a company to disclose its internal forecasts, "if a company voluntarily chooses to disclose a forecast or projection, that disclosure is susceptible to attack on the ground that it was issued without a reasonable basis." *In re Burlington Coat,* 114 F.3d at 1428; *see also In re Next Level Systems, Inc. Sec. Litig.*, No. 97 C 7362, 1999 WL 387446, at *7 (N.D. Ill. March 31, 1999) (an earnings projection "may violate § 10(b) where defendant 'ignor[ed] facts seriously undermining the accuracy of the forecast'") (citation omitted).  As the Court of Appeals for this Circuit held 25 years ago, projections or opinions of those "with greater access to information or having a special relationship to investors" are actionable under Section 10(b) and Rule 10b-5 if "issued without a genuine belief or reasonable basis." *Eisenberg v. Gagnon,* 766 F.2d 770, 776 (3d Cir. 1985).  Thus, for example, in *Marsden,* 2006 WL 891445, at *4, the court upheld plaintiffs' claims that defendants withheld information about certain CMS proposed regulations and alleged Medicare abuses when making public statements, including projections, about the company's revenues.[16]

Defendants' statements that (a) the Company had assumed only "some reduction in reimbursement" in setting its revenue and earnings projections through 2011, (b) "the argument is just as strong that we could justify a higher level of reimbursement as there would be any reduction," (c) "at this point in time, we see nothing that would significantly change our current way to reimbursement," and (d) "[w]e know of no reason today to expect any significant change

---

[16]     Defendants argue that the plaintiffs in *Marsden* alleged more facts showing that the defendants in that case were aware of CMS's proposed regulations and, therefore, that *Marsden* is inapplicable.  *See* Def. Mem. at 26.  In this case, however, plaintiffs assert there were facts impacting CardioNet's projections that were disregarded by defendants, and that defendants intentionally did not seek critical information from the person – Brian Kennedy – who had spoken directly with Highmark, as well as numerous other industry experts.  As such, the rationale of the decision in *Marsden* is highly relevant to this case.

in the reimbursement levels," were further materially false and misleading because CardioNet

had failed to adequately apprise itself of likely reimbursement rate cuts by its commercial

payors, who collectively paid approximately 66% of the Company's revenues on a quarter-to-

quarter basis by April 2009.  ¶ 85(e).  Thus, while much of the question and answer portion of

the April 30, 2009 conference call was devoted to questions concerning Highmark and the

reimbursement rate for the MCOT system under Medicare, the same factors that led Highmark to

decide to significantly reduce the reimbursement rate would also impact commercial payors,

further making defendants' statements materially false and misleading with respect to

reimbursement rates being set or re-set by commercial payors.[17]

Where favorable predictions are made without regard to known adverse facts, such

statements are false and misleading.  For example, in *Helwig*, 251 F.3d 540, an action based

upon defendants' false and misleading predictions regarding the impact of the Balanced Budget

Act on Medicare reimbursement and reduced incentive payments for hospitals, the Sixth Circuit

reversed in part the dismissal of securities claims.  The court determined that defendants'

earnings predictions made prior to the Balanced Budget Act's adoption were false and

misleading because defendants were in receipt of lobbyist reports detailing the likely effect of the

Act and had created an internal analysis discussing the potential impact of the legislation.

During the class period, defendants made statements about the Act and its effect on the business,

including statements about not being able to gauge the impact of the Act.  *Id.* at 554.  At the

---

[17]     Plaintiffs allege that the large stock sales by CardioNet founder James M. Sweeney, as well as Guidant Corporation (one of the Company's early investors) and other early investors in the IPO and secondary offering that occurred a few months after the IPO, suggest that the Company's founder and its early investors anticipated that the reimbursement rates set by commercial payors, Highmark and eventually CMS would decline significantly as the MCOT device gained further acceptance and penetration in the market.  ¶ 85(d). Contrary to defendants' argument, plaintiffs may properly rely upon pre-class facts to help show the falsity of defendants' statements.  *See In re Scholastic Corp. Sec. Litig.*,  252 F.3d 63, 72 (2d Cir. 2001) ("Any information that sheds light on whether class period statements were false or materially misleading is relevant.").

same time, however, the company projected earnings and told analysts that it was "comfortable"

with these figures.   The court found "plaintiffs have alleged facts to produce a strong inference

that defendants knew that the Budget Act could adversely affect their operations.   Yet defendants

simply rested on their disavowals of knowledge while continuing to make favorable earnings

predictions."  *Id.* at 556.  The court further held that "[w]hen defendants disclaimed any ability to

predict health care legislation, while persisting in favorable earnings estimates … [the Company]

was representing that it knew of no way the Budget Act could adversely affect its operations."

*Id.* at 557.[18]   The court found such statements were false and misleading.

Defendants' forecasts here, as reiterated after issuance of the Jefferies Report, were

similarly false and materially misleading.[19]

## III.   The Allegations of the Complaint Give Rise to a Strong Inference of Scienter

Under the PSLRA, a plaintiff must allege particularized facts "giving rise to a strong

inference" that the defendant acted with "either reckless or conscious behavior."  *Institutional

Investors Group v. Avaya, Inc.*, 564 F.3d 242, 267 (3d Cir. 2009); *see also* 15 U.S.C. § 78u-

---

[18]      Defendants' attempt to distinguish *Helwig*, *see* Def. Mem. at 25-26, is not persuasive. While defendants are correct that in *Helwig* there were opportunistic stock sales by defendants, there were also facts tending to show that defendants were aware of the negative impact the Budget Act would have on Vencor (the defendant company in that case).  Similarly here, defendants were aware of credible information that a rate cuts were imminent, yet despite such information they continued to issue the same, positive revenue and earnings forecasts for the Company.

