# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| DIANNE SOLOMON-SHRAWDER,<br>Individually and on Behalf of All Others<br>Similarly Situated, | : <br> : <br> : <br> : | CIVIL ACTION No. 2:09-cv-3894-SD |
| Plaintiff, | : <br> : | CLASS ACTION |
| v. | : <br> : | FILED ELECTRONICALLY |
| CARDIONET INC., RANDY H. THURMAN<br>and MARTIN P. GALVAN, | : <br> : <br> : | |
| Defendants. | : <br> : | |

## [PROPOSED] REPLY TO LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT

Dated: May 13, 2010

Marc J. Sonnenfeld (I.D. No. 17210)
Karen Pieslak Pohlmann (I.D. No. 60079)
Jill Baisinger (I.D. No. 82476)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone: 215.963.5000
Facsimile: 215.963.5001

*Attorneys for Defendants*

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     ARGUMENT .......................................................................................................1

        A.      Defendants Had No Obligation To Contact Kennedy, The Jefferies
                Analyst, And No Such Obligation Should Be Created............................2

        B.      Plaintiffs Have Not Adequately Pleaded That Dr. Bloschichak Provided
                Kennedy With Information Regarding A Rate Decrease ........................6

        C.      Plaintiffs Have Not Adequately Pleaded Any Other Source To Support
                Allegations That Highmark Provided Information To Kennedy Or
                Jefferies Regarding An Imminent Rate Cut. .......................................10

        D.      Plaintiffs Have Not Explained How CardioNet Committed Securities
                Fraud In Light Of The Apparent Conflict Between What Plaintiffs Claim
                Highmark Allegedly Told Kennedy And/Or Jefferies And What Plaintiffs
                Acknowledge That Highmark Communicated To CardioNet. ............12

        E.      Plaintiffs' Challenge To Statements About Kennedy's "Due Diligence"
                And CardioNet's Relationship With Highmark Should Be Rejected.................15

        F.      Plaintiffs Do Not Plead That Defendants Lacked A Reasonable Basis For
                Their Forecasts .................................................................................18

        G.      Plaintiffs Fail In Their Efforts To Show That Their Interpretation Of Facts
                Is The Most Plausible Inference And Demonstrates Scienter .............19

III.    CONCLUSION ................................................................................................22

# TABLE OF AUTHORITIES

## FEDERAL CASES

In re ATI Tech., Inc. Sec. Litig., 216 F. Supp.2d 418 (E.D. Pa. 2002) .................................. passim

In re Advanta Corp. Sec. Litig., 180 F.3d 525 (3d Cir. 1999), abrogated
   in part on other grds., Institutional Investors Group v. Avaya, Inc.,
   564 F.3d 242 (3d Cir. 2009) ............................................................................ 3, 21

In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410 (3d Cir. 1997) ..................................... 16

Cal. Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126 (3d Cir. 2004) ............................ 8

Commw. of Pa. ex rel v. Zimmerman v. PepsiCo, Inc.,
   836 F.2d 173 (3d Cir. 1988) ................................................................................... 21

In re Discovery Labs. Sec. Litig., No. 06-1820, 2006 WL 3227767
   (E.D. Pa. Nov. 1, 2006) .................................................................................. 4, 8, 12

In re Discovery Labs. Sec. Litig., No. 06-1820, 2007 WL 789432 (E.D. Pa.
   Mar. 15, 2007), aff'd, 276 Fed. Appx. 154 (3d Cir. 2008) ...................................... 18

Frederico v. Home Depot, 507 F.3d 188 (3d Cir. 2007) ......................................................... 21

Helwig v. Vencor, Inc., 251 F.3d 540 (6th Cir. 2001), rejected in part,
   Tellabs v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007) ................................. 18

Ieradi v. Mylan Labs., Inc., 230 F.3d 594 (3d Cir. 2000) ...................................................... 16

Institutional Investors Group v. Avaya, Inc., 564 F.3d 242 (3d Cir. 2009) .......................... passim

In re Par Pharm., Inc. Sec. Litig., 733 F. Supp. 668 (S.D.N.Y. 1990) ........................................ 13

In re Qwest Commc'ns Int'l, Inc. Sec. Litig., 387 F. Supp.2d 1130 (D. Colo. 2005).................. 21

Roffman v. Trump, 754 F. Supp. 411 (E.D. Pa. 1990)................................................................... 21

In re Stonepath Group, Inc. Sec. Litig., 397 F. Supp.2d 575 (E.D. Pa. 2005) ............................... 3

In re Stonepath Group, Inc. Sec. Litig., No. 04-4515, 2006 WL 890767
   (E.D. Pa. Apr. 3, 2006), aff'd sub nom., Globis Capital Partners, L.P.
   v. Stonepath Group, Inc., 241 Fed. Appx. 832 (3d Cir. 2007) .............................. 2, 13

Tellabs v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007) ................................................ 8, 18

<u>Warshaw v. Xoma</u>, 74 F.3d 955 (9th Cir. 1996) .......................................................... 13

## FEDERAL STATUTES

15 U.S.C. § 78u-4(b) ....................................................................................................... 8

## I.  INTRODUCTION

Plaintiffs' lengthy brief attempts to divert attention from the undisputed fact that is central to defendants' pending Motion to Dismiss.  Although plaintiffs cast out numerous red herrings in an effort to characterize CardioNet's statements as "false and misleading," see, e.g., Opp. at 1, 16-18, 21,[1] they never dispute that: (1) defendants communicated directly with CMS and Highmark about the Jefferies Report, or (2) defendants accurately recounted that CardioNet was told by CMS and Highmark that "'neither organization provided the analyst with any confidential information or any information specifically about CardioNet.'"  ¶ 74.  These concessions are fatal to this action.  Plaintiffs' efforts to create a securities fraud claim based on the novel and illogical theory that defendants may be held liable for failing to contact an analyst collapses like a house of cards.  No matter how plaintiffs try to distort defendants' statements or draw unwarranted inferences, they simply cannot state a claim that satisfies the PSLRA's requirements, and their Complaint should be dismissed.[2]

## II.  ARGUMENT

Virtually all of plaintiffs' arguments—whether purporting to address their failure to plead a particularized false statement or their failure to plead a strong inference of scienter—rest on the same flawed theories.  These theories, which attempt to define how a company should react to an analyst report or how it should phrase its public statements, are utterly unfounded and repeatedly rely on exaggerations of the Complaint's factual allegations and inapposite case law.

