IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DIANNE SOLOMON-SHRAWDER, et al. :            CIVIL ACTION
                                :
        v.                      :
                                :
CARDIONET INC., et al.          :            NO. 09-3894

MEMORANDUM

Dalzell, J.                                  August 10, 2010

        The plaintiffs in this putative securities class action case sue CardioNet, Inc. ("CardioNet"), and two of its executives for violations of Securities and Exchange Commission Rule 10b-5, among other things. Generally speaking, the plaintiffs contend that the defendants made overly optimistic statements during the proposed class period regarding the company's general prospects and, more specifically, the reimbursement rate that Medicare and Medicaid would pay for CardioNet's main product, which is a wireless heart monitor. As it turned out, Medicare and Medicaid kept the rate stable for some of the class period but eventually reduced it, after which CardioNet's stock price fell.

        The defendants move to dismiss the complaint and argue that the plaintiffs have failed to adequately plead that (1) the statements at issue were false or misleading and (2) the defendants made the statements with the requisite scienter, that is, knowingly or recklessly. For the reasons we discuss

extensively below, we agree with the defendants, and we will

grant their motion to dismiss.

## I.   Factual Background

### A.   Introduction to the Parties

According to the Consolidated Class Action Complaint

("Complaint"),[1] CardioNet was formed in 1997 and became a

publicly traded company in March of 2008. CardioNet's stock

trades on the Nasdaq market under the symbol "BEAT." On March 25,

2008 CardioNet made its initial public offering of 4.5 million

shares of common stock, and the company made a secondary offering

of five million shares in August of 2008. Id. at ¶¶ 30, 56-58

(explaining that some early investors sold their stake in

CardioNet through these offerings). Based on CardioNet's 2009

proxy statement, on March 16, 2009 the company had more than

twenty-three million shares outstanding. Id. at ¶ 30.

CardioNet "provides continuous, real-time ambulatory

outpatient management solutions for monitoring relevant and

timely clinical information regarding an individual's health."

Id. at ¶ 2. This matter primarily focuses on Cardionet's Mobile

---

[1] We discuss the standard for the defendants' motion at
length below, but as with any other motion to dismiss, we assume
the veracity of the facts in the Complaint.

Cardiac Outpatient Telemetry device ("MCOT"), for which CardioNet received FDA approval in 2002. Id. at ¶ 38. According to the Complaint, MCOT

> incorporates a lightweight patient-worn sensor attached to electrodes that capture two-channel EKG data, measuring electrical activity of the heart and communicating wirelessly with a compact, handheld monitor. The monitor analyzes incoming heartbeat-by-heartbeat information from the sensor on a real-time basis by applying algorithms designed to detect arrhythmias. When the monitor detects an arrhythmic event, it automatically transmits the ECG [also known as "EKG"] to the CardioNet Monitoring Center, even in the absence of symptoms noticed by the patient and without patient involvement.

Id. at ¶ 39.

In contrast to MCOT, the plaintiffs describe another device, the Holter monitor, as a "[t]raditional heart rate monitor[]" and explain that the data from Holter monitors, which continuously monitor a patient's heartbeats, may be uploaded through the Internet or retrieved at a physician's office. Id. at ¶ 41. Other traditional monitors, called "event monitors," only "intermittently record a patient's heartbeats during cardiac events," and patients must manually activate some event monitors. Id. Data from event monitors is transmitted through the telephone. Id. The MCOT device uploads data wirelessly, and patients wear it continuously for up to twenty-one days. See id.

at ¶¶ 41-42.[2] MCOT's share of CardioNet's total revenue grew from 79% in the first quarter of 2008 to 86% in the fourth quarter of 2008 and then again to 88% in the first quarter of 2009. Id. at ¶ 47.

Defendant Randy Thurman has been the Chairman of the Board and Chief Executive Officer of CardioNet since February of 2009, but he joined the company in July of 2008 as the Executive Chairman of the Board. Id. at ¶ 26. The other individual defendant, Martin Galvan, was the Chief Financial Officer of CardioNet from September of 2007 until January 15, 2010. Id. at ¶ 27.

Central Laborers' Pension Welfare and Annuity Funds, which is comprised of three separate funds, is the lead plaintiff in this purported class action. See id. at ¶ 23. One of its funds purchased 18,184 shares of CardioNet stock during the proposed class period, which is April 28, 2009 through July 10, 2009. Id. at ¶¶ 23, 29. The other named plaintiff in this case, Dianne Solomon-Shrawder, is an individual who bought 1,000 shares of CardioNet stock during the proposed class period. Id. at ¶ 24.

---

[2] Physicians receive more compensation for their work with an event monitor than with MCOT, but MCOT nonetheless demands more effort from the prescribing doctor than an event monitor due to MCOT's continuous data stream. Id. at ¶¶ 45-46.

The plaintiffs allege that they bought these shares "at artificially inflated prices" and suffered damages when the stock price later plummeted. Id. at ¶¶ 23-24. The proposed class is "all persons . . . who purchased or otherwise acquired CardioNet's publicly traded securities [during the class period] and were damaged thereby." Id. at ¶ 29.

### B. CardioNet's Revenue Streams

When health insurers change the rates that they will pay for the MCOT and related services (the "reimbursement rates"), those changes can have a significant impact on CardioNet's financial health. In the first quarter of 2009, for example, Medicare represented 34% of CardioNet's "payor mix," and commercial payors -- primarily private insurers -- comprised the remaining 66%. Id. at ¶ 47. There are two parts to the reimbursement rate for MCOT: (1) the "technical component," which is the amount that the MCOT provider -- apparently CardioNet --receives for providing the MCOT service, and (2) the "professional component," which is what doctors are paid for interpreting MCOT reports. Id. at ¶ 48. Effective January 1, 2009, these two components had separate billing codes under the American Medical Association's standard coding system. See id. at ¶¶ 48-49.

The Centers for Medicare and Medicaid Services ("CMS")
contracts with Highmark Medicare Services ("Highmark") to set
Medicare's reimbursement rate[3] for the billing code that covers
the technical component for MCOT and a few other competitor
devices. On October 31, 2008, Highmark set that rate for MCOT's
technical component at $1,123 per service, which became effective
on January 1, 2009. Id. at ¶ 3. At that time, CMS also set the
rate for the professional component at $25, a decrease from the
$30 to $300 that physicians previously received.[4] Id. at ¶ 49.
Several months later, in the week before May 18, 2009, Highmark
announced that the technical fee would remain at $1,123, and
CardioNet issued a press release stating that fact on May 18,
2009. Id. at ¶ 88. But on July 12, 2009, CardioNet issued another

---

[3] The plaintiffs sometimes allege that Highmark set the
reimbursement rate for Medicare and Medicaid, but for the most
part they describe their claims in terms of Medicare and rarely
mention Medicaid. Whether the plaintiffs focus on the rate for
Medicare alone or Medicare and Medicaid is not, however, material
to our resolution of the defendants' motion.

[4] The plaintiffs contend that CardioNet should have
known that the technical fee would go down because CMS reduced
the professional fee. But the defendants were not reckless -- as
that term applies in this Circuit to the PSLRA -- to reach a
different conclusion. One could more readily observe this chain
of events and conclude that CMS thought the professional fee was
inflated but that the technical fee that Highmark set was
appropriate.

press release stating that it had learned two days before that Highmark reduced the technical rate to $754. <u>Id.</u> at ¶ 99.

Earlier, on January 5, 2009, Highmark issued a Medical Policy Bulletin revision that stated that systems like MCOT were "'not indicated in all patients with arrhythmias' and should be used 'only in circumstances where traditional Holter monitoring or cardiac event recording is not expected to provide adequate information or has been unrevealing.'" <u>Id.</u> at ¶ 50. Highmark issued another Bulletin on April 13, 2009 that imposed additional restrictions on coverage for MCOT. <u>See</u> <u>id.</u> at ¶¶ 51-52. The plaintiffs claim that this revision "was a strong statement with respect to the limitations of when the MCOT system should and should not be utilized." <u>Id.</u> at ¶ 52.