[19]      Plaintiffs also allege in the Complaint, at ¶¶ 88-92, that the press release of May 18, 2009, which reported on Highmark's posting of an unchanged reimbursement rate, was materially misleading.  While the statements in that release were not literally false, defendants may still be liable for this announcement under Rule 10b-5 because the announcement was a misleading half-truth.  *See Johnston v. HBO Film Management, Inc.*, 265 F.3d 178, 192-93 (3d Cir. 2001); *In re U.S. Bioscience Sec. Litig.*, 806 F. Supp. 1197, 1205 (E.D. Pa. 1992) (two statements that were not objectively untrue, "when read in the context of the other allegations in the complaint … could take on less innocent meanings").  *In re Cell Pathways, Inc.*, No. 99-725, 2000 WL 805221 (E.D. Pa. 2000) bears this out. There, the company made positive statements about a key product while knowing of a "fundamental flaw" concerning the product's testing and, therefore, its ability to obtain favorable FDA action.  Based on that, the court found that defendants' statements, even if literally true, were actionable.  As the court stated, "the disclosure required by the securities laws is not measured by literal truth, but instead by the ability of the material to accurately inform rather than mislead prospective buyers."  *Id.* at *9 & n.7.  Here, while defendants argue that it would be impossible to determine whether investors were misled by the May 18 announcement, the public clearly reacted to this as favorable news as the price of CardioNet's stock increased by $2.50 per share, to close at $19.60 per share on May 19, 2009 – a one-day increase of 15%.  ¶ 89.

4(b)(2).  A reckless statement is one born of "[h]ighly unreasonable (conduct) [or] an extreme

departure from the standards of ordinary care" which "presents a danger of misleading buyers or

sellers that is either known to the defendant or is so obvious that the actor must have been aware

of it."  *Suprema*, 438 F.3d at 276 (quotations omitted); *accord Argent Classic Convertible

Arbitrage Fund L.P. v. Rite Aid Corp.*, 315 F. Supp. 2d 666, 684 n.23 (E.D. Pa. 2004).[20]

    The strong inference created by a plaintiff's factual allegations must be "cogent and at

least as compelling as any opposing inference of nonfraudulent intent" on the part of the

defendants.  *Avaya*, 564 F.3d at 267 (citing *Tellabs*, 127 S. Ct. at 2504-05).  Significantly, the

plaintiff's allegations need not rise to the level of "irrefutable," "smoking-gun" fact, or "even the

most plausible of competing inferences."  *Id*. at 267 (citing *Tellabs* at 2510).  Instead, the

inference of scienter in a complaint should be assessed in light of "all of the facts alleged, taken

collectively," and does not hinge on "whether any individual allegation, scrutinized in isolation,

meets that standard."  *Id*. at 268 (citing *Tellabs* at 2509).  Moreover, a court's assessment of

scienter should be "viewed with a practical and common-sense perspective."  *Id*. at 272-73 (citing

*South Ferry, L.P., No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008)).

    Here, the Complaint asserts particularized facts giving rise to a strong inference that

defendants knowingly and/or recklessly disseminated the false and misleading statements

identified above.  These include the following:

- As soon as they saw the Jefferies Report, defendants went on the offensive to discredit
  Jefferies and the Report, despite never communicating with Kennedy or any Jefferies
  analyst about their sources of information or their analysis.  The smear campaign started
  with CardioNet's attempt to guide the market by having friendly analysts write reports
  attacking Jefferies (¶ 108), followed closely by defendants' own statements responding to
  the Report  (¶¶ 74, 86), describing their supposedly close working relationship with
  Highmark and CMS (¶¶ 74, 84, 86), reiterating the revenue and earnings guidance the

---

[20]    As discussed by the Third Circuit in *Avaya*, the U.S. Supreme Court's decision in *Tellabs* did not disturb
the rule that a plaintiff may meet the scienter requirement by showing that the defendant acted either intentionally or
recklessly.  *See* 564 F.3d at 267 (citing *Tellabs*, 127 S. Ct. at 2507 n.3).

Company had issued several months before the Jefferies Report was published (¶¶ 78, 82), and ending with Thurman's allusion to an investigation by the SEC and FINRA that Thurman himself was trying to instigate (¶¶ 86).

- Thurman and Galvan, who were CardioNet's two senior-most executives, made a conscious decision not to contact Jefferies, not to return their telephone calls, and to ban the Jefferies' analysts from investor and analyst conferences (¶ 9), choosing instead to take non-responsive communications with Highmark and misrepresent the significance of those communications to the market (*e.g.*, ¶ 75).

- Thurman and Galvan also blatantly misrepresented the Company's relationship with Highmark and CMS and its awareness of the reimbursement rate evaluation process, going so far as to deny entirely that any substantive review was taking place (¶ 86) – although they later admitted they had known such a review had been pending (¶ 99) – and to state publicly that it was just as likely that the reimbursement rate would go up (¶ 84).

Viewed in their totality, these facts and others pled in the Complaint lead to a strong

inference that defendants knowingly or, at the least, recklessly issued false and misleading

statements about the Jefferies Report and the impending rate reductions in an attempt to

artificially prop up the Company's stock price.  On the date the Jefferies Report was released, the

Company's stock price dropped by 13%.  ¶ 5.  Defendants then went on the offensive, choosing

to attack Jefferies in lieu of verifying its sources.[21]  Given the importance of the MCOT device

CardioNet, *i.e.*, the source of 88% of the Company's revenues by the first quarter 2009 and

growing on a quarter-to-quarter basis (¶ 47), defendants' statements to this effect – without

taking the simple step of returning phone calls from Jefferies to ascertain the bases of the Report

– show the statements were made with scienter.

---

[21]     Defendants do not argue that either of the individual defendants was not in control of the Company's statements or that either is immune from liability for the statements made by the other defendants.  Thus, neither CardioNet nor the individual defendants contest their responsibility for any of the statements at issue in this case. They similarly do not seek to dismiss the Complaint on any loss causation ground.  Further, the individual defendants have not contested their "control person" status over the statements made by the Company and each other for purposes of the Section 20(a) claims against them.  Thus, if the primary claims against defendants are upheld, the control person claims should also be upheld.

    **A.**    **Defendants' Actions and Statements Seeking to Discredit the Jefferies Report, Overstating Their Relationship with Highmark and CMS, and Reiterating Their Revenue and Earnings Guidance Demonstrate Their Scienter**

Defendants do not contest that they failed to call Kennedy after issuance of the Report. Rather, they argue that (a) they had no duty to talk with him, since they spoke with various people at Highmark, and (b) even if they had called Kennedy, it is not clear that Kennedy "had information not included in the Jefferies Report that would necessarily have led CardioNet to re-evaluate its position or that Kennedy would have shared with defendants all the information he possessed." Def. Mem. at 25. Both arguments are without merit.