---

[1]    "Opposition" or "Opp." refers to Lead Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Class Action Complaint.  Capitalized terms and abbreviations used in this Reply Brief have the same meaning as those used in the Memorandum of Law in Support of Defendants' Motion to Dismiss the Consolidated Class Action Complaint ("Defendants' Memorandum" or "Defs. Mem.").

[2]    Defendants respond in this Reply to key thematic points raised in the Opposition and stand on Defendants' Memorandum as to issues not addressed herein.

**A.** **Defendants Had No Obligation To Contact Kennedy, The Jefferies Analyst, And No Such Obligation Should Be Created.**

This Court should reject plaintiffs' efforts to impose liability based on defendants' alleged failure to communicate with Jefferies, an argument that pervades plaintiffs' Opposition and serves as a basis for most of their contentions of both falsity and scienter. See, e.g., Opp. at 9-14, 18, 19, 22, 26, 29, 33-39, 41. In all the pages that they devote to this point, plaintiffs do not cite a single case that holds directly or indirectly that defendants have a duty to speak with an analyst, a journalist, or anyone else publishing reports about a company. Indeed, plaintiffs concede that "a company executive does not have a general duty to speak with any analyst who writes a research report about the executive's company," id. at 35, but nonetheless argue that defendants were required to speak to Kennedy because they commented on his report. Adoption of such a sweeping duty would lack a foundation in law or logic.

Defendants do not quarrel with the general legal principle that, having chosen to speak on a subject, they must not speak in a false or misleading manner. See, e.g., id. at 22 (arguing that Thurman "had a clear obligation to speak the truth once defendants had decided to comment on the Jefferies Report"). However, this general principle does not mean that public companies must reach out to everyone who criticizes them before responding to the comments. Defendants have been unable to locate—and plaintiffs have not cited—any authority supporting such a burdensome obligation, a fatal flaw in plaintiffs' position. See, e.g., In re Stonepath Group, Inc. Sec. Litig., No. 04-4515, 2006 WL 890767, at *15 (E.D. Pa. Apr. 3, 2006) (Dalzell, J.), aff'd sub nom. Globis Capital Partners, L.P. v. Stonepath Group, Inc., 241 Fed. Appx. 832 (3d Cir. 2007) (declining to "adopt" plaintiffs' theory where "plaintiffs have not pointed to any authority" supporting it; rejecting separate argument because "[p]laintiffs have cited no authority in our Circuit or any other that would permit us to take [their] novel approach"); see also id. at *16

(rejecting plaintiffs' efforts to establish the existence of a "'heightened' duty to monitor" for one of the defendants because "[n]either of [plaintiffs'] cases supports plaintiffs' proposition").

At most, the conduct plaintiffs challenge could be characterized as simple mismanagement. However, the Third Circuit has permitted companies discretion in conducting their business and has refused to allow securities fraud claims grounded on "simple mismanagement" to proceed. In re Advanta Corp. Sec. Litig., 180 F.3d 525, 540 (3d Cir. 1999), abrogated in part on other grds., Institutional Investors Group v. Avaya, Inc., 564 F.3d 242 (3d Cir. 2009); see also In re Stonepath Group, Inc. Sec. Litig., 397 F. Supp. 2d 575, 586 (E.D. Pa. 2005) (Dalzell, J.) ("'claims essentially grounded on corporate mismanagement are not cognizable under federal law'"; citing Advanta). Where "[n]one of the facts in the complaint suggests [defendants'] strategy represented an egregious departure from the range of reasonable business decisions as opposed to simple mismanagement," the securities fraud claim is "'not cognizable.'" Advanta, 180 F.3d at 540 (citation omitted). Here, defendants did not simply make statements about Kennedy without undertaking an investigation: they made public statements only after contacting CMS, the Medicare agency, and Highmark, the Medicare contractor that actually set the reimbursement rates, to learn what information they had provided to Kennedy. Plaintiffs may have preferred that defendants spoke with Kennedy, but it is hardly an "egregious departure from the range of reasonable business decisions" to choose to speak to the two entities with which CardioNet actually had a relationship rather than an unknown analyst who had not spoken with CardioNet's CEO or CFO before issuing his report and who could reasonably have been perceived to have had an interest in justifying his conclusions. Defs. Mem. at 16. There are simply no facts pleaded in the Complaint that would render defendants' investigative choices or their speech thereafter actionable.

Plaintiffs contend that "defendants' failure to contact Kennedy or any other Jefferies' analyst is evidence of their willful blindness and conscious indifference to the truthfulness of their statements," Opp. at 35, and that this constitutes "recklessness" sufficient to allege scienter. Although plaintiffs emphasize cases from outside this Circuit, along with a few from this jurisdiction that use the phrase "willful blindness," id. at 35-36, the controlling definition of "recklessness" within this Circuit is:

> A . . . statement . . . that is highly unreasonable and involves not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