Commercial payors also set their own reimbursement rates. Those rates "may be pegged in some fashion to a rate set for Medicare, and may be determined either with manufacturer input or as a result of discussions and negotiations between medical service providers and commercial payors." <u>Id.</u> at ¶ 54. CardioNet lowered its guidance on June 30, 2009 due to "'lower than anticipated commercial reimbursement rates.'" <u>Id.</u> at ¶ 93. The plaintiffs do not state any particular facts regarding what commercial payor rates were reduced, how CardioNet learned about

7

those reductions, or whether CardioNet knew or had any particular warning of those reductions before June 30, 2009.

## C. **Financial Reports**

On February 17, 2009, CardioNet issued a press release in which it reported revenue of $34.4 million in the fourth quarter of 2008 (a 43.8% increase over the fourth quarter of 2007) and full-year revenue of $120.5 million for 2008 (a 65% increase over 2007). Id. at ¶ 60. The company also reported on its successful IPO and secondary offering and stated that its earnings per diluted share for the full year and fourth quarter of 2008 increased over comparable data for 2007. Id. The press release included a lengthy quote from Thurman in which he discussed the new AMA billing codes for MCOT and related reimbursement rates, new contracts with payors, additions to the management team, and other developments. See id. at ¶ 61. Thurman stated that the demand for CardioNet's outpatient cardiac services was growing "'at greater than 40% per year'" and that "'[e]very indication is that CardioNet is positioned for years of exceptional growth.'" Id.[5]

---

[5] In this Memorandum we have removed the bold formatting that the plaintiffs employ throughout their quotations
(continued...)

8

In that press release, CardioNet also provided guidance for the company's future, including (1) "[r]evenue of $170 to $175 million for 2009, representing 40% growth over 2008," (2) "[e]arnings of $0.69 to $0.73 per diluted share for 2009, representing 76% to 87% growth over 2008," (3) "[r]evenue growth of at least 50% for 2010 (at least $255 to $262.5 million)," (4) "[e]arnings growth of 100% for 2010 ($1.38 to $1.46 per diluted share)," and (5) "[e]arnings that could reach $2.00 per diluted share by 2011." Id. at ¶ 63. See also id. at ¶ 62 (quoting Thurman at length). In a conference call with analysts on the day CardioNet issued this press release, Thurman and Galvan reiterated the information about the company's 2008 results and guidance for 2009 through 2011. See id. at ¶ 64.

CardioNet's stock closed on February 17, 2009 at $22.22 per share, and the next day the closing price rose to $25.00 per share. Id. at ¶ 66. According to the Complaint, "CardioNet's immediate and long-term guidance surprised but impressed analysts," especially as it was unusual at that time for companies to provide three years of guidance. Id. At a conference on March 17, 2009, Thurman and Galvan again gave the guidance

---

[5] (...continued)
of the defendants' statements.

CardioNet had announced a month earlier, and Thurman stated that the guidance "assumed 'about a 5% decline in reimbursement every year.'" Id. at ¶ 67.

### D. **Negative Analyst Report from Jefferies & Co.**

Despite CardioNet's glowing predictions for its continued growth, on April 24, 2009 an analyst at Jefferies & Company, Inc. ("Jefferies"), Brian Kennedy, initiated coverage of CardioNet with a negative report about the company's prospects ("Kennedy Report"). Id. at ¶ 68. Kennedy gave CardioNet an "'underperform'" rating and, according to the Complaint, claimed that he and his colleagues had done "an extensive investigation" that revealed that "a significant reimbursement rate cut by Highmark was imminent." Id. at ¶ 4. See also id. at ¶ 68.

The Kennedy Report did not, however, actually claim that the rate cut would be "imminent", but rather stated that Jefferies's "checks indicate that the technical fee is now under review" and that Highmark would lower the fee "by at least $200, a decision that should be announced shortly and implemented around midyear." Kennedy Report, Compl. Ex. 1 at 1. The report predicted that the Medicare reimbursement rate was "at risk of being cut in a matter

of weeks."[6] Id. at 2. According to the Kennedy Report, most of the physicians and industry experts with whom Jefferies spoke suggested that the technical fee would be between $700 and $1,000. Id. at 6. Jefferies believed that Highmark would "'revisit'" the technical fee because, inter alia, CMS had recently reduced the professional component fee from $128 to $25, which "'sent a clear signal to Highmark that it's been overvaluing the service.'" Compl. at ¶ 69. The Kennedy Report predicted that CMS would cut the rate, even if Highmark did not recommend that it do so. Id. The report noted that other analysts had positive ratings for CardioNet but stated that Jefferies took a different position due to its concerns about changes to the reimbursement rate. Id. at ¶ 71. The Kennedy Report set a price target of $17.00 per share, and the day that Jefferies published the report CardioNet's common stock fell by 13% and closed at $19.94, down $2.97 per share. Id. at ¶ 72.

---

[6] Shortly before May 18, 2009 -- but "weeks" after Jefferies published the Kennedy Report -- Highmark announced that the technical fee would stay the same.

**E.   CardioNet's Reaction to the Kennedy Report**

Four days after the Kennedy Report came out, CardioNet issued a press release in response to it.[7] The release "stated that after frequent communications with its two main reimbursement entities, CardioNet had not been notified of any proposed adjustment downward of its reimbursement rates" and that CardioNet "believed the Jefferies analyst's reference to such an imminent decrease in the reimbursement rate was 'not based on any indication or suggestions provided by Highmark Medicare Services or CMS.'" Id. at ¶ 8. CardioNet also claimed that reimbursement rates would normally change "only 'after a substantial amount of interaction and dialogue with our organization.'" Id.

---

[7] The plaintiffs also allege facts regarding the actions of two other investment firms after the Kennedy Report's publication. They claim that Leerink Swann LLC and Citigroup, both of which were involved with CardioNet's IPO and secondary stock offering, issued positive reports on the company (i.e., with "Outperform" and "Buy" ratings) shortly after Jefferies issued the Kennedy Report. Compl. at ¶¶ 6-7, 73. CardioNet's management allegedly spoke with analysts at these firms before they issued these positive reports, but we do not see how statements that Leerink and Citigroup published regarding CardioNet are relevant to this lawsuit against CardioNet and its executives. The plaintiffs offer no reason that the defendants may be liable for the reports that Citigroup and Leerink authored or what type of research those firms conducted before publishing those reports.

The plaintiffs aver that after Jefferies published the
Kennedy Report, CardioNet stopped speaking with Jefferies's
analysts and did not allow them to participate in its conference
calls. Id. at ¶ 9. No one from CardioNet ever contacted anyone at
Jefferies regarding the Kennedy Report, though at some point
CardioNet allowed Jefferies's analysts back on the conference
calls but still refused to take questions from them. Id. During
this time, the defendants spoke with analysts from other firms.[8]
The plaintiffs aver that CardioNet's alienation of analysts from
Jefferies "was part of the defendants' scheme to prevent the
disclosure of accurate information, prevent pointed questioning
about CardioNet's relationship with Highmark, and/or conceal the
reality of the status of Highmark's reimbursement process and

---

[8] In the plaintiffs' response to the motion to dismiss,
they lay the blame for this at the feet of Thurman and Galvan.
See Pl. Br. at 34 ("Thurman and Galvan, who were CardioNet's two
senior-most executives, made a conscious decision not to contact
Jefferies, not to return their telephone calls, and to ban the
Jefferies' [sic] analysts from investor and analyst conferences .
. . "). They cite Paragraphs 9 and 75 of the Complaint in support
of this statement, but those sections do not state that any
particular individual at CardioNet made this decision; the
Complaint does not say when, how, or from whom Jefferies learned
of this decision. We also note that a confidential witness
identified as "CW1" is the plaintiffs' source for the allegations
as to how CardioNet treated Jefferies after the Kennedy Report.
See Compl. at ¶ 9. We discuss the weight that we give to such
allegations below.

decision." Id. at ¶ 10. But the Complaint includes quotations from question-and-answer sessions during a conference call and at a health care conference, which we describe below, that demonstrate that other analysts stepped into the vacuum that Jefferies's absence (purportedly) created and repeatedly asked CardioNet about the reimbursement issue.