First, while a company executive does not have a general duty to speak with any analyst who writes a research report about the executive's company, defendants' decisions here to attack the Report while failing to call Jefferies or return their calls reveals defendants' scienter. Thurman and Galvan spoke with analysts who would write reports *favorable* to CardioNet, but would not talk with Jefferies, which had written the one negative report. Thereafter, they publicly and repeatedly contradicted and criticized the Jefferies Report, starkly accusing Kennedy of not doing "proper due diligence." A jury could readily conclude that defendants' failure to contact Kennedy or any other Jefferies' analyst is evidence of their willful blindness and conscious indifference to the truthfulness of their statements. As the court stated in *In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398, 415 (S.D.N.Y. 1998):

> "Recklessness" under the securities laws includes "conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care.' " *SEC v. McNulty,* 137 F.3d 732, 740 (2d Cir.1998) (quoting *Rolf,* 570 F.2d at 47). ***Such conduct, at a minimum, encompasses willful blindness.*** *See In re Fischbach Corp. Sec. Litig.,* 1992 WL 8715, at *6 (S.D.N.Y.1992) ("reckless disregard of the truth satisfies the scienter requirements of § 10(b) when the defendant **deliberately failed to acquire the information** that would have indicated to her that her statements were false or misleading"); *see also*

> *Leslie Fay,* 871 F.Supp. at 690-92 (discussing standard for actionable recklessness in Second Circuit).

*Id.* at 415 (emphasis added).  Courts in the Third Circuit similarly have accepted that willful blindness constitutes scienter.  *See, e.g., Suprema*, 438 F.3d at 281 (scienter of financial auditor established by allegations that "reasonably suggest that [defendant] either knew of, or willfully turned a blind eye to, the fraud"); *Lautenberg Found. v. Madoff*, No. 09-816 (SRC), 2009 WL 2928913, at *17 (D.N.J. Sept. 9, 2009) (scienter inferred from detailed allegations concerning defendant's job responsibilities and his knowledge of facts indicating that defendant was "at the very least willfully blind of [company]'s wrongdoing for failure to investigate those facts and confirm what the indicia of fraud would suggest to him").[22]

Here, defendants chose to remain willfully blind to the impending reimbursement rate cut, and instead of investigating in good faith the facts underlying the Jefferies Report they baselessly accused Kennedy of failing to conduct "proper due diligence."  ¶ 86.  They even went so far as to suggest to Jefferies' regulatory authorities that the Report was meant to manipulate the price of CardioNet stock for the benefit of short sellers, without having any basis whatsoever for such an accusation.  ¶ 87(d).  In this and other regards alleged in the Complaint, defendants' actions toward Kennedy and Jefferies clearly show their willful indifference to the truth of their statements, which is sufficient to demonstrate scienter at this stage of the case.

Defendants incorrectly believe that, by conferring with Highmark, they absolved themselves of scienter in their subsequent statements about Jefferies and the possibility of a

---

[22]    *Accord Zuckerman v. Smart Choice,* No. 6:99-cv-237, 2000 WL 33996254, at *3 (M.D. Fla. Aug. 29, 2000) (adopting magistrate judge's finding that allegations were sufficient to plead scienter because they showed, *inter alia,* defendant's "willful blindness" of fraudulent practices); *In re System Software Associates, Inc.,* No. 87 C 177, 2000 WL 283099, at * 14 (N.D. Ill. Mar. 8, 2000) (scienter adequately alleged where plaintiffs pled that defendants acted with "reckless indifference" to warnings about the company's revenue practices).  As the *Kidder Peabody* court held, because plaintiffs had submitted sufficient evidence from which "a reasonable trier of fact could conclude that officials at Kidder and Kidder Group either knew of or consciously avoided knowledge of Jett's trading activities and the false profits," defendants' motion for summary judgment was denied. 10 F. Supp. 2d at 417.

reimbursement rate decrease.  Def. Mem. at 25.  The fact remains, however, that defendants

refused to seek confirmation from Jefferies or any of its analysts concerning the veracity of the

Jefferies Report.  Moreover, while defendants stated that they spoke many times with senior

managers at Highmark, the *Wall Street Journal* article reported that they based their statements

of April 28 criticizing the Report on a single email from Highmark's legal counsel, which simply

stated that Highmark had not discussed with anyone from Jefferies any "confidential information

or any information specifically about CardioNet."  *See* ¶ 74 & Exhibit 2 to Complaint.  Through

careful word games, defendants attempted to convince the investment community that this meant

Jefferies had received no relevant information from Highmark.  *See* ¶ 75(c) (Highmark gave

Kennedy information about the CPT code under which MCOT was billed).  Indeed, defendants

went so far as to say that Highmark had provided Jefferies "with ***no information whatsoever*** on

CardioNet and never spoke to them about price."  ¶ 86.  These types of false statements only

strengthen the inference of scienter with respect to defendants' statements about Jefferies.

Second, defendants are misdirecting the analysis when they speculate about what

Kennedy may or may not have told them had they bothered to contact him, and whether this

would have altered the substance of their statements.  The question before the Court is

defendants' state of mind.  To find scienter, one need only look at defendants' deliberate effort to

avoid confronting the truth of the Jefferies Report.  Based on the *Wall Street Journal* article, the

Complaint alleges that Kennedy had additional information supporting the conclusions in his

Report, including the conclusion that Highmark would imminently announce a significant rate

reduction for the MCOT system.  ¶ 13 & Exhibit 2 to Complaint.  Most obviously, Kennedy

could identify his source of information at Highmark, Dr. Bloschichak.  While one cannot know

exactly what information Kennedy would have shared with defendants, it is undisputed that

defendants not only failed to ask for such information but worked to keep it out of view, refusing to talk with anyone from Jefferies and banning Jefferies from conference calls.  In essence, defendants are arguing that they acted with pure motives because they might not have learned anything important had they called Kennedy.  To state the argument this way shows its fallacy.

In order to plead scienter, plaintiffs do not need to theorize what defendants *would have done* had they communicated with Jefferies or Kennedy directly about their Report.  Plaintiffs need only direct the Court to facts showing that defendants knew or recklessly disregarded that their statements were false and misleading at the time they were made.  When Thurman and Galvan specifically refuted the possibility of a rate decrease and accused Kennedy of fabricating his Report, at a minimum they acted with total disregard for the fact that they lacked important first-hand information known to Kennedy.  The fact defendants issued such statements while consciously avoiding such first-hand confirmation suggests a strong inference of scienter.