In re Discovery Labs. Sec. Litig., No. 06-1820, 2006 WL 3227767, at *14 (E.D. Pa. Nov. 1, 2006) (Dalzell, J.) ("Discovery Labs I") (citations, internal punctuation omitted); see also Opp. at 33 (same). "'[I]t is the danger of misleading buyers that must be actually known or so obvious that any reasonable man would be legally bound as knowing.'" Discovery Labs I, 2006 WL 3227767, at *14 (citation, internal punctuation omitted). Plaintiffs try to establish that defendants acted recklessly by describing defendants' decision not to speak to Kennedy or Jefferies as "willful blindness." Opp. at 35. This approach misses the point: whether defendants' failure to contact Kennedy was "willful blindness" is not the question. Rather, the question is whether defendants knew or should have known, after conducting their investigation, that their statements would mislead investors in light of the undisputed fact that defendants communicated with CMS and Highmark and were informed that neither organization provided Kennedy with any confidential information or any information specifically about CardioNet. Notably, plaintiffs do not contend that defendants ever suggested that they had communicated with Kennedy, making it all the more difficult to establish that the investing public could possibly have been misled about the basis of defendants' statements. Moreover, plaintiffs cannot

refute the fact that the May 18 statement reporting that Highmark posted unchanged reimbursement rates, ¶ 88, confirmed the reasonableness of defendants' approach: defendants had every reason to believe that the information they received from Highmark and CMS was accurate, and no facts set forth in the Complaint show that they obtained different or additional information after May 18 that should have led them to reconsider their position.

By contending that contacting CMS and Highmark was not enough, Opp. at 36-37, plaintiffs propose an unreasonable standard. To play out what plaintiffs propose illustrates the absurdity of their approach. Assume that defendants had spoken to Kennedy, as plaintiffs demand, and further assume that Kennedy said he had been given information by Highmark that contradicted what defendants themselves had been told by Highmark. Plaintiffs apparently believe, although they do not state, that had CardioNet spoken with Kennedy, defendants' public statements would somehow have been different. They do not explain, however, what Kennedy would have said that would have necessarily led to this result, an approach that undermines their claims regarding scienter.[3] Plaintiffs' theory of liability also takes no account of the possibility that, faced with inconsistent statements, defendants might reasonably have chosen to believe the statements of the long-term Medicare contractor with whom they had a relationship, Highmark, rather than those of an analyst who was unknown to the Company, who failed to speak with defendants about his conclusions prior to the publication of his report, and who reasonably could be perceived as having an interest in justifying his beliefs. Plaintiffs' focus on the supposed

---

[3] Plaintiffs assert that what defendants may have learned from Kennedy is not the issue for pleading scienter. Opp. at 37-38. However, analyzing what Kennedy may have disclosed is highly relevant to plaintiffs' efforts to persuade the Court to adopt their proposed rule, because if defendants would not have learned anything from Kennedy, plaintiffs lack any reasoned basis for the argument. Put another way, plaintiffs cannot show that the danger of misleading investors was so obvious to defendants that they acted recklessly in not contacting Kennedy without showing what defendants would have learned if they had communicated with Kennedy. Plaintiffs' recklessness theory collapses if it is possible that Kennedy would not have disclosed his sources to defendants.

obligation to contact Kennedy above all else suggests that, in plaintiffs' view, even if defendants made precisely the same public statements but had spoken with Kennedy before making them, they would be absolved of liability. In the end, what plaintiffs seemingly want is a requirement that companies contact <u>and believe</u> their critics before responding to any negative reports. <u>See,</u> <u>e.g.</u>, <u>id.</u> at 29 (arguing, <u>inter alia</u>, that defendants had an obligation to speak to Kennedy or give "credence to the Report"). This approach should be rejected as creating an unwarranted and unworkable interference in the internal functioning of public companies that would not necessarily improve disclosure to investors.

### B.     Plaintiffs Have Not Adequately Pleaded That Dr. Bloschichak Provided Kennedy With Information Regarding A Rate Decrease.

Another fatal flaw permeating plaintiffs' Opposition is its reliance on the premise that "Kennedy had learned from Dr. Andrew Bloschichak ('Bloschichak'), Vice President for Clinical Affairs at Highmark Medicare Services, who has oversight of the reimbursement rate process at Highmark, that a reimbursement rate cut for the CPT code under which the MCOT device is billed was imminent." Opp. at 4-5 (citing ¶ 75(c)); <u>see also id.</u> at 8, 14, 18, 26, 37. This argument overstates the contents of the Jefferies Report and the Complaint's allegations.

As an initial matter, the Jefferies Report never mentions Dr. Bloschichak as the source of Kennedy's information about Highmark's review of the reimbursement rate. It refers only to "[o]ur checks." Compl. Ex. 1 at 1-3. As plaintiffs acknowledge, "the Jefferies Report did not attribute publicly that information to Dr. Bloschichak." Opp. at 5. Moreover, the Jefferies Report never directly stated that a rate decrease for the CPT code was imminent. <u>Cf. id.</u> at 5 (describing Jefferies Report as stating that "as a result of the review the technical reimbursement fee by Highmark would be cut in 2009 by at least $200 per service"). Rather, Kennedy drew the conclusion that a rate decrease would occur based on his understanding that "Highmark is

currently reviewing the technical fee." Compl. Ex. 1 at 2. Thus, the comments in the Jefferies Report regarding the potential lowering of the reimbursement fee are all Kennedy's opinions, phrased as "we think," "[w]e believe," "[w]e expect" or "we envision." Id. at 1-4. In short, the Jefferies Report does not support plaintiffs' contention that "Jefferies had learned from Dr. Bloschichak that a rate revision was not only under review, it was imminent." Opp. at 14.

Moreover, the Complaint itself does not properly establish that Dr. Bloschichak told anyone that Highmark would lower the rate for MCOT™. The only sources for this claim are two confidential witnesses who do not come close to meeting the Third Circuit's standards for such anonymous sources. Id. at 4 (noting plaintiffs' investigators discovered this information based on confidential witnesses). Only one factual allegation makes a direct reference to Dr. Bloschichak: "[A]ccording to CW2, a person with knowledge of the investigation, Mr. Kennedy received information from Highmark's Vice President for Clinical Affairs, Dr. Andrew Bloschichak ('Bloschichak'), who is directly responsible for oversight of the reimbursement rate process at Highmark." ¶ 13. The Complaint's only other references to Dr. Bloschichak are found in paragraphs 75(b)-(c), 85(b)-(c) and 87(b)-(c), none of which contain independent factual assertions and which simply repeat, without referring to any source, that Kennedy received information from Dr. Bloschichak. ¶¶ 75(b), 85(b), 87(b). These paragraphs further allege generally that "CW1 and CW2 explained that information was provided to Jefferies by Dr. Bloschichak of Highmark." ¶¶ 75(c), 85(c), 87(c).