CardioNet's officers also purportedly worked to "discredit" the Kennedy Report in the company's first quarter 2009 press release and earnings call on April 30, 2009 and at the Bank of America Healthcare Conference on May 12, 2009. See, e.g., id. at ¶ 11. We discuss below the specific statements that they made on these occasions, but the plaintiffs stress that at the conference Thurman questioned Kennedy's motives and his "'due diligence'" prior to issuing the report. See id. On May 18, 2009 CardioNet issued a press release stating that the previous week Highmark posted a steady reimbursement rate of $1,123 for MCOT. Id. at ¶ 88.

A confidential informant, identified in the Complaint as "CW1,"[9] stated that CardioNet told some "on the Street" that

---

[9] The parties dispute whether CW1 and the other confidential witnesses mentioned in the Complaint meet the pleading requirements that our Court of Appeals has established.
(continued...)

14

Jefferies (1) never spoke with Highmark and (2) "'like literally made it up.'" Id. at ¶ 12. CardioNet later purportedly claimed that Jefferies misrepresented itself to Highmark.[10] Id.

In early June of 2009, Thurman also sent letters to the SEC, Nasdaq, and the Financial Industry Regulatory Authority ("FINRA") "suggesting that the Jefferies report 'may have been part of a plot to enrich CardioNet short sellers betting on a share-price decline.'" Id. at ¶ 14. He also claimed to these institutions that Kennedy or Jefferies was attempting to manipulate CardioNet's stock price and added that the Kennedy Report was inaccurate. This echoed Thurman's claim at the May 12, 2009 conference that CardioNet believed that FINRA and the SEC would investigate the Kennedy Report. See id. at ¶ 86. Thurman did not, however, disclose at that conference that he complained to these regulatory bodies about the report. Id. at ¶ 87(d).

_____

[9] (...continued)
We discuss this issue below.

    [10] The plaintiffs do not plead the amorphous allegations in ¶ 12 with the specificity that the Private Securities Litigation Reform Act ("PSLRA") demands. We discuss that standard below. They do not state, e.g., what CardioNet allegedly said, to whom "on the Street" it made these statements, how it supposedly spread the word, or when it did so.

According to the plaintiffs, however, Kennedy did a "thorough investigation" before issuing his report, and he spoke with a "reliable source at Highmark" and others in the field. Id. at ¶ 13. Another confidential informant, identified as "CW2,"[11] stated that Kennedy got information from the Vice-President for Clinical Affairs at Highmark, Dr. Andrew Bloschichak, "who is directly responsible for oversight of the reimbursement rate process at Highmark." Id. CW1 also amorphously "explained that [unspecified] information was provided [at some unstated time] to [an unidentified person at] Jefferies by Dr. Bloschichak of Highmark." Id. at ¶ 85(c).

## F. Reduction in Reimbursement Rate for MCOT

On June 30, 2009, CardioNet announced that it expected "'lower than anticipated commercial reimbursement rates'" for MCOT and that it was therefore lowering its guidance for 2009 and withdrawing its guidance for 2010 and 2011. Id. at ¶ 16. The company also stated that "'[v]olume growth continues to be significant, but is expected to be somewhat lower than the

---

[11] The Complaint identifies CW2 only as "a person with knowledge of the investigation." Compl. at ¶ 13. For the reasons we discuss below, we will give little credence to facts attributed to CW2.

16

Company had anticipated.'" Id. at ¶ 93. In a conference call the next day -- in which Jefferies was allegedly not invited to participate -- Thurman said that the reimbursement rate change accounted for 98% of the adjustment to CardioNet's projected revenue for 2009. Id. at ¶ 96. He characterized the "pricing dynamics" as "'unfortunate [but] a mere bump in the road'" and said that CardioNet was "'very enthusiastic about [its] long-term success.'" Id. Thurman also said that "'Medicare reimbursement rates will remain stable'" and that CardioNet had "'an outstanding dialogue undergoing'" with Highmark and CMS. Id. at ¶¶ 96-97. CardioNet's stock fell from $16.32 per share on June 30, 2009 to $9.57 the next day. Id. at ¶ 98.

Less than two weeks later, on July 12, 2009, CardioNet announced that it received a letter from Highmark lowering the reimbursement rate for MCOT to $754 per service, a reduction of about a third from the prior $1,123 rate. Id. at ¶¶ 17, 99. The press release stated that

> CardioNet has previously indicated that while it had
> been aware Highmark Medicare Services was conducting a
> normal review of the reimbursement rate for MCOT, it
> had received no indication of any rate adjustment or
> the specific timing of a Highmark decision prior to
> being notified on July 9, 2009. During a July 9
> communication, Highmark reported that CardioNet would
> receive a letter notifying it of a change in

17

reimbursement including the exact amount of the change. That letter arrived July 10, 2009.

Id. at ¶ 99.[12] The company also withdrew its 2009 guidance.

After the July 12, 2009 announcement, CardioNet's stock lost $2.96 in one business day and closed at $5.87 on July 13, 2009. Id. at ¶ 101. Thurman later said that due to the reimbursement rate reduction, CardioNet "'will not be able to sustain operations as a stand-alone company.'" Id. at ¶ 18. In mid-December of 2009, Thurman disclosed that CardioNet would cut operating costs and that it had retained Lazard Frères & Co. "to evaluate its options, including what some analysts believe could be a sale" of CardioNet. Id. The share price fell to $4.36 on December 8, 2009 and currently trades at around $5.00 to $6.00 per share. Id.

---

[12] The plaintiffs contend that at the May 12, 2009 conference, Thurman denied that Highmark was reviewing the reimbursement rate, yet two months later CardioNet said that it had been aware that Highmark was reviewing the rate. Id. at ¶ 102. But at the May 12 conference, someone asked Thurman if CardioNet had inquired of Highmark "'point blank'" whether the rate was under review, and Thurman replied, "'Oh we know it is. . . . But they have told us that there is nothing [im]minent in the way of change.'" Id. at ¶ 86. Thurman also stated at that conference that "'[t]here is no formal review of our pricing underway at Highmark that we are aware of, nor any, as they've said, nor any pending change.'" Id.

## G.  **Facts Alleged Specifically as to Scienter**

According to the Complaint, Thurman and Galvan were CardioNet's senior management and had "principal responsibility" for ensuring the accuracy of the company's statements. Id. at ¶ 104. The defendants "embarked on a concerted campaign to discredit the information" in the Kennedy Report, questioned Kennedy's motives and "'due diligence,'" and sent letters about the report to the SEC, Nasdaq and FINRA. Id. at ¶¶ 105, 111. They told the public that CardioNet had no indication that Highmark would cut the reimbursement rate and "consistently misrepresented the nature of the information that Jefferies received from Highmark." Id. at ¶ 112. These actions were purportedly "even more egregious in light of the fact that the [Kennedy Report] evidenced significant due diligence, and presented many indications that Highmark was going to lower the reimbursement rate." Id. at ¶ 106. The plaintiffs argue that CardioNet's refusal to communicate with Jefferies, allow the firm to participate in the conference calls, or ask questions of CardioNet "at a minimum, constituted willful blindness on the part of defendants CardioNet, Thurman and Galvan." Id. at ¶ 109. While the defendants alienated Jefferies, Thurman and other CardioNet employees spoke with other analysts and

19

"constituencies" about Jefferies and the Kennedy Report. <u>Id.</u> at ¶ 110.