Defendants' statements about their relationship with Highmark, including most specifically that (a) CardioNet would know if any review of the reimbursement rate was taking place, (b) its executives would know if Highmark was about to announce a rate decrease, and (c) there was just as good a chance that Highmark might increase as decrease the reimbursement rate applicable to the MCOT device, similarly evidence their scienter.[23]  These statements were intended to and did have the effect of portraying the reimbursement rate review process as completely transparent to CardioNet.  As the Jefferies Report and subsequent developments confirmed, that was demonstrably false and misleading.

---

[23]     For instance, during the April 30, 2009 conference call, Thurman said: "We know of no reason today to expect any significant change in the reimbursement levels."  ¶ 84.  Later during the same call, he said "the argument is just as strong that we could justify a higher level of reimbursement as there would be any reduction."  *Id*. Defendants further represented that they worked "hand in glove with Highmark and with CMS"; they had an "outstanding relationship with Highmark"; and there was "***no question that … if there was any meaningful or anticipated change in the reimbursement rates, that we would be well aware of that***."  *Id*.

Defendants argue they made these statements in good faith, *see* Def. Mem. at 30-33, yet the facts alleged raise at least as compelling an inference that defendants (a) did not, in fact, have such a relationship with Highmark that they would definitely be aware any "meaningful or anticipated change" in the reimbursement rate, and (b) given their refusal to talk with anyone from Jefferies, defendants were content to stick their heads in the sand rather than risk discovering that the Jefferies Report was based on credible information.

As for defendants' argument that a higher reimbursement rate could just as easily be justified "and plaintiffs allege no facts casting doubt on that belief," *see* Def. Mem. at 28, the overwhelming conclusion from the facts pled is that if defendants truly had the type of relationship they claimed to have with Highmark, they could not have made this statement in good faith. *See Urbach v. Sayles*, 779 F. Supp. 351, 359 n.8 (D.N.J. 1991) (even a statement that "a highly improbable proposition is true or likely to be true is no less actionable under the securities laws than the knowing communication of outright lies").

Given the importance to the Company of MCOT device sales and rates the third-parties would pay for the device, defendants' reiteration of their revenue and earnings guidance to the market after issuance of the Jefferies Report constitutes further evidence of their scienter.  The MCOT device – which accounted for 88% of the Company's revenues (¶ 47) – and its reimbursement rates unquestionably formed the core business of CardioNet.  Indeed, in the April 30 press release, Galvan noted that margins were benefiting from a shift in the sales mix to MCOT, and Thurman reaffirmed the financial guidance based, in part, on the "continued strong outlook for our core business."  *See* ¶¶ 76, 78.  But even if Thurman and Galvan had not admitted their knowledge concerning this core product, as the Company's CEO and CFO they would still be presumed to have such knowledge.  *See*, *e.g.*, *In re RAIT Financial Trust Sec.*

*Litig.,* No. 2:07-cv-03148-LDD, 2008 WL 5378164, at *12-13 (E.D. Pa. Dec. 22, 2008) ("Because the alleged misstatements involved RAIT's core business operations and because the Officer Defendants had ample reason to know of the falsity of their statements, there is a strong inference of scienter in this case."); *In re Aetna Inc. Sec. Litig.,* 34 F. Supp. 2d 935, 953 (E.D. Pa. 1999) (size of corporate merger and defendants' positions as CEO and CEO, in conjunction with allegations of operational problems following merger, provided strong circumstantial evidence that defendants misrepresented success of integration).[24]

As the Complaint alleges, even apart from the Jefferies Report there were numerous signals known to defendants that a reduction in the reimbursement rate for the MCOT device during 2009 was imminent.  Beginning at least as early as January 2009, Highmark was signaling that there should be a reduced use of the MCOT device and a reduction of the reimbursement rate.  On January 5 and 26, 2009, Highmark issued bulletins signaling its concerns of over-use and abuse of real-time cardiac surveillance monitoring systems such as the MCOT device.  The bulletins propounded updated restrictions on the circumstances under which use of the MCOT device was appropriate.  ¶ 50.  On April 13, 2009, Highmark issued an even more rigorous set of restrictions.  ¶¶ 51-52.  Given how defendants Thurman and Galvan touted the intimate relationship between the Company and Highmark, they can hardly be heard now to deny knowledge of the Highmark bulletins that required reduced and/or restricted MCOT usage.

---

[24]     *See also Reid v. Hemispherx Biopharma, Inc.,* No. 09-5262 (and consolidated cases), slip op at 7-8 (E.D. Pa. April 20, 2010) (Exhibit 1 to Declaration of Jeffrey W. Golan ("Golan Decl."), submitted herewith) (citing *RAIT* and finding the company's highest ranking officers acted with scienter with respect to statements about one of the company's two key products); *In re Campbell Soup Co. Sec. Litig.,* 145 F. Supp. 2d 574, 599 (D.N.J. 2001) ("knowledge may be imputed to individual defendants when the disclosures involve the company's core business"); *In re Tel-Save Sec. Litig.,* No. 98 CV 3145, 1999 WL 999427, at * 5 (E.D. Pa. Oct. 19, 1999) (stating "knowledge concerning a company's key businesses or transactions may be attributable to the company, its officers and directors" and finding that knowledge regarding the misstatements about information "central to the business" could be attributed to the CEO).

Yet, even as Highmark was warning that health providers had to tighten their use of devices such as the MCOT, CardioNet reported ever-increasing absolute and percentage revenues from the MCOT device.  ¶ 76.  The significant rise in MCOT sales during this period signaled two facts material to CardioNet's bottom line: (1) Medicare claims for the Company's MCOT device were increasing while fewer claims for CardioNet's non-real-time cardiac surveillance monitors were being filed; and (2) an upward trend of claims on the MCOT device signaled the potential, at the least, of abuse of the device in light of Highmark's enhanced restrictions on the proper use of the MCOT device.  These factors should have been strong indicators to CardioNet that a reimbursement rate reduction for the CPT code affecting the MCOT device was likely, if not inevitable (as the Jefferies Report stated).