CW2, however, is never identified except to say that he or she had "knowledge of the investigation." ¶ 13. This is inadequate and tautological—by definition, a source is a person with knowledge. As the Third Circuit explained in Avaya:

> The PSLRA imposes a particularity requirement on all allegations, whether they are offered in support of a statement's falsity or a defendant's scienter. 15 U.S.C.

§ 78u-4(b)(1), (b)(2). In the case of confidential witness allegations, we apply the requirement by evaluating the "detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." [California Pub. Employees' Ret. Sys. v. Chubb Corp, 394 F.3d 126, 147 (3d Cir. 2004.] If anonymous source allegations are found wanting with respect to these criteria, then we must discount them steeply. This is consistent with Tellabs's teaching that "omissions and ambiguities count against inferring scienter" under the PSLRA's particularity requirements. Tellabs [v. Makor Issues & Rights, Ltd, 551 U.S. 308, 325 (2007)].

Avaya, 564 F.3d at 263 (emphasis added); see also Chubb, 394 F.3d at 147 (articulating

standards reaffirmed in Avaya); Defs. Mem. at 17 n.9 (relying on Avaya and Chubb).

Plaintiffs provide none of the information the Third Circuit requires, such as title, place

of employment, dates of employment, or any other factual basis for CW2's alleged personal

knowledge of what Kennedy had been told or by whom. This omission fatally undermines

plaintiffs' ability to rely on these allegations. In re ATI Tech., Inc. Sec. Litig., 216 F. Supp. 2d

418, 437 n.12 (E.D. Pa. 2002) (Dalzell, J.) ("as the complaint is devoid of a description of how

these [former unnamed] employees came to their conclusions about inventory, we must ignore

the averments of overvalued inventory that are attributed to them as unparticularized"); cf.

Avaya, 564 F.3d at 263 (accepting confidential witness allegations because complaint identified

the sources' positions, the basis of personal knowledge, "the duration of each CW's employment,

the time period during which the CWs acquired the relevant information, and how each CW had

access to such information," citing Chubb, 394 F.3d at 150). Instead of including the requisite

information, plaintiffs ask the Court simply to accept their bald representation that CW2 is a

"person with knowledge," an assertion that even they acknowledge is "somewhat more vague

about this witness's identity." Opp. at 29 n.15. They justify their lack of detail by arguing that

more information would disclose the identity of the person and that CW2's statements are

corroborated by the Jefferies Report and the Wall Street Journal article. Id. Neither document,

however, mentions Dr. Bloschichak as Kennedy's source; each, instead, simply states that Kennedy spoke to Highmark. Compl. Exs. 1, 2. If the key factual allegation underlying a securities fraud claim can be based primarily on a source identified only as "a person with knowledge," the particularity requirements of the PSLRA will have lost much of their force.

The Complaint does not clearly attribute to CW1 any factual allegations regarding Dr. Bloschichak. Even if the Complaint were fairly read to allege that CW1 claimed that Dr. Bloschichak provided information, plaintiffs provide inadequate detail about this source as well. The Complaint only avers that CW1 was "a person in the Medical Device & Diagnostics Industries Group within Jefferies," ¶ 9, but fails to include facts about this person's title, dates of employment by Jefferies, his or her relationship with Kennedy, or any other reason why CW1 would have personal knowledge of what Kennedy was allegedly told by Dr. Bloschichak.[4]

Finally, even if the CWs were credible sources, the Complaint does not adequately plead that "Kennedy had received credible information about a rate decrease from Dr. Bloschichak," as plaintiffs argue. Opp. at 8. In all references to Dr. Bloschichak except one, the Complaint only pleads that Kennedy "received information" from him, without identifying what the "information" supposedly was. ¶¶ 13, 75(b)-(c), 85(b)-(c), 87(b). Plaintiffs rely solely upon paragraph 75(c), which lacks a description of the "information," to support their argument that their allegations that "Dr. Bloschichak and others from Highmark provided information to Kennedy and Jefferies" were "sufficient[ly] detail[ed]." Opp. at 26-27 n.14. Only in the last mention of his name, at paragraph 87(c), does the Complaint allege that Dr. Bloschichak "had provided Jefferies with information relative to a rate reduction in the CPT code applicable to CardioNet's product." ¶ 87(c). This paragraph is a summary paragraph and lacks any

---

[4]     The Opposition cites paragraph 9 as describing CW1 as "an analyst," not just "a person," and states that Jefferies' Medical Device & Diagnostics Industries Group "covers CardioNet and other medical device makers." Opp. at 28 n.15. These facts do not appear in paragraph 9 or anywhere else in the Complaint.

independent factual basis for plaintiffs' contention. Moreover, it fails to particularize who at Jefferies received this purported information or when he or she received it. Accordingly, where all references to Dr. Bloschichak except one only mention unspecified "information," the passing statement in paragraph 87(c) does not sufficiently establish what "information" Kennedy or Jefferies was purportedly told by Dr. Bloschichak.

Accordingly, the contention that Dr. Bloschichak informed Kennedy of an imminent rate cut should be rejected as based on unreliable sources and as insufficiently particularized.