**H.   <u>Damages</u>**

The named plaintiffs and other members of the putative class suffered damages when they purchased stock during the class period -- between the Kennedy Report's release and July 10, 2009. They claim that the stock price was artificially inflated during that period due to the defendants' false and misleading statements and that members of the putative class lost money when Highmark cut the reimbursement rate and CardioNet's stock plummeted. <u>Id.</u> at ¶¶ 113-14. The plaintiffs allege that the market for CardioNet's common stock was an efficient market because it traded on Nasdaq, filed reports with the SEC, communicated widely and regularly with investors, and was followed by securities analysts at major firms. <u>Id.</u> at ¶ 117. All who purchased CardioNet stock during the proposed class period thus "suffered similar injury through their purchase of CardioNet's common stock at artificially inflated prices." <u>Id.</u> at ¶ 118.

## II. <u>Analysis</u>

### A. <u>Standard Of Review</u>

Our Court of Appeals extensively reviewed the standard for a motion to dismiss in a putative securities class action in <u>Institutional Investors Group v. Avaya, Inc.</u>, 564 F.3d 242 (3d Cir. 2009) (Scirica, C.J.). Like the plaintiffs in <u>Avaya</u>, the plaintiffs here assert that the defendants violated § 10(b) of the Securities Exchange Act of 1934, codified at 15 U.S.C. 78j(b), and Rule 10b-5, which the Securities and Exchange Commission promulgated. Pursuant to § 10(b), it is unlawful,

> by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe.

15 U.S.C. 78j(b). Rule 10b-5 states that

> [i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the

circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a claim under Rule 10b-5, the plaintiffs "must allege defendants made a misstatement or an omission of material fact with scienter in connection with the purchase or the sale of a security upon which plaintiffs reasonably relied and plaintiff[s'] reliance was the proximate cause of their injury." Avaya, 564 F.3d at 251 (internal quotations omitted). The plaintiffs assert claims against Thurman and Garvan pursuant to § 20(a) of the Securities Exchange Act of 1934, which imposes liability on those who "exercise control over a 'controlled person,' including a corporation, that has committed a violation of Section 10(b)." Id. at 252.

As with any motion to dismiss, we assume the veracity of the facts in the Complaint. But because this is a securities fraud case, the plaintiffs must satisfy the PSLRA's two heightened pleading requirements. First, the plaintiffs "must 'specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all

facts supporting that belief with particularity.'" <u>Id.</u> at 252-53

(quoting <u>Winer Family Trust v. Queen</u>, 503 F.3d 319, 326 (3d Cir.

2007)) (footnote omitted). In addition, the Complaint must "state

with particularity facts giving rise to a strong inference that

the defendant acted with the required state of mind." 15 U.S.C. §

78u-4(b)(2). <u>See also</u> <u>Avaya</u>, 564 F.3d at 253.

Both requirements mandate that the plaintiffs plead the

facts "with particularity," which means that the Complaint must

"plead the who, what, when, where and how: the first paragraph of

any newspaper story." <u>Id.</u> at 253 (internal quotation marks

omitted). <u>See also</u> <u>id.</u> at 263 (explaining that plaintiffs must

plead <u>all</u> allegations in a case such as this -- those regarding

falsity <u>and</u> scienter -- with particularity). And when the

Complaint includes allegations made on information and belief, it

"must not only state the allegations with factual particularity,

but must also describe the sources of information with

particularity, providing the who, what, when, where and how of

the sources, as well as the who, what, when, where and how of the

information those sources convey." <u>Id.</u> at 253. The plaintiffs

make all allegations in the Complaint "upon personal knowledge as

to Lead Plaintiff, and upon information and belief as to all

other matters, based upon the investigation of counsel." Compl.
at 1.

To adequately plead scienter, the plaintiffs must "state
with particularity facts giving rise to a strong inference that
the defendant acted with the required state of mind," to wit,
consciously or recklessly. 15 U.S.C. § 78u-4(b)(2). See also
Avaya, 564 F.3d at 280. In this context,

> [a] reckless statement is one involving not merely
> simple, or even inexcusable negligence, but an extreme
> departure from the standards of ordinary care, and
> which presents a danger of misleading buyers or sellers
> that is either known to the defendant or is so obvious
> that the actor must have been aware of it. [C]laims
> essentially grounded on corporate mismanagement do not
> adequately plead recklessness.

Id. at 267 n.42 (internal quotation marks and citations omitted).

In deciding whether the allegations give rise to a strong
inference of scienter, we "must take into account plausible
opposing inferences." Tellabs, Inc. v. Makor Issues & Rights,
Ltd., 551 U.S. 308, 323 (2007). This "inquiry is inherently
comparative . . . [A] court must consider plausible nonculpable
explanations for the defendant's conduct, as well as inferences
favoring the plaintiff." Id. at 323-24. Ignorance does not
necessarily excuse a defendant from liability. In Avaya, our
Court of Appeals held that a defendant "might be culpable as long

as what he knew made obvious the risk" that the defendant's

statements would mislead investors. 564 F.3d at 270. When a

defendant is on notice of such a risk, he may not stick his head

in the sand and claim ignorance. <u>See</u> <u>id.</u> Allegations that a

defendant had motive and the opportunity to commit fraud are

relevant to this inquiry, but allegations of "'motive and

opportunity' may no longer serve as an independent route to

scienter." <u>Id.</u> at 277.[13]

Stating the general rule regarding scienter, the Supreme

Court held that "[a] complaint will survive . . . only if a

reasonable person would deem the inference of scienter cogent and

at least as compelling as any opposing inference one could draw

from the facts alleged." <u>Tellabs</u>, 551 U.S. at 324. To make this

decision, we view the complaint as a whole and then make "a

practical judgment about whether, accepting the whole factual

---

[13] When corporate officers make normal sales of their
company's stock, we may not infer that they acted with fraudulent
intent. "But if the stock sales were unusual in scope or timing,
they may support an inference of scienter." <u>In re Advanta Corp.</u>
<u>Sec. Lit.</u>, 180 F.3d 525, 540 (3d Cir. 1999) (overruled on other
grounds), <u>quoted in</u> <u>Avaya</u>, 564 F.3d at 279. In this case, the
defendants argue that Thurman and Galvan bought stock during the
class period, which they contend undercuts an inference of
scienter. We agree with the plaintiffs that the defendants' stock
purchases were relatively minor and will not give this factor
much weight.

picture painted by the Complaint, it is at least as likely as not
that defendants acted with scienter." Avaya, 564 F.3d at 269. See
also id. at 272 ("it is the composite picture, not the isolated
components, that judges must evaluate in the last instance").

As noted, the plaintiffs here plead facts that they
attribute to several confidential witnesses. We evaluate such
allegations by examining the "detail provided by the confidential
sources, the sources' basis of knowledge, the reliability of the
sources, the corroborative nature of other facts alleged,
including from other sources, the coherence and plausibility of
the allegations, and similar indicia." California Pub. Emp. Ret.
Sys. v. Chubb Corp., 394 F.3d 126, 147 (3d Cir. 2004), quoted in
Avaya, 564 F.3d at 263 (holding that "Chubb remains good law").
Where confidential witnesses are "found wanting" on these issues,
we are to "discount [their allegations] steeply," but do not
dismiss such allegations simply because they are anonymous.
Avaya, 564 F.3d at 263.

The defendants contend that the plaintiffs have not pled
adequate facts regarding their confidential witnesses and argue
that we should thus discount the facts from those witnesses. The
plaintiffs mention five confidential witnesses in the Complaint,
but we will only discuss CW1 and CW2 because the allegations that

26

the plaintiffs attribute to these confidential witnesses are the
only such averments that have a material effect on the outcome of
the defendants' motion. The Complaint describes CW1 as "a person
in the Medical Device & Diagnostics Industries Group within
Jefferies." Compl. at ¶ 9. The plaintiffs do not explain how big
that group is or what role CW1 has in it.[14] They also do not
describe how CW1 is connected to Jefferies's research on
CardioNet or why that person would be privy to, e.g., the way
that CardioNet allegedly treated Jefferies or what anyone at
Highmark told Jefferies about the reimbursement rate. Applying
the Chubb factors, we know very little about CW1, and we will
therefore "discount" the facts that the plaintiffs attribute to
that individual.