Further, as discussed above, (a) CMS had cut the professional rate for the MCOT device significantly, which Jefferies found was a significant "tell" that Highmark would have to cut the technical reimbursement rate (¶¶ 69-71 & note 4 *supra*), (b) defendants' refusal to speak with Kennedy or any Jefferies analyst constitutes a willful blindness on their part, and (c) defendants actually ***knew*** that Highmark was reviewing MCOT's reimbursement rate (¶ 99).  All of this further supports that they reiterated the Company's guidance without any reasonable basis.  *See, e.g., Par*, 2009 WL 3234273, at *8-9 (based on the reports defendants received "they should have at least investigated whether the Company needed to increase its accounts receivable reserves" and although defendants were aware of certain inventory issues, they "failed to address a methodology they knew or should have known was incorrect"); *Marsden v. Select Medical*, 2006 WL 891445, at *10 (finding scienter where plaintiffs alleged that various sources provided defendants with information that a significant change to its reimbursements "was imminent").

**B.    The Most Plausible Inference Is that Defendants Knew or Were Reckless In Ignoring the Falsity of Their Statements**

Defendants' primary point in support of their argument that they "genuinely believed in the truth of their statements" is that Thurman's letters to the SEC, FINRA and Nasdaq "requesting an investigation into the trading of CardioNet stock." Def. Mem. at 30.  Defendants posit that it would have been irrational for Thurman to request a regulatory investigation had he engaged in securities fraud, and therefore, the fact the letters were sent are evidence of defendants' good faith rather than any recklessness on their part.  *Id*.  This argument fails on many levels.

<u>First</u>, defendants disregard that Thurman's accusations in his letters to the regulatory agencies were completely and demonstrably baseless.  Thurman said in his letters that the Jefferies Report "may have been part of a plot to enrich CardioNet short sellers betting on a share-price decline," it struck him as a "blatant and inappropriate manipulation of our company's stock," it was suspect "given its apparent inaccuracies," and the SEC and other regulatory agencies should question "whether it was written with the intent of driving down [CardioNet's] stock price."  ¶ 14.  In making these accusations, Thurman's letter went far beyond merely requesting an investigation into the trading of CardioNet stock.  Rather, his letters constituted a broadside attack against Kennedy and others at Jefferies, consistent with all of the other ways in which defendants sought to discredit them, as detailed above.  Moreover, in his public statements Thurman sought to make it appear that the SEC and FINRA had initiated investigations of Kennedy and the Jefferies Report on their own, rather than at his instigation.  *See* ¶¶ 86 & 87(d). Such statements were highly misleading and intended to confuse the public as to the basis of potential regulatory investigations of Jefferies.  At a minimum, they show that Thurman would go to any lengths to discredit Kennedy, and even attempt to ruin his ability to make a living,

without ever once talking with Kennedy or anyone at Jefferies about the sources of the information in their Report.  That, plaintiffs submit, is the essence of scienter.

Second, while defendants posit that sending such letters would have been irrational for Thurman had he engaged in securities fraud, there have been many instances in which company executives mounted such aggressive counter-attacks to distract attention from their own malfeasance.  *See, e.g., Roffman v. Trump*, 754 F. Supp. 411 (E.D. Pa. 1990) (upholding certain disparagement claims brought against Donald Trump by analyst who stated that he did not believe the Trump Taj Mahal would prosper after its initial opening, and who was fired by Janney Montgomery Scott at Trump's insistence) and Henriques, Diana B., "Analyst Who Criticized Trump Casino Is Ousted," The New York Times (March 27, 1999); *In re Qwest Communications Int'l., Inc. Sec. Litig.*, 387 F. Supp.2d 1130, 1142 (D. Colo. 2005) (denying motion to dismiss securities fraud action based in part on allegation that "Qwest undertook a concerted effort to counter the effect of the Morgan Stanley report among investors and analysts, and, thus, to conceal and deny the existence of accounting improprieties").[25]

---

[25]     *See also* Fisch, Jill E. and Hillary A. Sale, "The Securities Analyst as Agent: Rethinking the Regulation of Analysts," 88 Iowa L. Rev. 1035, 1054-56 (May, 2003) (citing numerous examples of similar retaliatory actions, including: a Boston Chicken executive banning from its investor and analyst conference an analyst who wrote negative reports on the company; Oxford, Inc. executives who "disinvited" an analyst who had issued a sell rating on the company from its analyst conferences and did not return phone calls; a CSFB analyst who was not allowed to meet with PNC's chief executive and whose firm was threatened by certain banks with a cessation of all underwriter and trading business after he recommended sales of bank stocks (*see also* Rynecki, David, "The Price of Being Right," Fortune (Feb. 5, 2001)); and Conseco's chairman confronting a Salomon Smith Barney analyst who had downgraded Conseco's stock by "reminding" the analyst that Conseco was a "good client" of Salomon, although it turned out the analyst's analysis was right on the money (*see also* Lohse, Deborah, "Heard on the Street: Analyst Feels Vindicated on Conseco," The Wall Street Journal (April 14, 2000)).

In addition to the Fisch law review article and sources cited therein, *see also* Pulliam, Susan, "Deals & Deal Makers: Analysts to Tell Congress that Skepticism Gets The Abuse," The Wall Street Journal (March 19, 2002); MacDonald, Elizabeth, "Heard on the Street: Libel Suits Pose a Risk For Analysts," The Wall Street Journal (December 29, 1999) ("Wall Street analysts who dare to take the unusual step of criticizing companies in their research reports routinely risk being pilloried by their institutional-investor clients, frozen out of company conference calls or even fired.  Now they have another problem to contend with: libel suits.").

Indeed, just recently, the report issued by the examiner in the Lehman Holdings bankruptcy proceedings showed that Lehman was carrying out a wholesale financial fraud at the same time that its CFO publicly upbraided David Einhorn, a short-seller, after he had publicly questioned Lehman's financial reports in the spring and summer of 2008, prior to its bankruptcy filing in September 2008. As the Examiner's report found, and as later articles confirmed, the company's attacks on Einhorn came precisely at the time when Lehman was engaged in "actionable balance sheet manipulation." *See* de la Merced, Michael and Andrew Ross Sorkin, "Report Details How Lehman Hid Its Woes," The New York Times, March 11, 2010, and Dealbook, edited by Andrew Ross Sorkin, "In Lehman Report, a Vindication of Short-Sellers?," The New York Times, March 15, 2010.[26]

Thus, rather than the letters serving as an indicator of Thurman's "genuine[] belie[f]" in the truthfulness of his statements, a more compelling inference – or at least one that is equally compelling, which is all that is required under *Tellabs* – is that Thurman and Galvan believed that the best defense to the truthfulness of the statements made in the Jefferies Report was a good offense. As such, the letters are also indicators of defendants' scienter.