**C.     Plaintiffs Have Not Adequately Pleaded Any Other Source To Support Allegations That Highmark Provided Information To Kennedy Or Jefferies Regarding An Imminent Rate Cut.**

Once the allegations about Dr. Bloschichak are "steeply discounted," Avaya, 564 F.3d at 263, or "ignor[ed]," ATI Tech., 216 F. Supp. 2d at 437 n.12, the Complaint lacks any other reliable particularized source to support plaintiffs' central premise—namely that Kennedy or Jefferies had been told by Dr. Bloschichak or Highmark that a rate cut was "imminent" or "impending." Opp. at 14, 18. The only other factual basis for this argument is the allegation that, according to CW1, "Highmark did, in fact, give Jefferies information concerning the impending rate cut for the CPT code under which the MCOT device is billed." Id. at 18. For this proposition, plaintiffs cite paragraph 75(c) and reference a statement in the Wall Street Journal article about additional information Kennedy received. Id. at 21 n.8 (referring to "detailed information" mentioned in the Wall Street Journal article), 22 n.9 (referring to work performed by Kennedy), 37 (identifying The Wall Street Journal as a source for allegation that "Kennedy had additional information supporting the conclusions in his Report, including the conclusion that Highmark would imminently announce a significant rate reduction for the MCOT system"; citing ¶ 13 and Compl. Ex. 2).

However, the contention that Highmark told Jefferies about an impending rate cut lacks both a reliable source and sufficient detail to meet the PSLRA standards. The only source for this claim is CW1. See, e.g. ¶¶ 75(c), 85(c) ("CW1 further explained that Highmark did, in fact, give Jefferies information concerning the impending rate cut for the CPT code under which the MCOT™ device is billed"). As explained above, allegations based on CW1 should not be credited because the Complaint lacks the requisite "who, what, when, where and how of the sources, as well as the who, what, when, where and how of the information those sources convey." Avaya, 564 F.3d at 253. And even if CW1 were an appropriate source, his or her alleged statement lacks the necessary particularity, including the identities of the person or persons at Highmark who made the communication, the identities of the person or persons at Jefferies with whom the person or persons at Highmark communicated, what precisely was communicated, and when these communications occurred. Defs. Mem. at 18.

Nor can plaintiffs save their claims by citing the Wall Street Journal because the article itself does not set forth the detail required by the PSLRA. ¶ 13 ("As later reported in the Wall Street Journal article, Mr. Kennedy had detailed information stemming from his investigation that was not even included in the April 24 Report."). The article states only that Kennedy said that he had "more detailed information on how he made his call" but does not identify such information or who provided it. Compl. Ex. 2 at 2. These general descriptions do not provide the requisite facts, such as what Kennedy's "information" was, who obtained it, from whom it was obtained, or how or when it was gathered. Nothing even links this "more detailed information" to Highmark, and plaintiffs' assertion that whatever the "information" is would support "the conclusion that Highmark would imminently announce a significant rate reduction for the MCOT system" is sheer speculation.

-11-

Because neither CW1 nor the statements about unspecified "information" satisfy the PSLRA standards, plaintiffs have not adequately pled any basis for their contention that Kennedy or Jefferies received information of any sort from Highmark.

### D. Plaintiffs Have Not Explained How CardioNet Committed Securities Fraud In Light Of The Apparent Conflict Between What Plaintiffs Claim Highmark Allegedly Told Kennedy And/Or Jefferies And What Plaintiffs Acknowledge That Highmark Communicated To CardioNet.

Even if plaintiffs had alleged particularized facts showing that Kennedy or Jefferies received information from Highmark, their Complaint should still be dismissed. Plaintiffs seem to assume that if they establish that Kennedy had information from Dr. Bloschichak or that Jefferies had information from Highmark, they have stated a claim against CardioNet. See, e.g., Opp. at 18-20. This premise is wrong. The question for a securities fraud claim is whether, based on facts known to defendants at the time they made their statements, defendants made material misrepresentations with scienter. Discovery Labs I, 2006 WL 3227767, at *9 ("In order to state a claim, then, plaintiffs must, at a minimum, allege the existence of some fact, known to defendants at the time of the statements, whose disclosure would have made the statements clearer or more correct.") (footnote omitted). The amount of research Kennedy may have conducted has nothing to do with that question. Thus, plaintiffs' indignation over CardioNet's alleged efforts to "ruin" Kennedy, see, e.g., Opp. at 42, is irrelevant to defendants' motion to dismiss. Hyperbole about purported harm to Kennedy,[5] who is not a party to this action, does nothing to establish the elements of securities fraud. The key point is the undisputed fact that

---

[5] The Opposition is replete with accusatory language describing defendants' comments allegedly directed towards Kennedy. See, e.g., Opp. at 1 ("concerted smear campaign . . . to discredit an analyst"), 6 ("defendants launched a campaign to discredit [the Jefferies Report] and its author"), 12 ("zeal to discredit Kennedy"), 13 ("discredit"), 22 ("criticize"; "attack"), 33, 34 ("went on the offensive"), 34 ("attack"), 35 ("attack"; "starkly accusing"), 36 ("baselessly accused"), 38 ("accused Kennedy of fabricating his Report"), 42 ("discredit"; "broadside attack"). Moreover, for all of plaintiffs' rhetoric contending that defendants influenced other analysts, e.g., id. at 24, 35, plaintiffs have not set forth any basis for bringing claims premised on those supposed contacts, nor have they refuted that the analysts did not simply base their statements on comments from CardioNet. Defs. Mem. at 23 n.15.