   The plaintiffs disclose even less about CW2, who the
Complaint describes simply as a "person with knowledge of the
investigation." Id. at ¶ 13. Read in context, "the investigation"
appears to refer to the research that Kennedy and Jefferies did

_____

        [14] In the plaintiffs' response to the motion to
dismiss, they describe this person as an "analyst" in that group
at Jefferies, but this fact is not in the Complaint. Pl. Br. at
28 n.15. Even assuming that detail was in the Complaint, however,
the plaintiffs have not alleged facts that would support a
plausible inference that (1) any analyst in that group would have
the kind of knowledge that the plaintiffs attribute to CW1 or (2)
CW1 was in a particular position to have this information.

in preparation for the Kennedy Report. <u>See</u> <u>id.</u> The plaintiffs

admit that they have "been somewhat more vague about this

witness's identity" and explain that "providing more detail

would, effectively, identify the person." Pl. Br. at 29 n.15. The

plaintiffs argue that the information from CW2 is consistent with

statements in the Kennedy Report and with facts in the article

from <u>The Wall Street Journal</u> that the plaintiffs attached to the

Complaint. We will take this into account as we analyze the

motion to dismiss, but, generally speaking, the facts regarding

CW2 fall woefully short on the <u>Chubb</u> factors, and we will

accordingly discount the facts that the plaintiffs attribute to

CW2.

Having canvassed the PSLRA pleading standard, we will now

turn to an examination of the defendants' allegedly false or

misleading statements and determine whether the plaintiffs have

pled falsity and scienter with the requisite particularity as to

each statement.[15] We also discuss the issue of scienter more

_____

[15] The PSLRA created a "Safe Harbor" provision for
forward-looking statements. Pursuant to 15 U.S.C. § 78u-5,
defendants are not liable for any such statement as long as "the
statement is identified as such and accompanied by meaningful
cautionary language; or is immaterial; or the plaintiff fails to
show the statement was made with actual knowledge of its
falsehood." <u>Avaya</u>, 564 F.3d at 254.

(continued...)

generally below.

B.    **Defendants' Allegedly False or Misleading Statements**

1.    **Statements from the April 28, 2009 Press Release**

As we describe above, on April 28, 2009 CardioNet issued a press release that addressed issues that Jefferies raised in the Kennedy Report. In this section and the following sections, we will discuss each statement that the plaintiffs allege was false or misleading, as well as the plaintiffs' allegations regarding why it was false or misleading. We will number each statement by the paragraph of the Complaint in which it appears.

**Paragraph 75(a):** The plaintiffs allege that the defendants' statement in the press release that "'we have a longstanding and professional relationship with both CMS and Highmark Medicare Services and have no reason to believe either organization would ever disclose confidential information that could have a material effect on CardioNet or any other company'" was materially false and misleading because CardioNet did not contact anyone at

---

[15] (...continued)
    The defendants contend -- and the plaintiffs dispute -- that the Safe Harbor provision protects them from liability for some of their statements. We need not discuss this issue because we agree with the defendants that the plaintiffs have failed to plead -- with the particularity that the PSLRA mandates -- that the defendants made any false or misleading statements with the requisite scienter.

Jefferies regarding its sources for the Kennedy Report and then banned Jefferies from its conference calls. Compl. at ¶ 75(a). The plaintiffs allege that the defendants had no reasonable basis to state that they had "'no reason to believe'" that anyone from Highmark gave information to Jefferies.

But the defendants contend -- and, critically, the plaintiffs do not dispute -- that CardioNet did contact Highmark after the Kennedy Report and that Highmark told the defendants that it did not give confidential information about the rate change to Kennedy or Jefferies. The defendants argue that it was reasonable for them to rely on this statement from Highmark and that they had no duty to contact Kennedy to find out who at Highmark allegedly gave him the inside scoop. We agree with the defendants on this point, especially as the plaintiffs do not claim that the defendants had any information to contradict what the defendants undisputedly heard directly from their contacts at Highmark. The defendants stated that Highmark itself was the defendants' source of information regarding what Highmark disclosed -- or, rather, did not disclose -- to Kennedy and Jefferies. The plaintiffs argue that "[t]he simple fact was that defendants had no idea what information Jefferies had received from Highmark." Pl. Resp. at 18. But inconveniently for the

plaintiffs, the defendants did not (1) claim to be privy to the relationship or communications between Jefferies and Highmark or (2) state that they had spoken with Kennedy or Jefferies. The defendants only repeated what Highmark told them.

Reasonable investors could easily distinguish between Kennedy's statements about what Highmark told him and the defendants' claim that CMS and Highmark told the defendants that they did not give Kennedy or anyone at Jefferies the rate-cut information. What Highmark actually told Kennedy or Jefferies has nothing to do with our inquiry, in which we focus on what the defendants knew or recklessly ignored.

**Paragraph 75(b):** The plaintiffs claim that the defendants' description of their relationship with Highmark and CMS was materially false and misleading because, if the defendants had the kind of relationship they claimed they did, they would have known that (1) Dr. Bloschichak gave information to Kennedy -- an averment that, again, we discount -- and (2) Highmark told Jefferies that a rate cut for the MCOT code was "imminent." Compl. at ¶ 75(b). The plaintiffs aver that CW1 stated that CardioNet management "'overstated their relationship with Highmark'" and that the defendants' claim that they were "in

31

constant communication with Highmark 'was clearly an inaccurate statement.'" Id.

The defendants contend that the plaintiffs do not plead with sufficient particularity the allegations regarding the information that Dr. Bloschichak gave to Kennedy or Jefferies; they also argue that these allegations are based on confidential witnesses that do not meet the Chubb standard. We agree with the defendants on these issues. The plaintiffs do not aver what information Dr. Bloschichak gave to Jefferies or to whom, when, or how he did so. As to CW1 and CW2 -- who are the sole sources of the plaintiffs' claims regarding Dr. Bloschichak -- the Complaint does not give sufficient information under Chubb to support their knowledge of these facts. We know next to nothing about CW2, and the plaintiffs do not explain why CW1, who worked at Jefferies, would know about CardioNet's relationship with Highmark. The external sources on which plaintiffs rely to bolster CW1 and CW2 -- the Kennedy Report and the Journal article -- do not, moreover, identify Dr. Bloschichak as Kennedy's insider source.

The plaintiffs also fail to sufficiently plead scienter regarding the defendants' relationship with Highmark. There are no facts to suggest that (1) CardioNet knew or recklessly ignored

32

that its relationship with Highmark was less transparent or
trustworthy than CardioNet believed it was, or (2) CardioNet knew
or recklessly ignored the purported fact that Dr. Bloschichak
gave confidential information to Kennedy, despite the explicit
reassurances of Highmark and CMS that neither organization had
done so.

   **Paragraph 75(c):** The plaintiffs allege that the defendants'
statement that Highmark and CMS "'officials have stated to us
that the analyst's suggestion of an imminent adjustment was not
based on guidance from Highmark Medicare Services or CMS and that
"neither organization provided the analyst with any confidential
information or any information specifically about CardioNet"'"
was materially false and misleading because it suggested that
Jefferies received no rate cut information from Highmark and that
the Kennedy Report was therefore wrong. Compl. at ¶ 75(c).
According to CW1, Highmark at least gave Jefferies information
regarding a rate cut for MCOT's code -- even if it did not say
anything about CardioNet or MCOT in particular -- and the
information about the code "was in essence information specific
to CardioNet" and "one or two of its closest competitors."
Id. CW1 claimed that this statement "was nothing more than a

'word game.'" <u>Id.</u> We will again discount the allegations that the plaintiffs attribute to CW1.