Taken together, Lead Plaintiff's confidential witness reports, the Jefferies information, the facts uncovered in the *Wall Street Journal* article, the significant reimbursement rate decreases instituted by commercial payors and Highmark within months of defendants' contrary statements, Thurman's letters to the regulatory agencies, and defendants' admission on July 12, 2009 that they knew Highmark had been conducting a substantive reimbursement rate review

---

[26]    The full Lehman Brothers Holdings Inc. Chapter 11 Proceedings Examiner's Report, which encompasses nine volumes, is available at http://lehmanreport.jenner.com.   The first mention of Lehman's improper balance sheet manipulations comes in Volume I at 5-8. *See also* Einhorn, David, "Fooling Some of the People All of the Time" (John Wiley & Sons, Inc. 2008) (chronicling Einhorn's ordeal with the SEC after a 2002 speech in which he stated publicly that he had sold short the stock of Allied Capital Corp., only to be proven right, years later, that Allied was engaging at the time in accounting manipulations).

(which Thurman had expressly denied during the May 12, 2009 conference) all support a strong

inference of the defendants' scienter.

    **C.**    **Stock Purchases by the Individual Defendants Do Not Weaken the Strong Inference of Scienter**

Contrary to defendants' argument, *see* Def. Mem. at 32, the individual defendants'

purchases of CardioNet stock during the class period in no way negate scienter. As an initial

matter, stock transactions are just one factor to be considered in the holistic analysis. *See*

*Tellabs*, 127 S. Ct. at 2511 (fact that defendant did not sell shares during class period was not

fatal because significance of pecuniary motive, or lack thereof, "depends on the entirety of the

complaint"). Where plaintiffs have otherwise pled conscious misbehavior or recklessness, the

court "need not analyze whether they have also shown motive and opportunity for those claims."

*See Marsden v. Select Medical*, 2006 WL 891445, at *16.

Additionally, defendants greatly exaggerate the significance of Thurman's and Galvan's

stock purchases. Thurman purchased 5,555 shares on May 5, 2009, at a total cost of $99,794.50.

*See* Exhibit 10 to Def. Mem. (Thurman Form 4). In contrast, Thurman received $10,460,318 in

total compensation from CardioNet for 2009, including $442,308 in base salary, $375,000 in

bonus, and $487,054 in other cash compensation. *See* Exhibit 2 to Golan Decl. at 39 (excerpts

from Form DEF 14A filed Mar. 30, 2010).[27] Thurman's class period stock purchases, therefore,

represented just 0.95% of his compensation in 2009. Galvan purchased 5,000 shares on May 15,

2009, at a total cost of $41,526.25. *See* Exhibit 11 to Def. Mem. (Galvan Form 4). He received

$604,259 in total compensation from CardioNet for 2009, including $311,942 in base salary. *See*

Exhibit 2 to Golan Decl. at 39. Galvan's class period stock purchases, therefore, represented just

6.8% of his compensation for 2009. One cannot assume from such modest outlays that the

---

[27]    *See*  http://www.sec.gov/Archives/edgar/data/1113784/000104746910002912/a2197479zdef14a.htm.

individual defendants had genuine optimism about the reimbursement environment for

CardioNet.  More plausibly, their stock purchases were part of their larger scheme to reassure

outside observers of the continued financial viability of the Company after the Jefferies Report.

Thurman's stock purchases become even less helpful to him when one considers that he

did not have the option of dumping his investment in CardioNet.  Thurman had bound himself to

stock ownership and holding requirements when he became the permanent President and CEO.

*Id*. at 35.  As a consequence, he could not sell any CardioNet common stock that he acquired on

or after January 22, 2009.  *See* Exhibit 3 to Golan Decl. at 2 (Form 8-K, Ex. 99.5, filed Jan. 28,

2009).[28]  Thurman acquired 50,000 shares, the vast majority of his holdings during the class

period, as a stock unit award from CardioNet on February 25, 2009.  Exhibit 2 to Golan Decl. at

32.  Additionally, Thurman had to hold at least $200,000 worth of common stock by the time of

the 2011 annual stockholder meeting.  *See* Exhibit 3 to Golan Decl. at 3.

As a result, neither Thurman's nor Galvan's modest stock purchases serve to negate the

strong inference of scienter based on the totality of the Complaint's allegations.

## IV.    The Statutory Safe Harbor Does Not Immunize Any of Defendants' April 30, 2009 Statements from Liability

The PSLRA contains a safe harbor that immunizes a "forward-looking statement" from

liability to the extent that it "is identified as such and accompanied by meaningful cautionary

language; or is immaterial; or the plaintiff fails to show the statement was made with actual

knowledge of its falsehood."  *Avaya*, 564 F.3d at 254 (citing 15 U.S.C. § 78u-5(c)(1)).

Defendants' safe harbor argument has a very narrow scope.  It deals only with defendants'

---

[28]        *See* http://www.sec.gov/Archives/edgar/data/1113784/000110465909004645/a09-4048_1ex99d5.htm.

reaffirmation of prior financial guidance in the press release and conference call on April 30, 2009.  *See* Def. Mem. at 33-34;  *see also* ¶¶ 78, 82.[29]  Even so limited, the argument fails.

Defendants make no argument that the reaffirmation of the Company's financial guidance for the years 2009 through 2011 was immaterial.  In any event, materiality generally presents a mixed question of law and fact for the factfinder.  *See In re ATI Techs.,* 216 F. Supp. 2d at 428.  Thus, defendants fail the second prong of the *Avaya* test.