-12-

defendants were told by CMS and Highmark that "'neither organization provided the analyst with any confidential information or any information specifically about CardioNet,'" ¶ 74, a statement completely at odds with plaintiffs' assertion about what Dr. Bloschichak supposedly told Kennedy or what an unknown person at Highmark supposedly told an unknown person at Jefferies.[6]

Plaintiffs attempt to discredit the statement defendants received from CMS and Highmark on three grounds, none of which is persuasive. First, they argue that defendants were engaging in "word games" and suggest that defendants stopped asking questions once they obtained a statement that they could interpret as they wanted. See, e.g., Opp. at 8-9, 13, 19, 37. In support, plaintiffs argue that Kennedy received information about the CPT code for MCOT™, which is "tantamount" to receiving information about CardioNet but still consistent with Highmark's not providing the analyst "information specifically about CardioNet." Id. at 18; see also id. at 8. This argument fails because it ignores the first half of the statement CardioNet received from CMS and Highmark: "'neither organization provided the analyst with any confidential information.'" It was reasonable for defendants to believe that information relating to an "imminent" rate decrease for any CPT code (whether it related to CardioNet or not) would be "confidential information," and, thus, CMS's and Highmark's denial that they provided any

_____

[6]    In numerous places in their Opposition plaintiffs cite authority from outside the Third Circuit, some of which predates the PSLRA and is thus subject to the criticism this Court previously articulated: "We first note that [plaintiffs' case] is a Second Circuit pre-PSLRA case, so it was not decided under the jurisprudence to which we are now bound. Putting aside that crucial difference for the moment, [plaintiffs' case] bears no resemblance to this litigation." Stonepath, 2006 WL 890767 at *16. These same flaws apply with particular force to plaintiffs' reliance on Warshaw v. Xoma, 74 F.3d 955 (9th Cir. 1996), cited in Opp. at 20-21, 28, which both applies pre-PSLRA jurisprudence from outside this Circuit and reviews facts on a "skeletal analysis," finding that defendants possessed "unflattering facts" at the time they made the challenged optimistic statements. Id. at 760. In re Par Pharmaceuticals, Inc. Securities Litigation, 733 F. Supp. 668 (S.D.N.Y. 1990), cited in Opp. at 23, 27-28, also applies pre-PSLRA jurisprudence from outside this Circuit and "bears no resemblance to this litigation" because it concerned an alleged scheme where Par executives bribed FDA officials; the failure to disclose the bribery scheme purportedly rendered statements about Par's ability to obtain FDA approvals misleading. 733 F. Supp. at 677-78.

-13-

"confidential information" would support defendants' comments, including the statement that CMS and Highmark gave Jefferies no information on price. Id. at 37. Contrary to plaintiffs' insinuations, there was nothing ambiguous about the statement defendants received.

Second, plaintiffs assert that defendants' "statements were materially misleading because they gave the investing public the impression that Jefferies did not receive any information from Highmark regarding an impending rate cut." Id. at 19. However, plaintiffs do not challenge the accuracy of the statement that CardioNet quoted or that information regarding an impending rate cut would have reasonably been considered "confidential information" that CMS and Highmark denied providing. Plaintiffs fail to explain how defendants can be liable for accurately repeating a statement they obtained from a reliable source that they did not know was false, nor do plaintiffs support their assertion regarding how investors would supposedly have interpreted defendants' statements. ATI Tech., 216 F. Supp. 2d at 434 (rejecting claim that press releases were misleading because they did not disclose additional facts; "[t]he press releases gave specific information about specific design wins, and no more. A reasonable investor would not construe them as somehow implying anything greater about [aspects of the business]. Therefore, they are not materially misleading").

Third, plaintiffs seize on a passing comment in the Wall Street Journal article that claims Randy Thurman said "CardioNet based its information on an email from Highmark's legal counsel," Compl. Ex. 2 at 2, as another avenue of attack. Plaintiffs try to divert the Court's attention from the statement CardioNet received to the language in the press release referring to "senior officials at both CMS and Highmark" and argue that this comment was false because only "legal counsel" sent the email. Opp. at 9, 19, 37. However, plaintiffs fail to explain why "legal counsel" would not be a "senior official" or why investors would not view legal counsel as

being as reliable as some other senior official. Moreover, plaintiffs implicitly assume that legal counsel would not have accurately conveyed the facts—an assumption that rests on sheer speculation and does not establish that <u>defendants</u> could not have relied upon such a statement.

**E.     Plaintiffs' Challenge To Statements About Kennedy's "Due Diligence" And CardioNet's Relationship With Highmark Should Be Rejected.**

Plaintiffs next try to salvage their lawsuit by seizing on two other statements that they contend were misleading: (1) Thurman's statement on May 12, 2009 that allegedly accused Kennedy of failing to conduct the proper "due diligence," <u>id.</u> at 13-14, 21-23, 36-37, and (2) various statements about CardioNet's relationship with Highmark. <u>Id.</u> at 8, 9, 11, 13-14, 16, 25-28, 38-40.

The Court need not devote much time to the "due diligence" argument. Plaintiffs admit that it is "literally true" that Kennedy did not speak to CardioNet before or after the Jefferies Report was issued. <u>Id.</u> at 13. The "due diligence" statement by Thurman that plaintiffs attack reads in full as follows: "Most if not all of them [the other analysts who cover CardioNet] have actually visited the company and sat down with Marty [Galvan] and me, so, we certainly wish that that analyst [Kennedy] had taken the extra effort and done the proper due diligence, which he did not." ¶ 86. Read in context, nothing is misleading about the statement; it refers to Kennedy's failure to meet with Galvan and Thurman, which plaintiffs admit he did not do. The statement in no way criticized Kennedy's other research efforts, which were apparent from the face of the Jefferies Report in terms of the sources he cited and contacted. Plaintiffs cannot selectively quote only half of a statement. Courts permit submission of entire documents to support motions to dismiss precisely so that statements may be read in context "'to prevent . . . the situation in which a plaintiff is able to maintain a claim of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were

examined in the full context of the document, it would be clear that the statement was not

fraudulent.'" ATI Tech., 216 F. Supp. 2d at 431 (quoting In re Burlington Coat Factory Sec.

Litig., 114 F.3d 1410, 1426 (3d Cir. 1997)).