But the plaintiffs have also failed to connect the <u>reason</u> they say this statement is false -- the fact that Highmark <u>actually</u> gave inside information to Kennedy regarding the rate cut -- with the statement they attribute to the defendants, which was <u>not</u> regarding what Highmark <u>actually</u> did in its communications with Kennedy and Jefferies but rather what Highmark <u>told</u> the defendants that it did. And the plaintiffs have again failed to plead any facts to show that the defendants <u>knew</u> their relationship with Highmark was on rocky ground or that Kennedy's back-door channel to Highmark was so obvious that the defendants may be held legally liable for failing to disclose it.

In the plaintiffs' response to the motion to dismiss -- but not in the Complaint -- they contend that these statements were also misleading because CardioNet got its information in an email from Highmark's legal counsel,[16] not directly from Highmark's senior officials. Pl. Resp. at 9. We agree with the defendants that the plaintiffs have not pled falsity because they do not

---

[16] This statement was in an article from <u>The Wall Street Journal</u>, which the plaintiffs attached as an exhibit to the Complaint.

allege any facts to show that Highmark's counsel (1) was not a senior official of the company or (2) was not stating the position of Highmark's senior officials.[17]

## 2. Statements from the April 30, 2009 Press Release and Conference Call

CardioNet issued a press release and held a conference call on April 30, 2009 regarding its first quarter 2009 financial results. The plaintiffs allege that six particular statements that the defendants made on that day were materially false and misleading and violated Rule 10b-5.

**Paragraph 85(a):** In the conference call, an analyst asked if Highmark had "'sort of an annual review process or was [sic] there just been semi-annual or has there have been [sic] any consistency to the process in the past?'" Compl. at ¶ 84. Thurman responded that "'there is not a scheduled event.'" Id. Thurman also said that "'there has been this absolutely professional and collaborative relationship between the payors and us on justifying and understanding the cost benefit of what we do'" and

_____

[17] The plaintiffs also state -- but cite no supporting facts from the Complaint -- that CardioNet's contacts with Highmark and CMS "may have been nothing more than repeated inquiries from the Company's side about the status of rate reimbursement revisions." Pl. Resp. at 9. We will disregard this speculation.

"'that it's just an ongoing and a very collaborative effort
between the parties that are involved.'" Id. He also said that
CardioNet "'really work[s] hand in glove with Highmark and with
CMS on an ongoing basis.'" Id. Galvan told the analysts that
CardioNet had "'an outstanding relationship with Highmark and a
dialogue with that [sic] is weekly if not more frequently and
this [discussion about the reimbursement rate and whether it is
under review] always happens.'" Id. Thurman also stated that
"'[w]e know of no reason today to expect any significant change
in the reimbursement levels.'" Id.

The plaintiffs aver that these statements -- regarding the
nature of the relationship between CardioNet and the payors
(specifically Highmark and CMS) and "denying an imminent
reimbursement rate cut" or a current rate review -- were
materially false and misleading because CardioNet did not contact
Jefferies regarding its sources for the Kennedy Report, and then
it banned Jefferies from its conference calls. Id. at ¶ 85(a).
Again, CardioNet's statements regarding its relationship with
Highmark could not be deemed false just because Jefferies also
had a relationship with Highmark that CardioNet was not privy to.
There is no suggestion in the Complaint, moreover, that CardioNet

falsely characterized its past interactions with Highmark over the reimbursement rate.

The plaintiffs also have not adequately pled scienter as to these statements. They do not contest that CardioNet contacted Highmark regarding the Kennedy Report and that Highmark gave CardioNet the reassurances that the defendants shared with the public. We cannot hold that CardioNet's decisions <u>not</u> to contact Jefferies regarding its sources and to stop communications with the firm were "extreme departure[s] from the standards of ordinary care" for a publicly traded company and its executives. If we held otherwise, such a company would be required to contact <u>every</u> analyst who issued an unfavorable report based on information that differed from the company's. Perhaps more intriguingly, the analyst would then presumably be required to divulge his or her sources, so that the company could determine whether its sources or the analyst's sources were more credible.

The defendants did not need to carry out such an interrogation to avoid liability for fraud regarding these statements. A reasonable investor would understand that CardioNet and Jefferies simply had different sources of information and could determine for themselves which entity was more likely to be correct. The plaintiffs also fail to adequately allege that

CardioNet knew or acted recklessly regarding a reimbursement rate cut that was supposedly "imminent." In fact, Highmark <u>itself</u> announced around May 18, 2009 that the reimbursement rate would remain at $1,123, so we do not see how any of CardioNet's statements before that time regarding whether the reimbursement rate was likely to change could be actionable.

**Paragraph 85(b):** The plaintiffs again claim that the defendants' statements regarding the close nature of their relationship with Highmark and other payors were false and misleading for the reasons they stated in ¶ 75(b). We agree with the defendants that the plaintiffs have failed to adequately plead a Rule 10b-5 violation as to this issue, for the reasons we describe above as to ¶ 75(b).

**Paragraph 85(c):** As we discuss earlier, the defendants reiterated the guidance that they gave in February of 2009 regarding the company's earnings and other issues. The plaintiffs allege that it was materially false and misleading for them to do so because "the guidance factored in only a relatively small long-term reimbursement rate decline but, had defendants spoken with Mr. Kennedy or others at Jefferies concerning the April 24 Report, they would have learned that a significant reimbursement rate cut was imminent, and that this key assumption underlying

their market guidance was materially in error." Compl. at ¶ 85(c). They claim that the defendants' reiteration of the February guidance also gave the public the false impression that Jefferies received no information from Highmark regarding an impending rate cut and that the Kennedy Report was therefore wrong. The plaintiffs repeat their claim from ¶ 75(c) that any information Jefferies received about a rate cut for the code under which MCOT is billed is "is tantamount to providing information specific to CardioNet and, perhaps, one or two of its closest competitors." Id. at ¶ 85(c). For the reasons we discuss earlier in this Memorandum, the defendants had no duty to speak to Kennedy or Jefferies, and they did not claim that they had done so; the defendants were not reckless when they repeated what Highmark and CMS told them, especially as they made clear that Highmark and CMS were the sources of that information.

According to the facts in the Complaint, the defendants simply did not make a false or misleading statement about their communications with Highmark; the investing public could, again, easily distinguish between the defendants' claims about their relationship with Highmark and Kennedy's argument that Highmark was not telling CardioNet the whole story. The Exchange Act simply does not oblige executives to monitor their own

relationships with third parties -- such as Highmark -- and <u>also</u>
to monitor the third parties' relationships with others, such as
Kennedy and Jefferies.

As to the size of the reimbursement rate cut, the defendants
disclosed that they assumed that any cut would be small, and a
reasonable investor could have read the Kennedy Report and
decided that CardioNet was mistaken in that assumption. Such a
<u>mistake</u>, however, does not rise to the level of scienter required
for the defendants to be liable under Rule 10b-5.

**Paragraph 85(d):** In response to an analyst's question
regarding CardioNet's "'assumptions for reimbursement going
forward,'" Thurman made the "'hand in glove'" comment and stated
that "'candidly the argument is just as strong that we could
justify a higher level of reimbursement as there would be any
reduction.'" <u>Id.</u> at ¶ 84. The plaintiffs argue that this
statement was materially false and misleading because the
defendants had "no basis to lead the market to believe that a
reimbursement rate increase was just as likely as a reimbursement
rate decrease," especially because the company's early investors
sold large amounts of stock in CardioNet's IPO and secondary
offering, which the plaintiffs contend demonstrated that those

investors believed the reimbursement rates would go down. Id. at 85(d).