As to the first prong, defendants included the revenue and earnings guidance in a section of the April 30 press release called "Financial Outlook," but did not specifically identify any of the statements they made during the April 30 conference as "forward-looking statements."  The press release also included a section called "Forward Looking Statements," *see* Def. Mem. Ex. 3 at 4, and at the beginning of the conference call, the operator stated that (a) certain statements during the conference call "may relate to future events and expectations and as such constitute forward-looking statements within the meaning of the Private Securities and Litigation Act of 1995," (b) such statements involve "known and unknown risks, uncertainties and other factors which may cause the actual results, performance or achievement of the Company in the future to be materially different from the statements that the Company's executives may make today," and these risks are "described in detail in our public filings with the Securities and Exchange Commission, including our latest period report in Form 10-K and 10-Q."  Def. Mem. Ex. 4 at 1.

---

[29]     Plaintiffs seek to hold defendants liable for a number of other false and misleading statements of present fact made on April 30, 2009.  *See* ¶ 85(a)-(b) and (d)-(f) (denying that rate reimbursement review was underway, denying knowledge of facts that would justify apprehension of rate cut, overstating the relationship between CardioNet and payors, stating that circumstances could just as well justify a rate increase, and emphasizing increasing level of revenues from MCOT device over other devices sold by the Company).  Defendants do not and cannot characterize these as forward-looking statements.  "A statement is not forward-looking if its accuracy can be determined at the time it is made."  *In re NutriSystem Sec. Litig.*, 653 F. Supp. 2d 563, 579 (E.D. Pa. 2009); *accord In re Viropharma, Inc. Sec. Litig.*, No. 02-1627, 2003 WL 1824914, at *7 (E.D. Pa. Apr. 7, 2003).  When a statement refers to both the present and the future, the safe harbor does not apply to the part referring to the present.  *Avaya*, 564 F.3d at 255; *accord In re Discovery Laboratories Sec. Litig.*, No. 06-1820, 2006 WL 3227767, at *16 (E.D. Pa. Nov. 1, 2006).

The forward-looking statements section of the press release includes a series of words, such as "expect," "anticipate," "estimate" and the like, that the Company said may identify its forward-looking statements. None of those words were used in the Company's reaffirmation of its revenue and earnings guidance in the press release, except when the Company said that it was "anticipating" a $0.01 per share dilutive impact from its announced acquisition of Biotel Inc. *See* Def. Mem. Ex. 3 at 3. The use of the word "anticipate" in this limited context, while no such forward-looking phrase was used to describe the statements "we are reaffirming our 2009 financial guidance" and "[b]eyond 2009, we are comfortable with our previous guidance," especially when detailed dollar and per share guidance was given, weakens any claim that these were readily-identifiable forward-looking statements.

Judge Diamond's recent decision in *Reid v. Hemispherx Biopharma, supra,* is instructive in this regard. There, defendants argued that their statements regarding the timeframe for the FDA's decision on the company's New Drug Application (NDA) were forward-looking because they were "plans or objectives relating to the[ir] products." Exhibit 1 to Golan Decl. at 9. Plaintiffs alleged, however, that in making these statements the defendants knowingly omitted facts regarding the FDA's concerns respecting the NDA, concerns that "would cause significant delay, at the very least." *Id*. at 9-10. In this circumstance, the court concluded that defendants' statements were not forward-looking, regardless of any cautionary language employed, since a statement may not be classified as forward-looking if a defendant withholds present information. *Id*. at 10; *see also Marsden v. Select Medical*, 2006 WL 891445, at *7 (finding that statements were not entitled to safe harbor protection where plaintiffs challenged statements on the basis that defendants "withheld present information regarding an imminent CMS proposal and alleged

Medicare abuses that were the real source of profits" for the company's long-term care

hospitals).

But even if the guidance qualifies as forward-looking statements, and was adequately

described as such in the press release, the section of the press release called "Forward Looking

Statements" merely included a laundry-list of fifteen (15) "inherent risks and uncertainties," and

stated that these "could cause actual outcomes and results to differ materially from current

expectations." Def. Mem. Ex. 3 at 4. But none of the items, including "changes to

reimbursement levels for our products," which defendants highlight in their argument (*see* Def.

Mem. at 33), contained any meaningful descriptions of these generic "uncertainties." Indeed, the

list included by defendants in the press release could just as easily apply to any company in the

health industry, and certainly did not include any of the factors that actually made CardioNet

susceptible to a highly damaging imminent reimbursement rate decline applicable to its key

product, the MCOT device.

The "risk warnings" stated during the April 30 conference call fare no better. The

PSLRA has special provisions for oral forward-looking statements made by the issuer of a

security or someone acting on its behalf.[30] To be protected, such statements must be

accompanied by a cautionary statement "that the particular oral statement is a forward-looking

statement." 15 U.S.C. § 78u-5(c)(2)(A)(i). Defendants rely on a generic recital at the beginning

of the conference call that "[c]ertain statements" to come "may" constitute forward-looking

statements, *see* Def. Mem. at 34 & Ex. 4 thereto at 1, but this does not qualify as proper

identification. *In re ATI Techs.,* 216 F. Supp. 2d at 443 n.18 (defendants stated at outset that

---

[30]     CardioNet was a regulated issuer that filed periodic public reports with the SEC, ¶ 117(b), and Thurman
and Galvan both acted on its behalf as senior executives.   ¶¶ 26-27.

conference calls might involve forward-looking statements but "never identified *which* statements were forward-looking statements and which were not") (emphasis in original).

Moreover, neither the press release nor the conference call meets the cautionary language requirement of the safe harbor's first prong. The statute requires "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C § 78u-5(c)(1)(A)(i). The Third Circuit Court of Appeals has repeatedly stressed that cautionary language must be "'extensive and specific.'" *Avaya*, 564 F.3d at 256 (quoting *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 243 n.3 (3d Cir. 2004)). A boilerplate disclaimer about risks will not suffice. Rather, cautionary statements must be tailored to the specific future projections or opinions being challenged. *Id.*