Plaintiffs' other arguments on this point are without merit. They contend that the jury

should have the opportunity to interpret Thurman's statement, Opp. at 22-23, but it is entirely

proper for courts to resolve such claims at the motion to dismiss phase. See, e.g., Ieradi v. Mylan

Labs., Inc., 230 F.3d 594, 599 (3d Cir. 2000) (affirming dismissal on grounds that alleged

omission was immaterial); ATI Tech., 216 F. Supp. 2d at 428 (explaining that materiality may be

decided on motion to dismiss). Plaintiffs also attack Thurman's "due diligence" statement

because defendants allegedly did not return Kennedy's calls, but the Complaint's allegations do

not support the contention that CardioNet failed to return calls prior to the issuance of the

Jefferies Report: neither of the two references to this purported fact provides a date when this

conduct allegedly occurred. ¶¶ 9, 87(e).[7] More fundamentally, neither of these references is

reliable because paragraph 9 is based solely on CW1, whose lack of reliability is discussed

above. Like the earlier allegations, this claim lacks the requisite details such as who called

whom, when the call was made, and what message was left. It certainly provides no information

supporting the assertion that CW1 was in a position to learn such specific, detailed information

about CardioNet's response to a specific telephone call. Paragraph 87(e) lacks any source at all

and likewise fails to include any of the requisite supporting facts. Therefore, the Court should

ignore these allegations.

---

[7]   To the extent the allegations refer to CardioNet's purported conduct after issuance of the Jefferies Report, e.g.,
Opp. at 24 n.11 (claiming defendants would not return a phone call to learn the source of Kennedy's
information), plaintiffs fail to explain how this conduct could render false a comment referring to Kennedy's
conduct before issuance of the Jefferies Report.

Plaintiffs also claim that "in researching the report, other persons from Jefferies working with Kennedy did speak with CardioNet personnel." Opp. at 13 (citing ¶ 87(e)). However, paragraph 87(e) lacks any source for this claim and fails to identify who spoke with whom, when it occurred, or what was discussed. Indeed, the Complaint concedes that the topic of conversation was "not . . . the subject of the imminent reimbursement rate cut by Highmark," ¶ 87(e), a failure that falls far short of satisfying the PSLRA's particularity requirements. Defs. Mem. at 21 and n.12. Moreover, even if paragraph 87(e) contained the necessary detail, plaintiffs do not show how the fact that someone from Jefferies may have spoken to someone at CardioNet changes the truth of Thurman's comment that Kennedy did not meet with Thurman or Galvan before issuing his report, which in Thurman's view was not conduct that met the due diligence standards exercised by other analysts covering CardioNet.

Finally, plaintiffs' challenges to defendants' statements about CardioNet's relationship with Highmark are equally flawed. Plaintiffs' assertions all rely upon subsequent events to support their claim that statements were false when made and repeat the same theme, e.g., "[d]efendants' repeated boasts about their close relationship with Highmark and CMS were absolutely false . . . . [W]ithin a few months of this conference call, Highmark reduced the reimbursement rate." Opp. at 11.[8] It is difficult to conceive of arguments that more clearly fit the classic definition of impermissible "fraud by hindsight" than these. As the Third Circuit explained over a decade ago, "liability does not attach merely because '[a]t one time the firm

---

[8]    See also Opp. at 14 ("[D]efendants clearly overstated the quality of their relationships with Highmark and CMS, which could not have been as defendants claimed or they would have been aware of the rate revision to be announced."), 16 (defendants' admission that they had not received prior indication of a rate adjustment "confirms that defendants' previous assertions about the closeness of their relationship with Highmark and CMS were greatly exaggerated"), 26 (if "defendants had the type of positive relationship with Highmark that they said they had, they would have known that a rate cut was, in fact, imminent"), 38 (relying upon "subsequent developments" to "confirm[]" that defendants' statements about CardioNet's relationship with Highmark were "demonstrably false and misleading.").

bathes itself in a favorable light' but '[l]ater the firm discloses that things are less rosy.'"

Advanta, 180 F.3d at 538 (citation omitted); see also In re Discovery Labs. Sec. Litig, No. 06-

1820, 2007 WL 789432, at *5 (E.D. Pa. Mar. 15, 2007) (Dalzell, J.) (rejecting fraud by

hindsight) ("Discovery Labs II"), aff'd, 276 Fed. Appx. 154 (3d Cir. 2008).  Contrary to

plaintiffs' arguments, e.g., Opp. at 31, nothing in the Complaint shows that defendants had any

reason to believe that their statements about their relationship with CMS and Highmark were

false when made, a key fact distinguishing this case from plaintiffs' cited authority, including

Helwig v. Vencor, Inc.. 251 F.3d 540 (6th Cir. 2001), rejected in part, Tellabs, 551 U.S. 308; see

also Defs. Mem. at 25-26 n.16 (noting that court found the Helwig complaint adequately pled

facts showing defendants had knowledge statements were false when made).[9]  The Court should

reject plaintiffs' effort to show that defendants made materially false statements with scienter

about CardioNet's relationship with CMS and Highmark simply because there was a later

reimbursement rate decrease.

**F.      Plaintiffs Do Not Plead That Defendants Lacked A Reasonable Basis For Their Forecasts.**

Plaintiffs also assert that CardioNet's April 30, 2009 guidance was false and misleading

and lacked a reasonable basis.  See, e.g., Opp. at 11-12, 14-15, 29-32, 40-41.  To the extent that

this argument is based on the contention that defendants should have contacted Kennedy and

believed the prediction in the Jefferies Report, contrary to the information they had received

from CMS and Highmark, e.g., id. at 29-30, these points have been addressed above.  To the

extent this argument relies upon alleged "signals" that a reduction in the rate was "imminent," id.

at 40, it fails because plaintiffs have not shown that defendants' interpretation of these purported

---

[9]      The same flaws undercut plaintiffs' attack on defendants' statements about commercial payors.  Opp. at 31.
Plaintiffs have not shown what defendants supposedly knew when the statements were made that rendered
them false and cannot simply rely upon subsequent events to plead securities fraud.