As the defendants argue, early investors' stock sales in 2008 have little, if any, bearing on whether their statements at least eight months later were false. We agree that the plaintiffs have not pled facts to show that there is any connection between reimbursement rates and the actions of early investors. Moreover, other than the plaintiffs' blanket statement that the defendants had "no basis" to claim that the reimbursement rate was just as likely to go up as to go down, the plaintiffs have not pled any facts to support their allegation that this statement was false and have thus not pled falsity with particularity. We also note that Highmark announced around May 18, 2010 that the reimbursement rate would stay the same, which supports the reasonableness of the defendants' statement.[18]

**Paragraph 85(e):** The plaintiffs allege that the defendants' general statements regarding their expectations as to reimbursement rates were also materially false and misleading because CardioNet did not "apprise itself of likely reimbursement

---

[18] Indeed, we cannot imagine a better confirmation for the prediction that the rate was just as likely to go up as to go down. The rate actually stayed the same, precisely lodged between an increase and a decrease.

rate cuts by its commercial [*i.e.*, private insurance] payors."
*Id.* at ¶ 85(e). According to CardioNet's June 30, 2009 press
release, some commercial payors did reduce their reimbursement
rates. But the plaintiffs have failed to plead facts with
particularity as to whether CardioNet's representations on that
issue were false, *e.g.*, which payors reduced the rates, when they
did so, or how CardioNet learned that information. They have also
failed, with respect to the commercial payors, to plead scienter
with particularity.

**Paragraph 85(f):** The defendants stated that the company was
receiving an increasing percentage of its revenue from MCOT,
which offset declines for the Holter and event monitoring
devices. The plaintiffs claim that these statements were
materially misleading because Highmark was more likely to review
the reimbursement rate as Medicare got more claims for MCOT
"including claims that may have been outside the strict
limitations of coverage" under the Highmark Bulletins we describe
above. *Id.* at ¶ 85(f). The plaintiffs do not plead any facts that
could support a claim that Medicare actually received -- or had
any unusual problems with -- such non-qualifying claims, but they
nonetheless amorphously aver that "such increasing and

potentially abusive claims would increasingly push Highmark" to cut the MCOT reimbursement rate. Id.

The plaintiffs also claim that Highmark would be more likely to scrutinize the rate as CardioNet encouraged increased use of MCOT and less use of the Holter and event devices, in alleged "contradiction of Highmark's limitations on usage of the MCOT system." Id. The plaintiffs plead no facts regarding any effort by CardioNet to encourage physicians to inappropriately prescribe MCOT, but they nonetheless argue that this dynamic "would only temporarily make the Company's reported revenues and earnings appear better" and would also encourage Highmark to reduce the approved rate for MCOT. Id. We agree with the defendants that the Complaint contains no particular facts to support the plaintiffs' claim that Highmark even considered these issues when it set the reimbursement rates. Because the plaintiffs have failed to plead facts to support their theory of falsity -- and, we note, failed to plead facts to show that the defendants had the requisite scienter to make this supposedly misleading statement -- we agree with the defendants that this statement is not actionable.

### 3. Defendants' Statements
### at the May 12, 2009 Conference

Thurman made a presentation at the Bank of America Health Care Conference on May 12, 2009, and the plaintiffs allege that several of the statements in that presentation and in the following question-and-answer session were materially false and misleading.

**Paragraph 87(a):** During the question-and-answer session and in response to a question about the reimbursement issue, Thurman stated that

> "[w]ell obviously we've been inundated in the last two weeks with this question since an analyst came out with a report claiming that he had spoken with the people of Highmark and that there was a pending $200 decrease in reimbursement. For starters that analyst has never spoken with Cardionet [sic] before that report came out or afterwards. We have about seven other analysts who cover the company, all of whom [Galvan] and I are in constant dialogue with. Most, if not all of them, have actually visited the company and sat down with [Galvan] and me, so, we certainly wish that that analyst had taken the extra effort and done the proper due diligence, which he did not."

Compl. at ¶ 86. The plaintiffs claim that Thurman's statement that Kennedy "had not conducted 'proper due diligence'" was materially false and misleading and that Thurman made the statement recklessly and without a reasonable basis because CardioNet did not speak with anyone from Jefferies regarding the

44

sources for the Kennedy Report and then banned Jefferies from
CardioNet's conference calls. Id. at ¶ 87(a). We agree with the
defendants that, in context, Thurman's comment about Kennedy's
lack of "due diligence" plausibly related only to the analyst's
failure to meet with or talk to anyone at CardioNet before
issuing his report and not to Kennedy's other research. Thurman
did not opine on any sources or bases for the Kennedy Report
other than Kennedy's lack of contact with CardioNet and
Highmark's claim that it did not give Kennedy or Jefferies
information. The plaintiffs do not allege, moreover, that Kennedy
had spoken with anyone at CardioNet, and we agree with the
defendants' contention that the plaintiffs have therefore failed
to plead falsity with particularity.

**Paragraph 87(b):** The plaintiffs again claim that Thurman's
statements regarding the relationship between CardioNet and
Highmark were false and misleading for the reasons they stated in
¶ 75(b). We will dismiss this claim for the reasons we discuss
above in relation to ¶ 75(b).

**Paragraph 87(c):** Thurman made other direct statements in
response to the Kennedy Report. He stated that "'[w]e've never
gotten any signal from Highmark that they're considering a price
reduction. Our interface with them has been nothing less than

45

extraordinary since the company was created. We're in absolute

constant dialogue with the individual at Highmark who would be

the decision maker, who absolutely denies that they provided any

information to this analyst whatsoever.'" Id. at ¶ 86. The

plaintiffs contend that these statements were materially false

and misleading because (1) Dr. Bloschichak -- who set the

reimbursement at Highmark -- did tell Kennedy that Highmark would

reduce the reimbursement rate for the code under which MCOT was

billed,[19] (2) Thurman gave the impression that Jefferies did not

get any information from Highmark about the rate cut and that the

Kennedy Report was thus false, and (3) on July 12, 2009,

CardioNet announced a reimbursement rate change and admitted that

it "had been aware" that Highmark was reviewing the reimbursement

rate. Id. at ¶ 87(c) (emphasis omitted).

Even if we assume that Dr. Bloschichak gave Kennedy inside

information, for the reasons we explain above that does not make

false or misleading Thurman's statement that Highmark told

CardioNet that Kennedy did not get that information from

Highmark. The facts in the Complaint also do not support a

_____

[19] Again, we discount this alleged fact due to the
insufficiency of the plaintiffs' factual averments regarding (1)
the confidential witnesses and (2) whether Dr. Bloschichak shared
the information with Kennedy or Jefferies at all.

46

finding of scienter that the defendants knew or recklessly
ignored what an individual at Highmark allegedly told Kennedy. At
worst, the defendants were naïve or negligent in taking Highmark
at its word on this issue. We therefore reject the plaintiffs'
first and second arguments regarding this statement.

As to the third argument, the fact that CardioNet knew at
some point before July 12, 2009 that Highmark was reviewing the
reimbursement rate does <u>not</u> mean that its statement on that issue
on May 12, 2009 -- more than two months earlier -- was false.
There are also no facts to support a finding that the defendants
knew a real or formal review -- as opposed to the usual, constant
review that Thurman described in the passage we quote in note 13
-- was underway <u>on May 12, 2009</u> or were extremely reckless in
ignoring that issue. Highmark's announcement around May 18, 2009
that it would <u>not</u> change the reimbursement rate constitutes a
powerful rebuttal to any claim of scienter regarding a denial of
a rate <u>cut</u> six days earlier.

**Paragraph 87(d):** According to the plaintiffs, Thurman's
statement on May 12, 2009 that FINRA and the SEC would
investigate the Kennedy Report was materially false and
misleading because Thurman did not disclose that he personally
asked those agencies to investigate the issue. The defendants

47

argue that the plaintiffs have failed to plead facts to show that Thurman made this statement with scienter. They contend that Thurman's actions on this point -- asking these bodies to investigate the Kennedy Report -- actually weigh against a finding of scienter because "it presumes that defendant Thurman intentionally engaged in securities fraud and then went to the very regulatory bodies that are charged with preventing such fraud to ask for an investigation." Def. Br. at 31.