In the present context, meaningful cautionary language would have to alert investors to the signs of a forthcoming cut in Medicare and commercial payor reimbursement rates. Defendants reaffirmed highly optimistic revenue and earnings forecasts on April 30. *See* ¶¶ 78 (Thurman in press release), 82 (Galvan in conference call). Plaintiffs claim that these statements were false and misleading because, among other reasons, they did not account for the conclusion in the Jefferies Report that a significant rate cut was imminent and because they left the impression that Jefferies did not have any information from Highmark to justify that concern. ¶ 85(c); *see also* ¶ 85(e-f) (alleging that earnings guidance reiteration was unreasonable because of factors that would cause commercial payors, as well as Highmark, to cut the reimbursement rates, including the increasing level of claims being filed in spite of increasingly strict limitations of coverage under Highmark Medical Policy Bulletin revisions). "The required cautionary language must 'relate directly to that by which plaintiffs claim to have been misled.'" *Discovery Labs*, 2006 WL 3227767, at *16 (quoting *Kline v. First W. Gov't Sec., Inc.*, 24 F.3d 480, 489 (3d

Cir. 1994)).  Here, while CardioNet did include "changes to reimbursement levels for our

products" within the laundry list of potential risks and uncertainties in the April 30 press release,

defendants ***did not provide any specific information about the risk of an imminent decline in***

***the reimbursement rates for the MCOT device***; indeed, given Thurman's statement that a price

increase was just as likely as a price decrease, this "risk warning" really meant nothing and the

manner in which it was presented made it misleading.

  Defendants also point to CardioNet's 2008 10-K filing as a source of cautionary

language.  *See* Def. Mem. at 34.  This argument fails.  CardioNet filed the 10-K on March 3,

2009, *see* Def. Mem. at 34 & Ex. 12 thereto, more than seven weeks before Jefferies' April 24

Report and more than eight weeks before defendants' April 30 statements.  "Remote cautions are

less likely effectively to qualify predictions contained in separate statements."  *Grossman v.*

*Novell, Inc.*, 120 F.3d 1112, 1123 (10th Cir. 1997) (discussing common law bespeaks caution

doctrine); *see also In re Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d 1193, 1222 (D. Kan. 2002)

(refusing to dismiss claims under bespeaks caution doctrine and PSLRA safe harbor because

joint proxy with cautionary language was issued approximately seven weeks before the first

optimistic statement at issue).

  Moreover, the 10-K did not address the signs of a reimbursement cut by Highmark or

commercial payors that had been brought to light through the Jefferies Report of April 24, 2009.

Rather, the 10-K only generally noted that changes in reimbursement could affect CardioNet's

revenue.  *See* Def. Mem. Ex. 12 at 29 ("[T]he absence or inadequacy of reimbursement would

cause our revenues to fail to grow or decrease.").  Since 88% of CardioNet's revenue came from

MCOT reimbursements by the end of the first quarter 2009, *see* ¶ 47, this is tantamount to saying

that the Company depended on money for revenue.  It simply states the obvious.  Indeed,

wherever the 10-K spoke of Medicare reimbursement in particular, it ***downplayed*** the possibility of a decrease. *See* Def. Mem. at 34 & Ex. 12 thereto at 30-31 ("Reimbursement rates for 2008 were the same as 2007, ***and we expect 2009 and 2010 rates to remain consistent with 2008***."), 31 ("***We have no reason to believe the reimbursement rate will be reduced in the foreseeable future***; however, it is possible that the rate could decline."). This language would only have served to ***reinforce the false sense of security that defendants sought to foster after the Jefferies Report was issued on April 24, 2009***. It did not acknowledge any indications of a rate decrease but only the theoretical possibility of one occurring. Thus, defendants fail the first prong of the safe harbor test.[31]

As to the third prong, defendants incorporate their discussion of scienter in an attempt to show that they did not have actual knowledge that their forward-looking statements were false or misleading. *See* Def. Mem. at 36 n.17. Plaintiffs have demonstrated otherwise, *see supra* at 32-46, and further showed that defendants withheld present information that made their statements false and materially misleading. As the court stated in *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1165 (C.D. Cal. 2003):

> If the forward-looking statement is made with actual knowledge that it is false or misleading, the accompanying cautionary language can only be meaningful if it either states the belief of the speaker that it is false or misleading or, at the very least, clearly articulates the reasons why it is false or misleading. These are undeniably "important factors that could cause actual results to differ materially from those in the forward-looking statement . . . ." 15 U.S.C. § 78u-5(c)(1)(A)(i).

*Accord Rosenbaum Capital, LLC v. McNulty*, 549 F. Supp. 2d 1185, 1191 (N.D. Cal. 2008); *In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d 861, 873 (D. Minn. 2007).

---

[31] These positive statements included in CardioNet's 10-K, which defendants continued to state during the class period, overshadowed any generic "risk warnings" that were otherwise stated in the April 30 press release and during the conference call. Thus, unlike in *In re ATI Techs.,* 216 F. Supp. 2d at 441-43, the earnings forecast reaffirmation here was not rendered immaterial by defendants' warnings, and is further not immunized either by the "bespeaks caution" doctrine or the PSLRA's safe harbor provisions.

As a result, defendants have not shown any basis for their reaffirmations of revenue and earnings guidance to be immunized under the safe harbor provisions of the PSLRA.

## CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully submits that defendants' motion to dismiss should be denied in its entirety, and that the proposed order denying the motion being submitted herewith should be entered by the Court.

DATED: April 30, 2010

Respectfully submitted,

  /s/Jeffrey W. Golan
Jeffrey W. Golan
M. Richard Komins
Jeffrey A. Barrack
Beth T. Seltzer
**BARRACK, RODOS & BACINE**
3300 Two Commerce Square, Suite 3300
2001 Market Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838

and

J. Gerard Stranch, IV
Michael Stewart
Joe P. Leniski
Michael J. Wall
**BRANSTETTER, STRANCH &
    JENNINGS, PLLC**
227 Second Avenue North, Fourth Floor
Nashville, Tennessee 37201-1631
Telephone: (615) 254-8801
Facsimile: (615) 250-3970

*Attorneys for Lead Plaintiff and Co-Lead
Counsel for the Class*

John T. Long
**CAVANAGH & O'HARA LLP**
407 East Adams
P.O. Box 5043
Springfield, Illinois 62705
Telephone: (217) 544-1771
Facsimile: (217)544-9894

*Other Attorneys for Lead Plaintiff*

Deborah R. Gross
**LAW OFFICES OF BERNARD M.
GROSS, P.C.**
The Wanamaker Building, Suite 450
100 Penn Square East
Philadelphia, PA 19107
Telephone: (215) 561-3600
Facsimile: (215) 561-3000

*Attorneys for Plaintiff Dianne Solomon-
Shrawder*