"signals" was unreasonable. These "signals" were publicly available, and investors could reach their own conclusion about what they meant for CardioNet. As noted, the May 18, 2009 statement that Highmark's posted reimbursement rate was unchanged confirmed the reasonableness of defendants' beliefs as of April 30, 2009. Indeed, while plaintiffs claim that other analysts' reports merely "recit[ed] the party line of the Company," id. at 7, those analysts had access to the same "signals" that plaintiffs now contend should have alerted defendants to the "imminent" rate cut, including the Highmark bulletins, CardioNet's reported revenues, and CMS's decision to cut the professional rate. Id. at 40-41; see also id. at 12 (referring to public facts such as Medicare usage and emergence of competitor). Were these "signals" as obvious and defendants' views as unreasonable as plaintiffs contend, there is no rational explanation for outside analysts' willingness to put their reputations on the line and endorse the purported CardioNet "party line." Defs. Mem. at 31. Accordingly, the Complaint has not shown that the forecasts lacked a reasonable basis when made.

### G. Plaintiffs Fail In Their Efforts To Show That Their Interpretation Of Facts Is The Most Plausible Inference And Demonstrates Scienter.

For all the reasons discussed above, plaintiffs' overall efforts to establish liability are legally and factually insufficient. These deficiencies apply equally to plaintiffs' efforts to plead scienter, as their scienter arguments rely on precisely the same flawed assertions already addressed. See Opp. at 32-41 (setting forth scienter claims premised on failure to contact Kennedy, supposed efforts to "discredit" Kennedy, and supposed statements by Dr. Bloschichak). Moreover, plaintiffs have effectively abandoned their efforts to plead a motive for any defendant to have engaged in wrongful conduct, stating in a footnote only that they may consider pre-class conduct in the form of stock sales. Id. at 31 n.17. This argument in no way addresses the Complaint's failure to plead facts establishing that these pre-class sales by non-

defendants were suspicious in any way, much less that they were linked to concerns regarding reimbursement, or that defendants knew of or shared any purported concerns by non-defendants regarding reimbursement. Defs. Mem. at 30. Other than this largely pro forma argument, plaintiffs have failed to set forth any other conceivable reason why defendants would have lied to the market. Id. (noting that, in absence of motive, circumstantial allegations must be particularly strong). Finally, Highmark's posting of unchanged reimbursement codes, as reported on May 18, ¶ 88, adds further strength to defendants' analysis of scienter: the fact that CardioNet's position regarding reimbursement was seemingly confirmed only a few weeks after Kennedy's report undercuts the argument that defendants acted with a wrongful state of mind.

Plaintiffs, moreover, fail to overcome the arguments affirmatively weighing against scienter articulated by defendants: namely, the stock purchases by defendants Galvan and Thurman and the statements regarding the SEC and FINRA. As to the stock purchases, plaintiffs essentially argue that because the amount of money spent by Thurman and Galvan on stock purchases during this period was small in proportion to their overall compensation and because they could not sell during a certain period, the stock purchases "don't count." Opp. at 45-46. Plaintiffs unsurprisingly cite no case law for this theory because, as explained in Defendants' Memorandum, courts, including this Court, have generally considered class period stock purchases inconsistent with an inference of scienter. Defs. Mem. at 32. Moreover, overall compensation is an appropriate benchmark only when evaluating the relative importance of the proceeds of stock sales, which makes sense because dollars should be compared to dollars. When evaluating the relative importance of equity holdings, courts analyze the percentage of holdings bought or sold, not a comparison of the dollar amounts bought to overall compensation.

See, e.g., Advanta, 180 F.3d at 540 (analyzing "percentage of total holdings sold by defendants"; not discussing defendants' compensation).

As to the statements regarding the SEC and FINRA, notwithstanding plaintiffs' improper efforts to cite to multiple newspaper articles and law journal sources for factual contentions, Opp. at 43-45,[10] none of these sources counter defendants' basic point:  it is irrational for an executive affirmatively to invite regulatory inquiry regarding his company if he has committed securities fraud, and plaintiffs have pleaded no facts that could explain how such conduct is consistent with an inference of scienter.  Defs. Mem. at 31.  The cases plaintiffs cite, even if they could be considered for their factual contentions, do not in the least support plaintiffs' theory— neither involved a situation in which an individual or company that allegedly engaged in fraud invited a regulatory entity to investigate.  Cf. Roffman v. Trump, 754 F. Supp. 411, 413-14 (E.D. Pa. 1990) (recounting executive's communications to analyst's employer and to the market that consisted largely of personal attacks on analyst); In re Qwest Commc'ns Int'l, Inc. Sec. Litig., 387 F. Supp. 2d 1130, 1142 (D. Colo. 2005) (rejecting statute of limitations argument in part because defendants engaged in media efforts to allay investors' concerns regarding critical reports).  The absence of legal support for plaintiffs' strained reasoning is not surprising given that it lacks any basis in common sense.  Defs. Mem. at 30-31.  Similarly, the various other media reports cited on pages 43 and 44 and footnotes thereto do not relate to a situation in which a company contacted a regulatory entity.  The fact that companies may choose not to engage with critical analysts may not further the marketplace of ideas, but affirmatively inviting an

---

[10]   Plaintiffs cannot now, in an opposition brief, add to or change their theory of the case by relying upon extraneous news articles and irrelevant fact patterns.  Frederico v. Home Depot, 507 F.3d 188, 202 (3d Cir. 2007).  "[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."  Commw. of Pa. ex rel Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 181 (3d Cir. 1988).

investigation by a regulatory entity into the conduct of the company and its executives is another thing altogether.

In short, in light of defendants' actual conduct as alleged in the Complaint—contacting CMS, Highmark, the SEC, and FINRA—the most plausible inference is that defendants acted without scienter.

## III. CONCLUSION

For the foregoing reasons, defendants respectfully request that this Court grant their motion to dismiss the Complaint.

Respectfully submitted,

Dated: May 13, 2010

Marc J. Sonnenfeld (I.D. No. 17210)
Karen Pieslak Pohlmann (I.D. No. 60079)
Jill Baisinger (I.D. No. 82476)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone: 215.963.5000
Facsimile: 215.963.5001

*Attorneys for Defendants*