The plaintiffs respond with a litany of examples in which others allegedly "mounted such aggressive counter-attacks to distract attention from their own malfeasance." Pl. Resp. at 43. We have little doubt that others may have done this, but the question before us is whether under the facts alleged "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324. For the reasons we discuss elsewhere in this Memorandum, we find that there are no facts to show that Thurman or any other defendant knew about the impending rate cut at that time -- on May 12, 2009 -- or made an extreme departure from the usual standard of care in not knowing about it. There are no facts to suggest that the defendants knew or should have known about the purportedly solid

inside resources behind the Kennedy Report. It is therefore not plausible, based on the plaintiffs' facts, that Thurman contacted the regulatory bodies about Kennedy's conduct in an effort to cover his own tracks. As such, even if his failure to disclose that he contacted the regulatory bodies <u>was</u> misleading, the plaintiffs have not adequately pled that he acted with the requisite scienter.

**Paragraph 87(e):** The plaintiffs contend that when Thurman stated "'that analyst has never spoken with Cardionet [<u>sic</u>] before that report came out or afterwards,'" it was materially false and misleading because (1) <u>other</u> people from Jefferies spoke with CardioNet employees before Jefferies published the Kennedy Report, "albeit not on the subject of the imminent reimbursement rate cut by Highmark," (2) Jefferies's employees called Galvan, but Galvan did not return their calls, and (3) CardioNet cut off communication with Jefferies after the Kennedy Report. Compl. at ¶ 87(e). But Thurman made this statement only about "'that analyst,'" not <u>all</u> of Jefferies. This statement is not false or misleading because it is limited to CardioNet's interactions with <u>Kennedy</u>, which -- it is undisputed -- were nonexistent. Thurman did not claim, for example, that CardioNet <u>had</u> tried to contact Jefferies, nor could anyone so infer from

49

his simple statement that "'that analyst'" had not spoken to
CardioNet.

### 4. May 18, 2009 Press Release

On May 18, 2009, CardioNet issued a press release, which
stated that the previous week Highmark had posted a reimbursement
rate of $1,123.07 for MCOT's code and that this rate was the same
that Highmark had set in the fall of 2008 when the AMA created
the code. Id. at ¶ 88. CardioNet's stock rose 15% the next day
and closed at $19.60 on May 19, 2009. Id. at ¶ 89.

**Paragraph 90:** The plaintiffs admit that the May 18, 2009
press release was "technically accurate", but complain that it
was nevertheless "materially misleading because it falsely
implied that (a) there had been no basis for the statements made
in [the Kennedy Report], (b) the posting of the reimbursement
rate indicated that the $1,123.07 rate would remain in place at
least through the end of 2009, and (c) Highmark was not
undertaking and would not undertake any further review of the
reimbursement rate for 2009." Id. at ¶ 90. Again, the plaintiffs
state that CardioNet did not speak with anyone at Jefferies to
learn the basis for the information in the Kennedy Report,
excluded Jefferies from conference calls, tried to discredit
Jefferies, and attempted to get regulatory bodies to investigate

the firm. <u>Id.</u> But the May 18, 2009 press release makes <u>no</u> reference to (1) the Kennedy Report, (2) how long the rate would remain in place, or (3) whether Highmark was undertaking or would undertake any other review. We agree with the defendants that the May 18, 2009 press release could not have misled investors for the reasons that the plaintiffs allege.

**Paragraph 92:** The plaintiffs claim that the statement regarding the stable rate was materially misleading for the same reasons they asserted in ¶ 85(f): that, in summary, increasing and "potentially abusive" use of MCOT would cause Highmark to examine and reduce the reimbursement rate, which would hurt CardioNet's revenues and earnings. We reject this argument for the same reasons we describe above as to ¶ 85(f).

### C. <u>Scienter</u>

We discuss above the plaintiffs' allegations regarding the defendants' scienter as to some specific statements, but it may be helpful for us to make some general observations on this issue, as well.

The plaintiffs contend that CardioNet's refusal to speak with Jefferies after the firm published the Kennedy Report was evidence that CardioNet did not want to face the truth regarding

51

the Kennedy Report. They appear to argue that CardioNet could

not reasonably comment on the Kennedy Report without speaking

first to Kennedy or Jefferies. We disagree. The plaintiffs do not

undercut the defendants' claim that they went directly to the

source and asked Highmark if it leaked information to CardioNet.

Although it may have been unwise or even negligent for CardioNet

to fail to go any further in investigating the supposed leaks

from Highmark, it was hardly an extreme departure from normal

practice.[20] This is especially true since the Kennedy Report did

not identify the source of Kennedy's "checks," much less state

---

[20] The plaintiffs unconvincingly rely on Helwig v.
Vencor, Inc., 251 F.3d 540 (6th Cir. 2001) (overruled on grounds
not relevant here). In that case, the Sixth Circuit held that the
plaintiffs sufficiently pled scienter as to the falsity of the
defendants' statements regarding the impact of pending
legislation on the defendant company when (1) an industry
executive had testified about those concerns before Congress, (2)
a company executive stated that "'tough times were ahead'"
because of the legislation, and (3) executives sold millions of
dollars worth of stock after the act was signed. Id. at 558. A
Vencor executive had also circulated an internal memorandum
regarding the legislation's potential impact on the company. Id.
at 545.

The plaintiffs accurately state that "[w]here favorable
predictions are made without regard to known adverse facts, such
statements are false and misleading," and then they describe
Helwig. Pl. Br. at 31 (emphasis added). But the executives'
actions at issue in Helwig -- selling their stock and warning
about "'tough times'" -- suggest that they knew the legislation
would pass and negatively effect their company. The plaintiffs in
this case make no cognate allegations.

that an influential person such as Dr. Bloschichak was

purportedly Kennedy's inside source.

The plaintiffs also complain about the defendants' refusal

to believe Kennedy's prediction on April 24, 2009 that Medicare

would cut the reimbursement rate, and they claim that the

defendants had no reasonable basis on April 28, April 30, and May

12, 2009 to state, e.g., that Highmark would not cut the

reimbursement rate, or that Highmark was not formally reviewing

the reimbursement rate, or that Highmark would only cut the

reimbursement rate by a small amount. But inconveniently for the

plaintiffs, around May 18, 2009 Highmark announced that the

reimbursement rate would stay the same. This flies directly in

the face of Kennedy's claim that Medicare would cut the rate

within "weeks." Kennedy's prediction came true by mid-July of

2009, but, between the Kennedy Report and the July change,

Highmark itself announced that the rate would not change. We

therefore cannot conclude as to the rate change that a

"reasonable person would deem the inference of [recklessness]

cogent and at least as compelling as any opposing inference one

could draw from the facts alleged."

Regarding the plaintiffs' arguments about the relationship

between the defendants and Highmark, they plead no facts to

support a claim that the defendants had any reason to fear that their relationship with Highmark was rocky, and they do not claim that the defendants lied when they said they spoke with Highmark often about the reimbursement rate. The plaintiffs do not counter the defendants' statement that they spoke with Highmark specifically about the Kennedy Report and that Highmark (1) gave the defendants <u>no</u> reason to believe that a rate change was imminent and (2) told the defendants that Highmark did not divulge inside information to Kennedy or Jefferies. The plaintiffs have suggested no reason that the defendants should have distrusted the information they received from Highmark, and they have therefore not pled that the defendants committed fraud when they took Highmark at its word and passed that information on to the public.

In summary, even if the plaintiffs adequately pled falsity with respect to any of the statements in the Complaint, we would still dismiss their claims because they have not sufficiently pled scienter. Under the facts in the Complaint, and viewing the allegations as a whole, "a reasonable person would [not] deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." <u>Tellabs</u>, 551 U.S. at 324.

## III. Conclusion

The plaintiffs have not pled both falsity and scienter with the particularity that the PSLRA demands as to any allegedly false statement referred to in the Complaint. We will therefore grant the defendants' motion to dismiss. As plaintiffs have in their Consolidated Complaint taken two bites at this apple, we will not afford a third bite.

**BY THE COURT:**


**__\s\Stewart Dalzell**